UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OSCAR SALAZAR, *et al.*, on behalf )
of themselves and all others )
similarly situated, )
                    Plaintiffs, )
 )
            v. )        Civil Action No. 93-452 (GK)
 )        *In Forma Pauperis*
THE DISTRICT OF COLUMBIA, )
*et al.*, )
                    Defendants. )
 )

**PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT ORDER OF
JANUARY 25, 1999, CONCERNING THE PROVISION OF
EPSDT SERVICES BY REQUIRING THE USE OF
THE STANDARD MEDICAL RECORDS FORM**

Plaintiffs hereby move for an order enforcing the January 25, 1999 Order Modifying the

Amended Remedial Order of May 6, 1997 and Vacating the Order of March 27, 1997 (hereafter

"Settlement Order") by requiring defendants to require use of the Standard Medical Records

Form (hereafter "SMRF") for all early and periodic, screening, diagnostic and treatment services

(hereafter "EPSDT") screening visits by the managed care organizations (MCO's) and District of

Columbia fee-for-service providers.  Plaintiffs further seek an Order that defendants use the

SMRF data warehouse as the sole source for reporting the participant ratio to the federal

government on the annual CMS Form 416.

As explained more fully in the attached memorandum, in the seven years since the

Settlement Order was entered by the Court, defendants have been unable to produce

independently verified results showing compliance with the participant ratio provision of the

Settlement Order, *i.e.*, the number of children who receive at least one complete EPSDT

screening visit per year.  In September 2001, this Court issued a Memorandum-Opinion which

found that, as to the participant ratio data for fiscal year 1999, "there is simply, and sadly, no accurate data on which to rely."  Mem. Op., Docket No. 857, p. 4.  The Court further found that "[a]ccurate and reliable information is the *sine qua non* of any enforcement or monitoring system."  *Id.*, p. 5.

In response to this Court's 2001 findings and its later rulings, after a three-year effort under the direction of Court Monitor Dr. Henry Ireys, defendants have developed a set of SMRF's with the participation of stakeholders, namely, the Department of Health, the MCO's, District of Columbia physicians who provide EPSDT services, and plaintiffs' counsel.  The SMRF's will serve to ensure that children receive complete EPSDT screens by reminding and prompting physicians about all five of the required elements of each visit.  The SMRF's will also document that a complete screen has occurred.  However, after all of this effort, and despite defendants' inability to show compliance with the participant ratio standards in the Settlement Order when their data are subjected to independent audit, defendants propose to make use of the SMRF's voluntary by physicians and the MCO's.

Plaintiffs' motion in the instant case seeks to enforce the EPSDT provisions of the Settlement Order.  Requiring defendants to make the SMRF program mandatory with the MCO's and the fee-for-service providers is appropriate, indeed essential, relief by which to enforce the provisions of the Settlement Order requiring the provision of complete EPSDT screens (para. 36), the tracking of all children as to whether they have received each aspect of a complete EPSDT screen (para. 37), accurate reporting by the MCO's (para. 46), and penalties for MCO's who do not satisfy the participant ratios (para. 45).

For the reasons set forth in the attached Memorandum, plaintiffs seek an Order of this

Court requiring defendants to make use of the SMRF's mandatory by the MCO's and fee-for-service providers and that defendants be required to use them as the basis for the Form 416 report.

## STATEMENT PURSUANT TO LOCAL RULE 7(m)

As set forth in paragraph 80 of the Settlement Order, plaintiffs' counsel attempted to confer with defendants' counsel, Robert C. Utiger, concerning this motion by sending a detailed letter on April 17, 2006, and requesting to be contacted to discuss the issues.  On April 28, 2006, Mr. Utiger contacted Sara Faulman, plaintiffs' counsel, and informed her that defendants oppose this motion.

Respectfully submitted,

/s/ Kathleen L. Millian

BRUCE J. TERRIS, Bar #47126
KATHLEEN L. MILLIAN, Bar #412350
LYNN E. CUNNINGHAM, Bar #221598
SARA L. FAULMAN, Bar #496679
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005
(202) 682-2100

JANE PERKINS
NATIONAL HEALTH LAW PROGRAM
211 N. Columbia Street, 2nd Floor
Chapel Hill, NC  27514
(919) 968-6308

May 2, 2006                                    *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OSCAR SALAZAR, *et al.*, on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 93-452 (GK) *In Forma Pauperis* |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT ORDER OF JANUARY 25, 1999, CONCERNING THE PROVISION OF EPSDT SERVICES BY REQUIRING THE USE OF THE STANDARD MEDICAL RECORDS FORM**

**FACTUAL BACKGROUND**

On March 2, 1993, plaintiffs filed the above-captioned class action, alleging widespread failures on the part of the District of Columbia to comply with federal law in its administration of the Medicaid program. Docket No. 1. On October 11, 1996, this Court issued an Opinion finding for the plaintiff class. *Salazar v. District of Columbia*, 954 F. Supp. 278 (D.D.C. 1996). On May 30, 1997, defendants filed their Notice of Appeal. U.S. Court of Appeals for the District of Columbia, Case Nos. 97-7094 and 97-7100. Before the appeal was decided, the District entered into a settlement agreement with plaintiffs. After a public hearing, this Court approved and entered the Settlement Order as an Order of the Court on January 25, 1999. Order Modifying the Amended Remedial Order of May 6, 1997 and Vacating the Order of March 27, 1997 (hereafter "Settlement Order").

The Settlement Order requires that when defendants enter a contract with a managed care

organization (hereafter "MCO") for the provision of early and periodic, screening, diagnostic and treatment services (hereafter "EPSDT") services, the contract must require the MCO to meet specific participant ratios for each year.  Para. 45; *see* pp. 8-9 below.  The participant ratio sets forth the percentage of eligible children who receive at least one complete EPSDT screening visit per year. Defendants are required by the Settlement Order to enforce these contract provisions. Para. 45.  The participant ratios are to be computed based upon instructions from Section 2700.4 of the CMS State Medicaid Manual, which requires that the five elements of an EPSDT screen set forth in the Medicaid Act, 42 U.S.C. 1396d(r)(1)(B), be provided before that screen can be counted for purposes of calculating participant ratios.  Para. 46; *see* pp. 6-7, 11 below.  The Settlement Order further requires that the participant ratios in paragraph 45 be verified by an independent party. *Ibid.*

### The Development of the Standard Medical Records Form (SMRF)

In or about August 2000, in response to the fiscal year 1999 Form 416, which showed extremely poor performance in the participant ratio (*see* p. 12 below), defendants informed the Court that they intended to develop a Uniform Encounter Form (hereafter "UEF") in order to document the provision of EPSDT services.  The development of the UEF by defendants took approximately two years.  After the form was introduced to District of Columbia EPSDT providers, Children's National Medical Center, a major provider, declined to use the UEF.  In response, the Court convened a meeting on December 23, 2002, with the parties and District of Columbia EPSDT providers to address the issue of documenting EPSDT screening visits.

On January 2, 2003, this Court entered an order in response to issues raised regarding the UEF in the meeting held on December 23, 2002.  Docket No. 912.  Paragraph 4 of the order

required Dr. Ireys to work with appropriate parties to develop "either an amended version of the Universal Encounter Form or to develop a more satisfactory mechanism * * *." As a result, over a period of nearly three years, the Standard Medical Records Form (hereafter "SMRF") was developed.

The SMRF's provide a means for defendants and the MCO's to verify that a complete EPSDT screen of all five of the federally required components has been provided to a recipient. Even more importantly, the SMRF's are likely to improve the quality of health care received by children by reminding and prompting physicians to perform all five required parts of a complete EPSDT screening visit. The development of the SMRF's is the result of efforts by Dr. Ireys, both parties, the MCO's, staff from the Bright Futures program, and pediatric physicians from the major EPSDT-providing institutions in the District of Columbia. All participants were in agreement that the SMRF's would collect appropriate data, be easy to use, and potentially reduce overall paperwork.

There are seven separate SMRF's: a form for children from birth to one month of age, from 2 to 4 months of age, from 6 to 9 months of age, from 12 to 18 months of age, from 2 to 5 years of age, from 6 to 10 years of age, and from 11 to 21 years of age. Pl. Ex. 1. Each form, based on the District of Columbia periodicity schedule, records all of the federally-required elements of a complete EPSDT screen, as well as other information recommended by the pediatric health providers.

Unlike the UEF, the SMRF's are the only form a provider needs to complete during an EPSDT visit. The original SMRF will be the child's medical record, which is kept at the physician's office, with the carbon-less copy sent to a database warehouse, where the database

3

administrator will enter the information into a District-wide, EPSDT database.  The EPSDT data warehouse will be available to physicians in the District of Columbia to obtain information about prior medical visits of children who come to them for treatment.  The SMRF's were pilot tested by physicians throughout the District in the summer of 2005.  The final versions were sent for printing on September 21, 2005.

Implementation of the SMRF's, which had been scheduled for October 1, 2005, has been delayed because defendants lacked a contract with a computer database administrator to operate the SMRF data warehouse.  Plaintiffs were informed on September 9, 2005, that the contract between the database administrator and the Medical Assistance Administration (hereafter "MAA") was almost complete.  However, on December 31, 2005, defendants informed plaintiffs and the Court that negotiations between MAA and the original database administrator had been terminated and that defendants would require additional time to secure an administrator.  Although a contract has not been entered and there is no date certain for implementation of the SMRF program as of the date this motion is being filed, plaintiffs seek a ruling on this motion.  In this way, if the motion is granted, defendants can begin to inform the EPSDT providers and the MCO's that use of the SMRF's is mandatory as of fiscal year 2007, which begins on October 1, 2006.

At the periodic in-chambers status conferences in this case, plaintiffs have repeatedly requested that defendants agree to make use of the SMRF's mandatory.  *See*, *e.g.*, Letter from Kathleen Millian to Judge Gladys Kessler, Sept. 6, 2005, Pl. Ex. 2 (excerpt), p. 6; Letter from Ms. Millian to Judge Kessler, Oct. 25, 2005, Pl. Ex. 3 (excerpt), p. 11.  Defendants have repeatedly responded that they will not agree to require the use of the SMRF's for participation in

4

the EPSDT program.  *See, e.g.*, Letter from BJ Wolf to Judge Kessler, Sept. 9, 2005, Pl. Ex. 4

(excerpt), p. 3; Letter from Ms. Wolf to Judge Kessler, Oct. 31, 2005, Pl. Ex. 5 (excerpt), p. 6.

Pursuant to paragraph 80 of the Settlement Order, plaintiffs wrote defendants a detailed letter

about this matter on April 17, 2006, and requested to meet with defendants to discuss it.  Pl. Ex.

6.  However, defendants have been unwilling to discuss making use of the SMRF's mandatory.

Therefore, plaintiffs seek a ruling from the Court.

**I**

**DEFENDANTS ARE VIOLATING FEDERAL LAW AND THE SETTLEMENT
ORDER BY FAILING TO ENSURE ACCURATE REPORTING
OF REQUIRED EPSDT SCREENS**

**A.     FEDERAL LAW REQUIRES DEFENDANTS AND THEIR MCO'S TO PROVIDE
AND TRACK ALL COMPONENTS OF AN EPSDT SCREEN**

The Medicaid Act requires state plans for medical assistance to provide "such methods of

administration * * * as are found by the Secretary to be necessary for the proper and efficient

operation of the plan * * *."  42 U.S.C. 1396a(a)(4)(A).  The implementing regulations require

that states must ensure through their contracts with MCO's that, at a minimum, each MCO must

comply with the collection of data "on enrollee and provider characteristics * * *, and on services

furnished to enrollees through an encounter data system or other methods * * *" and "[e]nsure

that data received from providers is accurate and complete * * * ."  42 C.F.R. 438.242(b)(1) and

(2).  This regulation enables states to comply with 42 U.S.C. 1396u-2(a)(5)(C) (requiring plan-

specific comparative information on quality and performance be made available to beneficiaries)

and 42 U.S.C. 1396u-2(c) (requiring the Secretary to monitor quality assessment and

improvements).

5

Specifically regarding EPSDT, the Medicaid Act requires state Medicaid plans to provide for (42 U.S.C. 1396a(a)(43)(D)):

> reporting to the Secretary (in a uniform form and manner established by the Secretary, by age group and by basis of eligibility for medical assistance * * *) the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year: (i) the number of children provided child health screening services, (ii) the number of children referred for corrective treatment * * * , (iii) the number of children receiving dental services, and (iv) the State's results in attaining the participation goals set for the State under section 1396d(r) of this title.

Regulations require states to submit all reports required by the Secretary, according to the Secretary's instructions with regard to form and content. 42 C.F.R. 431.16. The MCO's are also required to make "all collected data available to the State and upon request to CMS * * *." 42 C.F.R. 438.242(b)(3).

Section 1396d(r) of the Medicaid Act requires that an EPSDT screening include, at a minimum, a comprehensive health and developmental history, a comprehensive unclothed physical examination, age appropriate immunizations, age appropriate laboratory tests (including lead blood level assessments), and health education. 42 U.S.C. 1396d(r)(1)(B)(i)-(v). Section 1396d(r) further provides that participant goals shall be set by the Secretary. Section 5310(A) of the State Medicaid Manual describes the District's "Program Monitoring, Planning and Evaluation" obligations by requiring the District to "[d]esign and employ methods to assure that children receive (1) those screening services initially or periodically requested or due under the periodicity schedule * * *." Section 5360(B) of the State Medicaid Manual also sets forth annual EPSDT participant goals. For fiscal year 1995 and beyond, the goal "is for each State to achieve an 80-percent EPSDT participant ratio * * * ." *Ibid*.

Section 2700.4 of the State Medicaid Manual provides instructions to the states on filling out the Health Care Financing Administration (hereafter "HCFA") (now the Centers for Medicare and Medicaid Services (hereafter "CMS")) Form 416, which is used to report on the number of EPSDT screens each state provides for each fiscal year.  The instructions state (*id.*, instructions, line 7):

> If [the State] permit[s] screening components to be administered by different providers, [the State] must first verify that all appropriate components have been furnished before reporting a complete initial or periodic screening service.  An initial or periodic screening service may be reported as complete if one or more of the required five components were not administered because the screening provider determines them to be medically contraindicated or inappropriate to age and health history.  Incomplete screening services which lack medical justification due to failure to administer one or more of the required five components are not be [sic] reported.

Section 5360(D) further allows the states to report a screen "only if the * * * complete set of activities comprising a screening service has been furnished."  In addition, the federal Medicaid agency has unequivocally stated that the complete set of services to be reported for Form 416 purposes must include all five components.  Letter from Christine Nye, Director of the Medicaid Bureau of CMS (then HCFA), to the Dallas Regional Administrator, Aug. 8, 1991, Pl. Ex. 7, pp. 2-4.[1]

---

[1] According to the Office of Inspector General of the Department of Health and Human Services (OIG), there is "more complete EPSDT documentation when providers used preprinted forms that detail the appropriate services for a child at a given age.  These forms correspond to the State's periodicity schedule * * *."  OIG, Medicaid Managed Care and EPSDT, OEI-05-93-00290 (May 1997), Pl. Ex. 25 (excerpt), p. 8.

**B.**    **THE SETTLEMENT ORDER REQUIRES THE PROVISION OF EPSDT SERVICES TO CHILDREN AND ACCURATE TRACKING AND REPORTING OF THESE SERVICES**

Paragraph 36 of the Settlement Order requires defendants to "provide or arrange for the provision of early and periodic, screening, diagnostic and treatment services (EPSDT) * * *." Paragraph 37 requires that children in the District of Columbia be tracked as to whether they have received complete EPSDT screening services:

> * * * Defendants shall ensure that the Managed Care Organizations (MCO's) with which it contracts to provide EPSDT services to children maintain a tracking system for all children that shows:
>
> (a) by name and Medicaid identification number, whether each child has obtained the screens, as defined in 42 U.S.C. 1396d(r)(1)(B), and laboratory tests set forth in the District of Columbia periodicity schedule issued in accordance with 42 U.S.C. 1396d(r)(1)(A)(i), 1396d(r)(2)(A)(i), 1396d(r)(3)(A)(i), 1396d(r)(4)(A)(i), at the times set forth in that schedule, including lead blood screens, mental health screens, dental services, and vision and hearing tests (hereafter "screens and laboratory tests");
>
> (b) by name and Medicaid identification number, whether each child has received age-appropriate immunizations * * *;
>
> (c) by name and Medicaid identification number, whether and on what date(s) each child has been referred for corrective treatment determined to be necessary as a result of an EPSDT screen or laboratory test; * * *.

Paragraph 45 of the Settlement Order sets forth the annual participant ratio requirements that defendants must ensure are met by each of the MCO's with which the District contracts to provide EPSDT services.  For fiscal year 1999 and thereafter, all MCO's are required to meet an 80% participant ratio.  Paras. 43(b), 45(b).  These participant ratios are to be "computed in accordance with HCFA State Medicaid Manual, Section 2700.4 * * *."  Para. 43(a).  Paragraph 46 specifically requires that:

8

Defendants shall comply with the HCFA State Medicaid Manual, Section 2700.4, in completing the HCFA Form 416. Defendants shall ensure that MCO's comply with the HCFA State Medicaid Manual, Section 2700.4, in providing information to be used in the HCFA Form 416 relating to whether the participant ratios in paragraphs 43, 44, and 45 above have been complied with.

Paragraph 46 further requires that defendants "* * * use an independent party to verify annually the data from each MCO used to compile the HCFA Form 416 used by Defendants to determine the participation ratios in paragraphs 43, 44, and 45."

Paragraph 39 requires that the contracts with the MCO's include the tracking system outlined in paragraph 37 and that defendants monitor and enforce the contractual provisions to ensure "that they are fully carried out." Paragraph 45(e) sets forth the penalties to be assessed to an MCO if it fails to reach the required participant ratios for fiscal year 2002 and any year thereafter. If the MCO fails to reach an 80% participant ratio, it must develop and implement an effective corrective action plan. If the participant ratio is less than 75%, the MCO must also be required to pay defendants "at least at a rate of $45 for each enrollee that is required to be added to the numerator in the MCO's EPSDT participant ratio to meet the 80% requirement." Paragraph 45(e) states that defendants "shall enforce these contractual requirements." The MCO's contracts with defendants further require the Contractor to be responsible for "any fines of [sic] sanctions imposed upon the District by the courts in which the Contractors [sic] failure to meet the requirements of Salazar v. The District of Columbia et al, or the contract." *See*, *e.g.*, MCO Contract #POHC-2002-C-0006, Oct. 2002, Pl. Ex. 8, section G.7.3, p. 158. The MCO's contracts further require that EPSDT screening tools include the five mandatory EPSDT components. *Id.*, section C.8.3.1.5, pp. 52-53.

As we will see below (pp. 12-17), the audits conducted by defendants for 1999-2001

9

demonstrate that the self-reports of the MCO's about well-child screening are not reliable.  Yet,

defendants rely on those MCO self-reports for purposes of imposing the financial penalties that

are required under the Settlement Order and the contracts with the MCO's.  The MCO's

therefore pay little, if any, financial penalties under the Settlement Order.  As a result, the penalty

provisions of the Settlement Order are for practical purposes rendered almost useless.[2]

---

[2]The amount the MCO's must pay in penalties is trivial in comparison to the amount that they are paid by defendants to provide full and complete EPSDT services for each child.  For example, in 2002, Chartered Health Plan was paid the following per member / per month payments (D.C. Chartered Health Plan, Inc., Contract #POHC-2002-D-005, Pl. Ex. 9, section B.6.2 Supplies/Services, p. 7)):

> age 2 to 12 months: $252.59;
> age 1 to 12 years: $101.43;
> age 13 to 18 years: $181.81 (average of female and male rates); and,
> age 19 to 20 years: $152.46 (average of female and male rates).

The Form 416 data for Chartered Health Plan for fiscal year 2002 (Pl. Ex. 10, line 3a) states that, after multiplying the total number of eligibles by the average period of eligibility, the total months of eligibility per age category are:

| <12 mos. | 12-35 mos. | 3-5 yrs. | 6-9 yrs. | 10-14 yrs. | 15-18 yrs. | 19-20 yrs. |
|---|---|---|---|---|---|---|
| 5,919 | 12,049 | 35,365 | 49,167 | 53,477 | 40,527 | 12,071 |

Assuming *arguendo* that 60% of the children in the 10-14 year old category are between 10 and 12 years of age and 40% are between 13 and 14 years of age, the total amount of money paid to Chartered Health Plan for the fiscal year 2002 Medicaid enrollees was approximately $27,643,414.  Chartered's self-reported participant ratio for fiscal year 2002 was 72%.  Pl. Ex. 10, line 1.  Therefore, according to Chartered's unaudited self-report, 28% of children enrolled with Chartered who were due for one or more EPSDT screening service failed to receive even one screening service.  Under the terms of the Settlement Order, in 2002, defendants required Chartered to pay $59,085 in stipulated penalties.  This figure represents 0.2% of the total amount paid to Chartered by defendants to provide EPSDT services to the 23,813 children under Chartered's care.

While these numbers are not exact, they provide an example of how little incentive the MCO's currently have, based on the stipulated penalty amounts, to ensure compliance with the EPSDT participant ratio requirements.  Plaintiffs note that the stipulated penalty amounts in the Settlement Order are a floor; defendants would be free to increase the amount of stipulated penalties in order to create a real incentive to the MCO's to increase the EPSDT participant ratio in a manner that withstands audit.  Plaintiffs further note that the MCO contracts give defendants the authority to set additional performance standards and penalize the MCO if the standards are

Paragraph 46 requires that the data used to compute the participant ratios on the Form 416's be based upon Section 2700.4 of the CMS State Medicaid Manual and that the MCO's participant ratios be audited annually by an independent party.  Moreover, paragraph 77 of the Settlement Order, which relates to termination of the Order, requires that defendants comply with the participant ratio requirements for three consecutive years.  Defendants cannot satisfy paragraphs 46 and 77 by having inaccurate data.  Thus, unless adequate data can be obtained, the Settlement Order is likely to continue indefinitely.

C.     **THE DENTAL ORDER OF 2004 REQUIRES THE PROVISION OF EPSDT DENTAL SERVICES TO CHILDREN AND ACCURATE TRACKING AND REPORTING OF THESE SERVICES**

The Order of October 18, 2004, concerning the provision of dental services under the EPSDT program (hereafter "Dental Order") requires defendants to provide oral health examinations to at least 80 percent of EPSDT-eligible children in both the 6-12 months-old age category and 12-24 months old age category by September 30, 2007.  Docket No. 1033, para 2(e)(i)-(ii).  According to the District's medical periodicity schedule, oral health examinations for children in these age categories are required as a part of the physical examination.  Without the oral health examination for children in these age categories, the physical examination is not complete.  Because the audits did not substantiate the reported number of children receiving complete screens (*see* pp. 12-17 below), there is no way to ensure that children in this age group with a reported EPSDT screen actually received an oral health examination.  Until they can ensure that the reported physical examinations for these children included an oral health

---

not met.  Pl. Ex. 8, section C.16, p. 113.  To the best of plaintiffs' knowledge, defendants have not set such additional standards or penalized the MCO's under this provision.

examination,  defendants are also in violation of the Dental Order

**D.**      **DEFENDANTS HAVE FAILED TO COMPLY WITH BOTH FEDERAL LAW AND THE SETTLEMENT ORDER WITH RESPECT TO EPSDT REPORTING**

     **1.**      **The EPSDT Screening Services Reported by Defendants and the MCO's for Fiscal Year 1999 Were Inflated**

In 1999, based in large part on the MCO's self-reported participant ratios, defendants reported to the federal government participant ratios ranging from 38% to 55%.  CMS Form 416, Fiscal Year 1999, Pl. Ex. 11, line 10; Pl. Ex. 12, line 10; Pl. Ex. 13, line 10.[3/]  MCO participant ratios were reported as 41%, 50%, and 61%.  Pl. Ex. 11, line 10 (CN); Pl. Ex. 12, line 10 (CN); Pl. Ex. 13, line 10 (CN).

On December 7, 2000, an independent auditor submitted a report, pursuant to paragraph 46 of the Settlement Order, with regard to the MCO's 1999 participant ratios.  Delmarva Foundation for Medical Care Inc., District of Columbia, External Quality Review Agent, "Calendar Year 1999, District of Columbia Medicaid MCO, Executive Summary of Systems Performance Review, EPSDT & Medical Record Review Findings," Dec. 7, 2000, Pl. Ex. 14 (excerpt).  After reviewing each of the MCO's medical records for those children who received a reported EPSDT screen, Delmarva found that the "medical records that were reviewed rarely contained documentation of all of the required components of a reportable well child exam." *Id.*, p. 8.  Further, "the MCOs may be inappropriately counting vision, hearing, and/or dental assessments as screening services." *Ibid.*  Most importantly, Delmarva was able to verify only an 11% participant ratio based on all five components of a complete EPSDT screen.  *Id.*, p. 7.  Thus, the Form 416's for fiscal year 1999 hugely exaggerated the participant ratio.

_____

[3/]Defendants submitted three versions of the HCFA (now CMS) Form 416.

2.      **The EPSDT Screening Services Reported by Defendants and MCO's for Fiscal Year 2000 Were Inflated**

For fiscal year 2000, based in large part on the MCO's self-reported participant ratios, defendants reported to the federal government a participant ratio of 70%.  CMS Form 416, Fiscal Year 2000, Pl. Ex. 15, line 10.  The MCO's self-reported a participant ratio of 81%.  *Id.*, line 10 (CN).

The independent audit for fiscal year 2000 used a method that reviewed only data from the second quarter of 2000, from April to June.  Delmarva Foundation for Medical Care Inc., "Evaluation of Participating Managed Care Organizations for Calendar Year 2000, Section III. Early and Periodic, Screening, Diagnosis and Treatment (EPSDT)," Pl. Ex. 16 (hereafter "Delmarva 2000 Report") (excerpt), p. III-9.[4]  To conduct the 2000 study, Delmarva relied upon data submitted to MAA, enrollment data from the MCO's, and the medical records.  *Id.*, p. III-10. From April to June 2000, the MCO's self-reported, in aggregate, that 22% of the children had at least one EPSDT screening encounter.  *Id.*, p. III-12.  However, Delmarva concluded that only 3% of children had received a complete EPSDT screen.  *Ibid.*  Again, the MCO data hugely exaggerated the number of complete EPSDT screens.

Not surprisingly, the Delmarva study found "that there is a significant problem with the MCOs reporting a screening service."  Delmarva 2000 Report, p. III-13.  Because of the reporting problems, Delmarva stated that (*ibid.*):

[I]t is imperative that each MCO have some sort of mechanism for validating the

---

[4]The Delmarva 2000 Report was divided into individual reports regarding each of the MCO's. Each individual report contained identical language regarding the methodology of the report and the aggregated EPSDT validation results.  Therefore, although this exhibit is from HSCSN's report, the language is identical to the reports for all of the MCO's.

data that is reported to DC MAA.  By inappropriately identifying complete services, children are put at risk for not receiving the recommended care.  MCOs cannot appropriately follow up and track children accurately if they believe that all services are complete.

To the best of plaintiffs' knowledge, the MCO's have never been required by MAA to validate the EPSDT screening numbers that they report to the District.  Yet, these unverified, self-reported numbers from the MCO's are used by the District to complete its annual CMS Form 416 and are the basis for MAA's determination of whether to impose or not to impose financial penalties.[5]

**3.     The EPSDT Screening Services Reported by Defendants and the MCO's for Fiscal Year 2001 Were Inflated**

For fiscal year 2001, based in large part on the MCO's self-reported participant ratios, defendants reported to the federal government a participant ratio of 79%.   CMS Form 416, Fiscal Year 2001, Pl. Ex. 17, line 10.  The MCO's self-reported a participant ratio of 93%.  *Id.*, line 10 (CN).

On May 16, 2002, Wanda Tucker, then Deputy Director of MAA, stated that the Delmarva Audit for fiscal year 2001 would not involve a medical record review and admitted: "MAA agrees that if Delmarva conducts a medical review to validate CMS 416 data for 2001 and thereafter, the results would be similar to results for 1999 and 2000."  Letter from Ms. Tucker to Kathleen Millian, Pl. Ex. 18, p. 1.  Ms. Tucker stated that the review for fiscal year

---

[5]Moreover, as we have set forth above (pp. 8-9), the District is not complying with a separate requirement of the Settlement Order in accepting the self-reported numbers from the MCO's when it has reason to know, based on the audits, that they are not accurate.  See paragraph 46 ("Defendants shall ensure that MCO's comply with the [CMS] State Medicaid Manual, Section 2700.4, in providing information to be used in the [CMS] Form 416 relating to whether the participant ratios in paragraphs 43, 44, and 45 above have been complied with.").

2001 would include only claims and encounter data, identified by billing code.  Ms. Tucker

further stated that for 2002 and thereafter, MAA would validate the CMS Form 416 data by

auditing the Uniform Encounter Forms, combined with any other encounter and claims forms.

*Ibid.*

On February 28, 2003, defendants submitted the report for fiscal year 2001 to the Court.

Delmarva Foundation, External Quality Review Report, "Section VII, HealthCheck Early and

Periodic Screening, Diagnosis, and Treatment (EPSDT)," Pl. Ex. 19 (hereafter "Delmarva 2001

Report") (excerpt).  Defendants acknowledged that the "study revealed a significant disparity

between the data reported by the MCOs and the data calculated by Delmarva."  Letter from Ms.

Tucker to Judge Kessler, Feb. 28, 2003, Pl. Ex. 20.

For this study, the District only reviewed the MCO's claims data to ascertain whether

every reported visit had coding for a well-child visit.  Thus, there was no examination in 2001 of

whether the full five-part screening was given.  This was simply an examination of whether the

back-up claim documents supported the number of well-child screens reported.  As in the prior

audits based on medical records, the MCO's reported numbers of well-child screening services

did not match their documentation.

First, in January 2003, the auditor asked each MCO how many well-child EPSDT

screening visits they had performed in the six-month period of April-September 2001.  In early

2002, those figures were reported to the District for preparation of the Form 416 submitted to the

federal government.  Delmarva 2001 Report, Pl. Ex. 19, pp. 12-26.  When the MCO's looked

back at the April-September 2001 time period in January 2003, they derived different and lower

numbers than they had originally reported.  *Ibid.*  Four of the five MCO's had over-reported the

number of well-child screening services that they had provided to children within their care:

> Advantage reported in January 2003 68.8% fewer screens and that 46.5% fewer children received at least one screen in the April-September 2001 time frame than it had previously reported in early 2002 (Delmarva 2001 Report, Pl. Ex. 19, p. 13);

> Amerigroup reported 31.9% fewer screens and that 32.2% fewer children received at least one screen (*id.*, p. 16);

> Health Right reported 13.4% fewer screens and that 17.3% fewer children received at least one screen (*id.*, p. 22);

> Chartered reported 59.9% fewer screens and that 5.8% fewer children received at least one screen (*id.*, p. 19).

The second way that the MCO's numbers did not match their claims data related to whether the new, lower counts of EPSDT screens could be supported by claims data. The January 2003 data for all five MCO's overstated the number of well-child screening visits that could be verified with claims data. The audit showed that:

> Chartered self-reported a level of total screens 76.1% higher than the claims data showed and that 42.7% more children received at least one screen than the claims data showed (Delmarva 2001 Report, Pl. Ex. 19, p. 18);

> Advantage self-reported a level of total screens 14.1% higher than the claims data showed and a 20.1% higher number of children receiving one screen than the claims data showed (*id.*, p. 12);

> HSCSN self-reported a level of total screens 2.7% higher than the claims data showed and a 19.3% higher number of children receiving one screen than the claims data showed (*id.*, p. 24);

> Health Right self-reported a level of total screens 8.6% higher than the claims data showed and a 6% higher number of children receiving one screen than the claims data showed (*id.*, p. 21);

> Amerigroup self-reported a level of total screens 1.5% higher than the claims data showed and undercounted the number of children receiving one screen than the claims data showed by 0.5% (*id.*, p. 15).

As in previous years, the 2001 audit of MCO claims data demonstrates that the MCO's self-reports cannot be relied on.

**II**

**TO DEMONSTRATE COMPLIANCE WITH THE PARTICIPANT RATIO PROVISIONS OF THE SETTLEMENT ORDER, DEFENDANTS MUST REQUIRE USE OF SMRF'S TO DOCUMENT THE PROVISION OF EPSDT SERVICES**

**A.    DEFENDANTS HAVE REPEATEDLY REPRESENTED THAT THEY INTEND TO RELY UPON THE SMRF PROGRAM TO DEMONSTRATE COMPLIANCE WITH THE ORDERS OF THIS COURT**

Defendants have repeatedly stated their intention to utilize the information from the SMRF-populated database to show compliance with the Medicaid Act, the Settlement Order, and Dental Order.

In an October 31, 2005, letter to the Court defendants stated that "with the successful implementation of the SMRFs, Child Health Registry, and the transition of the Oversight Committee to one focused on quality, the District will be in position to take the lead on EPSDT and its documentation."  Pl. Ex. 5, p. 6.  Most recently, on March 30, 2006, in Defendants' Opposition to Plaintiffs' Motion to Amend the Court's Order of February 8, 2006 and Motion for Expedited Consideration, defendants stated that (p. 2) "the primary purpose of the SMRF is to enable the District to establish that it has met the requirements to terminate the EPSDT provisions in the Settlement Order."  Docket No. 1141.

In addition, defendants rely upon the SMRF data for compliance with the Dental Order. For example, in defendants' most recent oral health corrective action plan (CAP), submitted to the Court on March 24, 2006, defendants stated that a number of action items identified as a

17

means to eliminate the barriers to children receiving EPSDT dental services will be delayed until implementation of the SMRF program.  Pl. Ex. 22, pp. 2-5.  These items include a report regarding physician compliance in making dental referrals (p. 2), documentation of oral health examinations by primary care physicians (p. 3), centralizing how providers report dental screenings and treatment (pp. 4-5), and the creation of a standard reporting format for dental care (p. 5).  Moreover, in a letter to The Court on December 21, 2005, defendants concluded that appropriate oral health screening goals could not be determined at that time for children age 3 and younger because the parties are "relying on the successful implementation of the Standard Medical Record Form (SMRF) and the Child Health Registry."  Pl. Ex. 21, p. 2.

Defendants similarly rely on the SMRF program for the purpose of compliance with the blood lead testing requirements of 42 U.S.C. 1396d(r)(1)(B)(iv) and the CMS State Medicaid Manual, Section 5123.2D.  Settlement Order, para. 37.  In defendants' October 31, 2005, letter to The Court, they stated that "it is anticipated that the successful implementation of the Child Health Registry and the incorporation of lead data into that database will also improve reported results."  Pl. Ex. 5, p. 5.  In response to inquiries from plaintiffs regarding ways to increase the frequency of blood lead testing in physician's offices, defendants included a memorandum in their March 17, 2006, letter to The Court.  The memorandum, from Dr. Minerva V. Campos, Associate Medical Director of Health Right, Inc., to Patrina Fowler, CEO of Health Right, Inc., stated that, according to a physician from the SMRF committee, the "vastly improved well-child encounter form will prompt the provider in every instance to order the lead level at the appropriate times."  Pl. Ex. 23.  Furthermore, "the data derived from these new forms will highlight more accurately the reasons for inadequate blood lead screening * * *."  *Ibid*.  The

18

inclusion of this memorandum confirms that defendants intend to rely on SMRF data as opposed to developing new ways to improve access to blood lead tests.

In these circumstances, where defendants themselves have staked their ability to demonstrate compliance with this Court's orders on the use of data from the SMRF program, defendants cannot be permitted to make use of the SMRF's voluntary and thereby undercut what they assert is their primary source of verifiable information about the provision of EPSDT services.  As shown above, neither plaintiffs nor the Court will be able to rely on reported EPSDT data without the SMRF's.  Even more importantly, many children will continue not to receive the screens essential to their health.

**B.     REQUIRING THE USE OF STANDARDIZED FORMS IS AN APPROPRIATE REMEDY FOR DEFENDANTS' FAILURE TO MEET AUDITED STANDARDS FOR THE PROVISION OF EPSDT SERVICES**

**1.     This Court Has the Authority to Order Defendants to Require Use of the SMRF's**

State officials can be held liable for a failure to monitor whether recipients are actually receiving EPSDT services.  In *Bond v. Stanton,* 655 F.2d 766, 770-772 (7th Cir. 1981)*,* certiorari denied, 454 U.S. 1063 (1981), the Court of Appeals for the Seventh Circuit held that Indiana's EPSDT program violated federal law, because, *inter alia*, it failed to monitor whether EPSDT-eligible children received the complete screening services required by federal law.  The court stated that "Indiana has no way of knowing whether a child had received a complete screen." *Id.* at 770.  Furthermore, Indiana had no system of "required or consistent feedback from the Medicaid provider who performs the screen * * *." *Id.* at 771.  *See also John B. v. Menke*, 167 F. Supp. 2d 786, 802-803 (M.D. Tenn. 2001) ("Meeting EPSDT screening requirements is a duty *

19

* *"); *Oklahoma Chapter of the American Academy of Pediatrics v. Fogarty*, 366 F. Supp. 1050,

1113 (N.D. Okla. 2005) (finding as a conclusion of law that the State Medicaid Manual imposes

monitoring obligations upon defendants and that state officials can be held liable for failing to

comply with monitoring obligations).

In this very case, this Court held that "* * * Defendants * * * do not monitor whether

EPSDT-eligible children receive complete screening services * * *." *Salazar v. District of*

*Columbia*, 954 F. Supp. 278, 329 (D.D.C. 1996).  The Court further found that "* * * Defendants

have no system for enforcing those data collection requirements or for utilizing that data to

ensure that EPSDT-eligible children are receiving complete screening services as required under

federal law." *Ibid*.

The Settlement Order addresses the failure of the District to monitor whether EPSDT-

eligible children receive complete screening services by requiring defendants to meet an audited

standard for the provision of EPSDT care.  Para. 46.  Plaintiffs have shown above that the

evidence from repeated audits establishes that most children reported to have received complete

EPSDT screens have not in fact received them and that the reporting of EPSDT screening rates

by the MCO's and the District of Columbia are totally inconsistent with the audits (pp. 12-17).

Morever, until the SMRF data warehouse is operational, defendants will not have the tracking

system required by paragraph 37 of the Settlement Order.

In *Frew v. Hawkins*, 540 U.S. 431 (2004), the Supreme Court unanimously held that a

consent decree "'embodies an agreement of the parties' and is 'an agreement that the parties

desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to

the rules generally applicable to other judgments and decrees.'"   540 U.S. at 904 (quoting *Rufo*

20

*v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992)).  Thus, federal courts have

jurisdiction over the consent decrees they have approved and are not reduced to * * * hoping for

compliance.  Once entered, a consent decree may be enforced."  *Frew v. Hawkins*, *supra*, 540

U.S. at 905.  To do so, "vindicates an agreement that the state officials reached to comply with

federal law."  *Ibid*.

Plaintiffs' motion in the instant case seeks to enforce the EPSDT provisions of the

Settlement Order.  Requiring defendants to make the SMRF program mandatory with the MCO's

and the fee-for-service providers is appropriate, indeed essential, relief by which to enforce the

provisions of the Settlement Order requiring the provision of complete EPSDT screens (para.

36), the tracking of all children as to whether they have received each aspect of a complete

EPSDT screen (para. 37), accurate reporting by the MCO's (para. 46), and penalties for MCO's

who do not satisfy the participant ratios (para. 45).

### 2.   This Court Has Previously Granted Relief Related to Accurate EPSDT Reporting

On June 8, 2001, pursuant to paragraph 48 of the Settlement Order, the Court Monitor,

Dr. Henry Ireys, submitted a report to the Court (hereafter "Paragraph 48 Report").  The

Paragraph 48 Report concluded, *inter alia*, that a critical activity for data collection was "to

collect data uniformly on EPSDT encounters, with sufficient specificity to document all

components of a complete screen."  Pl. Ex. 24 (excerpt), table 2, p. 6.  Based on this report, on

July 23, 2001, plaintiffs' filed their Motion for an Order pursuant to Paragraph 48(d) of the

Settlement Order (hereafter "Pl. 48(d) Motion").  Docket No. 847.

Plaintiffs' Memorandum in Support of their 48(d) Motion (pp. 3, 5-7) requested that,

*inter alia*, pursuant to the Paragraph 48 Report's recommendations, defendants require the MCO's to implement the UEF with their providers.  On September 17, 2001, this Court issued a Memorandum-Opinion which found that, for the Form 416 data for fiscal year 1999, "there is simply, and sadly, no accurate data on which to rely."  Mem. Op., Docket No. 857, p. 4.  The Court further found that "[a]ccurate and reliable information is the *sine qua non* of any enforcement or monitoring system."  *Id.*, p. 5.  The Court then ordered defendants to submit a time line for final adoption and implementation of the UEF (*id.*, p. 10), a form this Court stated was "the single most essential component for achieving compliance with the Settlement Order's central requirement * * * that a tracking system be implemented."  *Id.*, pp. 5-6.

As stated above (pp. 2-4), the utility of the UEF was subsequently questioned, leading to the development of the SMRF's.  Seven years after entering the Settlement Order, it is essential that this Court issue an order requiring defendants make use of the SMRF's mandatory.

### 3.     The MCO's and Physicians Are Likely to Support the Mandatory Use of the SMRF's

The MCO's were invited to participate in the SMRF oversight group during the entire period of its work.  Representatives of all of the MCO's attended meetings at various points in the process.  All of the MCO's came to agreement with MAA and the Department of Health (hereafter "DOH") about making incentive payments to all District of Columbia EPSDT providers to encourage them to use the form in its first year of operation.

Moreover, on January 10, 2006, in a letter from Leslie Lyles Smith, Senior Vice President of Health Plan Services and Market Development for Chartered Health Plan, to BJ Wolf, Ms. Smith stated that "we concur with the Plaintiff's [sic] recommendation to use completed

Standard Medical Record Forms (SMRF) in the data warehouse as the source for the CMS 416 report.  Using one District wide source such as the SMRF will help to gain consistent, more accurate reporting."  Pl. Ex. 26, p. 1.  Thus, Chartered, the second largest MCO, supports mandatory use of the SMRF forms.

In addition, physicians associated with Chartered, Children's National Medical Center, Unity Health Care, and Georgetown University Hospital were in the core group of physicians who developed the medical content of the SMRF forms.  These institutions, which constitute a large percentage of the EPSDT providers in the District of Columbia, have committed to using the SMRF's.  In addition, the MCO's have worked with MAA and DOH to develop and fund a plan to pay participating providers a set amount for each fully completed form in its first year of use.  The reimbursement should attract a large number of providers in the first year, making the transition to the second year less burdensome because providers will have become accustomed to its use.  Consequently, there is no reason to assume that any significant number of providers will refuse to use the SMRF's if defendants require their use.

## CONCLUSION

It has been nearly ten years since this Court determined that defendants lacked accurate and reliable information for determining whether children are receiving the EPSDT care to which they are entitled.  It has been more than five and one-half years since the Court issued an order requiring defendants to set a time line to develop and implement a uniform encounter form to track and monitor the MCO's compliance with EPSDT requirements.  Now, we are finally near the point where a standardized EPSDT reporting program is ready for use.

The only way to ensure that the MCO's are actually providing children within their care

the federally-mandated EPSDT screening services is through accurate EPSDT reporting.  For the reasons set forth above, plaintiffs request that the Court issue an order requiring defendants and the MCO's to mandate the use of the SMRF's for fiscal year 2007 and thereafter.  A proposed order is attached.

Respectfully submitted,

/s/ Kathleen L. Millian

BRUCE J. TERRIS, Bar #47126
KATHLEEN L. MILLIAN, Bar #412350
LYNN E. CUNNINGHAM, Bar #221598
SARA L. FAULMAN, Bar #496679
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100


JANE PERKINS
NATIONAL HEALTH LAW PROGRAM
211 N. Columbia Street, 2nd Floor
Chapel Hill, NC 27514
(919) 968-6308

May 2, 2006                               *Counsel for Plaintiffs*

24

LIST OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| 1 | Standard Medical Records Forms |
| 2 | Letter from Kathleen Millian to Judge Gladys Kessler, Sept. 6, 2005 (excerpt) |
| 3 | Letter from Kathleen Millian to Judge Gladys Kessler, Oct. 25, 2005 (excerpt) |
| 4 | Letter from BJ Wolf to Judge Gladys Kessler, Sept. 9, 2005 (excerpt) |
| 5 | Letter from BJ Wolf to Judge Gladys Kessler, Oct. 31, 2005 (excerpt) |
| 6 | Paragraph 80 Letter to Robert Utiger, April 17, 2006 |
| 7 | Letter from Christine Nye to the Dallas Regional Administrator, Aug. 8, 1991 (excerpt) |
| 8 | HSCSN Contract #POHC-2002-C-0006, Oct. 2002 (excerpt) |
| 9 | CHP Contract #POHC-2002-D-0005 (excerpt) |
| 10 | Fiscal Year 2002 Form 416 Data for CHP |
| 11 | Fiscal Year 1999 Form 416 |
| 12 | Fiscal Year 1999 Form 416, amended version |
| 13 | Fiscal Year 1999 Form 416, amended version |
| 14 | Delmarva Report for Calendar Year 1999 (excerpt) |
| 15 | Fiscal Year 2000 Form 416 |
| 16 | Delmarva 2000 Report (excerpt) |
| 17 | Fiscal Year 2001 Form 416 |
| 18 | Letter from Wanda Tucker to Kathleen Millian, May 16, 2002 |
| 19 | Delmarva 2001 Report (excerpt) |
| 20 | Letter from Wanda Tucker to Judge Gladys Kessler, Feb. 28, 2003 |
| 21 | Letter from BJ Wolf to Judge Gladys Kessler, Dec. 21, 2005 (excerpt) |
| 22 | Oral Health CAP, March 24, 2006 |
| 23 | Dr. Minerva V. Campos, Memorandum Regarding Blood Lead Level Screening at Point of Service, March 7, 2006 |

| 24 | Dr. Henry T. Ireys, Paragraph 48 Report, June 18, 2001 (excerpt) |
| 25 | OIG Report, OEI-05-93-00290, May 1997 (excerpt) |
| 26 | Letter from Leslie Smith to BJ Wolf, Jan. 10, 2006 (excerpt) |