UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OSCAR SALAZAR, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 93-452 (GK) |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) | |
| Defendants | ) | |

**DEFENDANTS' MOTION TO VACATE THE COURT'S ORDER GRANTING INJUNCTIVE RELIEF DATED OCTOBER 18, 2004**

Comes now the Defendant, District of Columbia, by undersigned counsel and moves this Court to vacate the Court's Order granting injunctive relief, dated October 18, 2004. This motion is supported by Declarations with attached exhibits and a Memorandum of Points and Authorities, which are incorporated by reference as if set forth at length herein. A proposed Order is attached.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ROBERT C. UTIGER [437130]
Senior Counsel to Deputy Attorney General

RICHARD S. LOVE [340455]
Chief, Equity I

_______/s/_____________
DENISE J. BAKER [493414]
Assistant Attorney General, D.C.
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
202-442-9887

CERTIFICATE PURSUANT TO LCvR 7.1(m)

The undersigned Assistant Attorney General hereby certifies that on May 15, 2006, during a telephone conference with counsel for plaintiffs, he advised counsel of the District's intention to file the within motion to vacate the Court's order granting injunctive relief dated October 18, 2004, to which plaintiffs' counsel advised that they did not consent.

____/s/___________________________
ROBERT C. UTIGER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OSCAR SALAZAR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 93-452 (GK) |
| | ) | |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| ______________________________ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO VACATE ORDER GRANTING INJUNCTIVE RELIEF DATED OCTOBER 18, 2004**

## I. INTRODUCTION

This Court required the Defendants (collectively the "District") to meet a series of specific goals related to dental services for children in an Order entered on October 18, 2004 ("Dental Order"). For example, the District must show that by September 30, 2007, at least 80 percent of Early and Periodic Screening Diagnostic and Treatment (EPSDT) eligible children three (3) years old and older receive a dental service in the previous 12 months. The federal EPSDT laws and Paragraph 36 of the January 25, 1999, Settlement Order were cited for support of the Order, and underlying relief granted to plaintiffs.

It is appropriate for this Court to vacate its Dental Order for the following reasons:

- The Injunction is Not Supported by Evidence Showing that the January 25, 1999 Settlement Order or the February 28, 2003 Order were Violated
- The Injunction is Not Supported by Evidence that the District has Failed to Provide and Arrange for Appropriate Dental Services When Requested By or in Behalf of Children as Required by 42 U.S.C. § 1396d(r)(3)
- The Injunctive Relief Imposed is Not Tailored to Cure a Constitutional or Federal Law Violation
- The Order Enjoins the District to be an "Insurer" of Dental Care for EPSDT Participants to an Inequitable Strict Liability Standard

- The Relief Ordered Vastly Exceeds the Standards set by the Federal and Local Agencies Administering the Programs

**1. The February 28, 2003 Order Pertains Solely to Providing Notice**

The stated purpose of the Dental Order was to enforce a February 28, 2003, Order and a January 25, 1999, Settlement Order. The Dental Order's injunctive relief, however, far exceeds the mandate of the February 28, 2003, Order being enforced.

The February 28, 2003, Order required that the District mail, to all EPSDT households with resident children, a written notice describing the EPSDT dental benefit. The notice had to include a telephone number for recipients to call with questions and for assistance in scheduling dental appointments; translated into Spanish, as necessary; and, include all information required in paragraph 58 (a)-(e) of the Settlement Order concerning dental benefits. Plaintiffs have not alleged, much less proved, that the required notices were not given.

**2. The January 25, 1999 Settlement Order Was Not Violated**

The January 25, 1999 Settlement Order contains several provisions relating to dental services. Paragraph 36 provides "Defendants shall provide or arrange for the provision of early and periodic, screening, diagnostic and treatment services (EPSDT) when they are requested by or on behalf of children." Paragraph 49 states that "Defendants' periodicity schedule shall require dental services at least annually for children age six (6) through twenty (20)." Paragraph 51 states, "Defendants shall offer scheduling and transportation assistance prior to the due date of each eligible child's periodic screening . . . when this assistance is requested." "Defendants shall assure that children and their parents or guardians shall be provided assistance, when requested and necessary, with transportation to EPSDT appointments" provides paragraph 52. In paragraph 57, the Defendants are required to give "written material describing EPSDT services

in simple terms when they first visit the provider and on subsequent visits, unless the provider has given the recipient such material within the preceding year."

In summary, this Court's two prior Orders requiring that the Defendants provide outreach and education to dental practitioners and program recipients, and arrange for the provision of covered services when requested arose from the requirements of the Settlement Order in this case. The Orders require transportation to the dental practitioners when the class members make the requests.

By comparison, respectfully, the Dental Order finds no basis in the terms of the Settlement Order or the underlying Medicaid statute. It is far-reaching; it sets mandatory, unrealistic timetables for dental services participation. More importantly, it transforms a federal law requirement to effectively inform Medicaid recipients of the availability and importance of dental services, instead, into a requirement to coerce, cajole, or convince plaintiffs into using these services.

The Dental Order inappropriately requires the government to impose dental services upon private individuals in the absence of proof that the services were requested or desired. In effect it holds the District strictly liable for the choices freely made by the parents of Medicaid eligible children. Further, the Dental Order legislates that the District controls the number of dental professionals available to see Medicaid eligible children. It does so, not only in the absence of any federal requirement to achieve a specific dentist to recipient ratio, but in the absence of any evidence that a single child was denied dental services within a reasonable time of requesting such services. In summary, the Dental Order is not crafted to achieve the mandates of the original Orders, federal law or constitutional mandates.

## II. PROCEDURAL HISTORY

Plaintiffs sought this Court's equitable jurisdiction to enjoin the District to take certain measures that Plaintiffs assumed would increase the utilization of dental services by children in the District's Medicaid program. Plaintiffs' assumptions were factually deficient and legal arguments in support were incorrect.

Plaintiffs' framed their request as a Motion to Enforce the Settlement Order, dated January 25, 1999, and a February 28, 2003, Order relating to Medicaid-funded dental services. The Court responded to Plaintiffs' Motion to Enforce the Settlement Order by entering a sweeping and pervasive order commanding that 80 percent of all children be served by the District's Medicaid Program by September 30, 2007, in an Order dated October 18, 2004.

The District moves this Court to vacate the October 18, 2004, Order, which enjoins the District to achieve by 2007, among other things, these Court ordered goals for eligible children:

- No less than 80 percent of children, ages 6-24 months, must receive an oral health assessment by a primary care provider

- 85 percent of school age children must receive an oral health screening by a dentist upon entering school for the first time

- 70 percent of all 8-14 year-old children must receive protective sealants on their permanent teeth.

## III. ARGUMENT

### A. THE INJUNCTION IS NOT SUPPORTED BY EVIDENCE SHOWING THAT THE JANUARY 25, 1999 SETTLEMENT ORDER OR THE FEBRUARY 28, 2003 ORDERS WERE VIOLATED.

#### 1. Introduction

The District has systematically provided dental services when requested by or on behalf of a Medicaid eligible child.[1] Paragraph 36 requires the provision of early and periodic screening, diagnostic and treatment services, when they are requested, and that the District and the Managed Care Organizations ("MCO") provide these services. There is no evidence to refute this statement of fact; yet, the Court was led by Plaintiffs to find otherwise, based upon faulty underlying assumptions. Most importantly, Plaintiffs' underlying assumption, that low dental participation was the result of an inadequate delivery system and that children for whom dental services are affirmatively sought are effectively denied such services. This assumption has no basis in the record or in fact.

Plaintiffs incorrectly persuaded this Court to believe that all children who are EPSDT-eligible requested dental services, when, as a matter of fact and law, that is not the case. (Pls' Reply at 3). They incorrectly asserted, and, respectfully, the Court accepted, that completion of the District's Medicaid application is tantamount to requesting dental services. (Pls.' Reply at 3). Plaintiffs fail to understand the non-compulsory nature of the EPSDT program, which misled

---

[1] See Generally, Declaration of Cesar D. Martinez, Chief Operating Officer at Chartered Health Plan (hereinafter referred to as "Chartered Declaration," ATTACHMENT "A," attached hereto and made a part hereof; Declaration of Dianne Houston, Health Promotion Director, AMERIGROUP Corp. (hereinafter referred to as "AMERIGROUP Declaration," attached hereto as ATTACHMENT "B," and made a part hereof; and Declaration of Sheritha R. Davis, Director of Health and Mental Health Services at Health Right, Inc. (hereinafter referred to as "Health Right Declaration," attached hereto as ATTACHMENT "C," and made a part hereof. Chartered AMERIGROUP, and Health Right maintain contracts with the D.C. Department of Health to provide a full array of Medicaid services to District residents.

the Court to the legally unsustainable finding that 100% of all Medicaid-eligible children had requested dental care and that the District had failed to honor the requests.

Utilization of dental benefits by the recipients is entirely voluntary after the District fulfills the conditions precedent of notice and outreach. If the recipients, after being fully informed *choose* to utilize the covered dental benefits, the District is responsible for referral and transportation for the recipients to and from dental appointments. Plaintiffs have made no argument, much less provided any evidence, that the District has systemically or even sporadically failed to meet these obligations.

It is not for the government to impinge upon the free will of the Medicaid recipient to force dental care participation. The District cannot and should not be ordered to ensure that every District child who may be eligible for EPSDT services actually receive these services. *Westside Mothers v. Olszewki, 368 F. Supp. 2d 740, 770 (E.D. Mich. 2005).* The right is created for those individuals who qualify for and actually request such services. *Id.* Medicaid was simply not intended to require the States to force parents to make the decisions Plaintiffs' counsel thinks proper.

**2. The District and Its Managed Care Organizations (MCOs) Performed Outreach and Education to Eligible Families as Required by the Settlement Order and the February 28, 2003 Order.**

Outreach strategies, defined as systematic efforts to inform families and the public at large about the importance and availability of dental services, currently include: (1) periodic mailings and announcements generally sent by the MCOs to families and providers for distribution to families, (2) MCO-provided incentives for families to make and keep dental appointments, and (3) neighborhood health fairs and special events such as "Give Kids A Smile Day" sponsored by the DC Dental Society. (Ireys Report, page 17 ¶D).

**a) Dental Contact Information**

All of the MCOs provide dental contact information to recipients upon their request. For example, AMERIGROUP maintains a Dental Member Services hotline at 1-800-608-9542 through which members can obtain dental provider contact information. *(AMERIGROUP Declaration, Attached as Exhibit A at ¶ 23). I*n addition, AMERIGROUP maintains a separate Nurse Advice Line that members can access through the AMERIGROUP Member Services hotline to provide guidance to members on specific dental problems at 1-800-600-4441 any time of the day or night and 7 days per week. *(Id.)*

Chartered Health Plan Outreach workers personally contact each new enrollee to welcome them to Chartered and ensure that the new enrollees understand the dental services available to them and their rights under the Plan. *(Chartered Declaration, Attached as Exhibit B at ¶ 18).* This outreach effort escalates from telephone contact, initially, followed by letters and finally home visits to assure appropriate outreach to the enrollees. *(Id. at ¶ 19).*

Health Right new enrollees receive the EPSDT bilingual brochure, which tells the enrollees that dental examinations are part of EPSDT health services, and include telephone numbers for enrollees to obtain help with transportation, ask questions, or schedule appointments. *(Health Right Declaration, Attached as Exhibit C at ¶ 14).* New enrollees also receive Primary Care Provider Directories, which include the contact information of available dentists. *(Id. at ¶ 15).*

**b) Dental Appointment Scheduling Assistance**

All of the MCOs assist recipients with scheduling dental appointments upon their request. For example, when a recipient requests assistance with the scheduling of an appointment,

including a dental appointment, the MCOs will schedule an appointment and then telephone the Medicaid enrolle to inform them of the appointment time and place.

Health Rights takes a multi-step approach to coordinate and assure dental services to enrollees. Prior to each office visit, Health Rights calls the enrollee. A second telephone call is made and a letter is mailed to the enrollee. If this is not effective, a face-to-face visit is made at the enrollee's home. *(Health Right Declaration, ¶ 18)*. Chartered uses a similar approach; but additionally, sets up three-way telephone conferencing with the dental office and enrollee to coordinate appointment scheduling. *(Chartered Declaration, ¶ 21, 24)*. AMERIGROUP contacts the enrollees by mail and telephone, if a regular dental appointment is missed; however, when contact with the enrollee fails after four attempts by telephone or mail, a home visit is made to personally educate the enrollees of the importance of regular screenings. *(AMERIGROUP Declaration, ¶ 9).*

**c) Transportation Assistance**

All of the MCOs arrange transportation to dental appointments for recipients who request such services. When an enrollee contacts an MCO requesting transportation for an appointment, the MCO contacts a taxi company or comparable transportation provider, schedules a pick-up date and time, and often confirms the pick-up in writing with the taxi company or other transportation provider. Alternatively, MCOs issue transportation vouchers to enrollees.

AMERIGROUP offers transportation services free of charge to enrollees. This free transportation service is available for enrollees traveling to and from the dental appointment. The only requirement of the enrollee is to telephone 1-800-600-4441 to arrange for the transportation. *(AMERIGROUP Declaration, ¶ 10).* Chartered provides transportation services to enrollees as well. *(Chartered Declaration, ¶ 3).* Contacting Chartered Member Services

Representatives at 1-800-408-7511 is the sole condition precedent for receipt of transportation services to the dental appointments. *(Id.)*

Health right provided round-trip transportation to health care appointments for 1,609 enrollees, 1,537 enrollees, and 1,850 enrollees to promote the utilization of dental services. *(Health Right Declaration, ¶ 20).* All that is required of the enrollee is to contact the Health Right Customer Service Department, which will then schedule a pick-up date and time, confirm the transportation via fax to the taxi company or issue a transportation voucher. *(Id.)*

### 3. The District and Its MCOs Performed Provider Education for Medical Practitioners as Required by the Settlement Order.

MCOs sponsor or participate in clinical training programs and orientations. MCOs also provide assistance to pediatricians and dentists in finding appropriate referrals to dental care. *(Ireys Report, page 16 ¶B).*

Health Rights provides new dental providers orientation and training in partnership with clinical sites. *(Health Rights Declaration, ¶ 9).* Health Rights' own Provider Relations staff conducts annual on-site visits and periodic updates to dentists within the network. *(Id.)*

All new Chartered primary care providers must attend a provider orientation/education program; existing providers attend quarterly training sessions to reinforce the stringent requirements for dental screenings and other dental services. *(Chartered Declaration, ¶ 9-13).* Written materials provided at these educational programs specifically state that "[A]ll Medicaid children must have a documented inspection of the oral cavity at each visit whether or not teeth have erupted. A referral to a dentist is required by age 3 if not done sooner." *[Id. at Ex. 9]*.

AMERIGROUP requires that each dentist attend an orientation/education program as well. The dental providers are trained in relevant screening, diagnosis and treatment requirements for compliance under EPSDT. *(AMERIGROUP Declaration, ¶ 13).*

Two District-wide conferences have been held since 2003 to inform stakeholders about dental needs, availability of dental services, and other concerns.

**4. The District Provides and Arranges for Appropriate Dental Services as Required by 42 U.S.C. § 1396d(R)(3).**

The District has performed all federal mandates concerning EPSDT services by performing the following four activities:

> (A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including [EPSDT services], of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,
>
> (B) providing or arranging for the provision of such screening services in all cases where they are requested,
>
> (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and
>
> (D) reporting to the Secretary. . . .

Federal law does not require that a specific number of children use dental services. Federal law does not require that a jurisdiction maintain an adequate number of dental practitioners within its borders to serve EPSDT clients.[2] The Settlement Order and the February 28, 2003 Order are not in accord with federal law. It begs the question, therefore, whether there is an equitable basis for compelling the Defendant to increase participation by EPSDT clients or dental practitioners.

---

[2] Though, as set-forth in the attached declarations the MCO's clearly maintain dental provider networks, which are more than adequate to meet the needs of their enrollees.

**B. THERE WAS NO EVIDENCE BEFORE THE COURT THAT EPSDT DENTAL SERVICES WERE NOT PROVIDED OR ARRANGED FOR EPSDT PARTICIPANTS WHEN REQUESTED.**

Plaintiffs' have provided no evidence that Medicaid children are requesting services, but not receiving services due to a lack of available dentists or outreach, notice, or transportation provided by the District. That is because Plaintiff's cannot meet that burden of proof.

**1. Plaintiffs Failed to Met Their Burden that the Number of Participating Dental Practitioners is Insufficient.**

Plaintiffs provide no evidentiary support for the conclusion that a dental practitioner participation shortage exists. The closest Plaintiffs come to providing any factual predicate for their assertion is that "14 dentists are plainly an inadequate number to care for the 11,060 children over the age of 3 in fee-for-service Medicaid in fiscal year 2003." *(Plt. Memo at 9.)* This statement is based upon a fallacious basis and misled the Court to an incorrect conclusion.

The U.S. Department of Health and Human Services set the acceptable ratio of dentist to population at 1:4000 in the District of Columbia. See Deft. Exhibit I. Based upon the District's population, therefore, the standard for the requisite number of dentists has been met, even if the Medicaid fee-for services program had 56,000 participants, many times the actual number.

Similarly, the MCOs, with which the District contracts for dental services, provide more than adequate dental service providers. Health Right's dental service plan has 130 dentists, of which 4 are pediatric dentists; AMERIGROUP has 151 dentists (some of who are pediatric dental specialists); and Chartered Health Plan has 90 dentists of which 9 are pediatric dental specialists.

More importantly Plaintiffs have not presented one instance where the unavailability of a dentist resulted in anything more than a *de minimus* delay in scheduling an appointment.[3]

**2. Plaintiffs Fail to Meet Their Burden that Long Wait Times or Travel Inconveniences Negatively Impacted Dental Service Utilization.**

Plaintiffs made no attempt to meet their burden of proving that low dental services utilization was linked to long wait times or travel inconveniences. Fallaciously, Plaintiffs beg the question that because these factors impact the participation ratios, then these conditions must exist because participation rates are low.

Plaintiffs did not attempt to prove that District Medicaid participants must travel long distances to or that wait time for a dental appointment is longer for the District's Medicaid population than for the general public. Nor have they presented evidence or even argument that Medicaid recipients wait longer in dental offices than the general population. Having failed to establish this threshold factual predicate, Plaintiffs can not possibly demonstrate that long wait and travel times are barriers to dental participation in the District.

In fact, the District provided every Medicaid household with children older than three (3) years with dental services notice and outreach by way of an outreach form approved by Plaintiffs. Still parents of Medicaid eligible children failed to avail themselves of services awaiting them.

---

[3] Defendant notes that in the single example Plaintiffs put forth to support their assertion that there is a lack of dentists serving the Medicaid population, Plaintiffs counsel themselves, with a few phone calls, found several dentists willing to promptly see their client. Ms. Bush however, declined to schedule an appointment, a "failure" Plaintiffs and this Court's order would fully attribute to the District Government.

### 3. Plaintiffs Fail to Meet Their Burden that Paragraph 36 of the Settlement Order was Violated by Defendants.

Plaintiffs did not allege that even one single class member requested EPSDT dental services, but failed to receive them. Plaintiffs did allege, however, that one class member's parent requested dental services, but failed to avail her son of the service by her own volition.

In an affidavit, the class member's parent requested a list of dental providers from her son's MCO. A list was provided by the MCO.[4] Thereafter, the class member's parent called the dental providers to schedule an appointment for her son, but apparently encountered minor scheduling difficulties. Ultimately, the class member's parent succeeded at finding a dental provider who was able to see her son, but then the parent "declined" to take her son to this provider. The class member's parent made no further effort to request dental services from her son's MCO.

Evidence before the Court was consistent with the assumption that the EPSDT participants received a direct referral to a dentist. None of the six obstacles for obtaining preventive dental care identified by Dr. Ireys in his report relate to the failure to receive a dental referral. *(Pls.' Mot. Ex. 1 at 2)*. Many of the obstacles, in fact, relate to the parents' attitude toward dental services. *(Id.)* For instance, parents may not understand the importance of dental check-ups, may give preventive dental visits low priority when under numerous demands of their time, and may have their own negative experiences with dentists which make them reluctant to seek dental care for their own children. *(Id.)* Thus, low utilization rates can occur even after a direct referral to a dentist which has been made in satisfaction of Defendants' obligation to provide a comprehensive screening.

[4] The list provided to the class member by the MCO was not a complete list of all dental providers, but only a "sample of participating dental offices." *(Pls.' Reply Ex. 33)*. Further, the list states: "If you need additional assistance in locating a dental office, please contact us at 1-800-390-1616 and we will be happy to assist you." *(Id.)*

## C. THE INJUNCTIVE RELIEF IMPOSED IS NOT TAILORED TO CURE A CONSTITUTIONAL OR FEDERAL LAW VIOLATION.

The standards for issuance and maintenance of an injunctive order have not been met. An injunction may be issued only when it is narrowly tailored to remedy the specific harm or wrong suffered. Federal courts may not order states or local governments, over their objections, to undertake a course of conduct not tailored to curing a constitutional violation. *Milliken v. Bradley, 433 U.S. 267 (1977) (Milliken II).* Conversely, an injunctive decree should be vacated based upon changed factual conditions that make compliance with the decree substantially more onerous. *Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992).*

The principles that this Court must be guided by in exercising its equitable powers are, "[r]estraint, economy, prudence, respect for other agencies of decision . . ., reasoned judgment, and above all fidelity to law." [5] A court's end purpose is to remedy the violation and then restore to state authorities complete control of the program's operations in compliance with federal law. *Freeman v. Pitts, 503 U.S. 467, 489 (1992) aff'd, 111 F.3d 9 (11th Cir. 1997).* The Dental Order, however, has taken considerable control over the District's Medicaid program in the absence of a showing of any violation of federal statutory or constitutional requirements.

It is a fact that utilization rates are not what the Court, Plaintiffs or the District would like. It may be true that dentists are sometimes unavailable, for many reasons, to care for eligible participants on as short a notice as the participant may want. The

[5] Ruth Bader Ginsburg, *Remarks on Judicial Independence: The Situation of the U.S. Federal Judiciary*, Presented at the University of Melbourne Law School. February 1, 2001. (Discussion of decisionmaking mores to which legions of federal judges adhere.)

Defendants ask that the Court recognize that the low dental participation rate in the District, which mirrors that in the rest of the country, is less an indictment of the implementation of the Settlement Order, and more a reflection of the scope of the problem. There are limits to the rolls of the courts in matters of policy. The neutral principles and constraints under which this Court should operate require that policy decisions be left to the state executive unless there is a clear violation of a specific federal statutory or constitutional mandate.

**1. Equity Does Not Support the Mandate to Achieve a Specific Dental Services Utilization Rate.**

No federally established mandate exists regarding utilization rates. The federal Medicaid Manual does not set a percentage guideline with respect to dental services, nor does the Medicaid statute. The federal Centers for Medicare and Medicaid Services (CMS) do not even require states to calculate specific ratios related to dental care.

The U.S. Department of Health and Human Services ("DHHS") has established a specific national "goal" for children's dental care; however it is not mandatory, and the federal goal is substantially lower than the 80 percent goal mandated by this Court. In addition, DHHS has recognized that even achieving the more modest aspirational goal of a 56 percent participation will take years longer than more aggressive improvement judicially mandated in this Court's order.

**2. Equity Does Not Support the Mandate to Achieve a Specific Number of Dental Practitioners in the Program.**

No federally established mandate exists to require a state to ensure that a specific number of dentists participate in the Medicaid program. Indeed, not even this Court's Dental Order requires a specific number of dentists and instead requires only that the District have a sufficient

number of dentists in the program. While the District maintains that it in fact has met this requirement under any reasonable definition of "sufficient" as a matter of law, this requirement cannot be found in the requirements of federal law.

Studies have shown, moreover, that enticing dentists with additional funds or easier paperwork, does not appreciably cajole the dentists to take additional or different patients. A report from the GAO (2000) indicated that 40 states increased Medicaid payment rates for dental care at least once in the late 1990s. Relying on assessments from state Medicaid officials, the GAO found that of these 40 states:

- 14 reported increases in dental participation or utilization
- 15 reported no increase in participation or utilization
- 11 states said either not enough time had elapsed since the rate increase or they did not have reliable data to report an effect

The states that reported increases in utilization had only **marginal increases** (i.e., less than 3 percentage points) which cannot be attributed solely to increased reimbursement rates because the states initiated other efforts simultaneously, such as outreach to recruit dentists (GAO 2000). This Court's dental order assumes that increased dental rates will achieve improvements from increased dental rates more than ten times those achieved in the minority of states that reported any improvement at all from increased rates.

**3. Equity Does Not Support Mandating Injunctive Relief that Exceeds the Standards Set by the Federal Agency Administering Medicaid and the Settlement Agreement.**

CMS is charged with the interpretation of the EPSDT regulations. It is CMS' interpretation that:

> The EPSDT statutory language states that State plans are to provide for "screening services in all cases where they are requested." The proposed regulation is consistent with this language. We think that forcing individuals to participate in the EPSDT program is not feasible and would be contrary to the intent of the statute. However, it is important to note that States are required to effectively inform all EPSDT recipients about the availability of EPSDT services, regardless of whether this information is requested or not.

*49 Fed. Reg. 43,654, 43,656 (Oct. 31, 1984).* CMS' interpretation is entitled to deference by this Court. *See, Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844 (1984). Accord, Westside Mothers v. Olszewski, supra.*

CMS recognizes EPSDT recipient's constitutional freedoms and liberty to participate or not participate, as well as flexibility, feasibility, and administrability of the program by the government, the dental practitioner, and Medicaid participants. *See, 49 Fed. Reg. 43654 at 43656* (CMS response to commentator that ". . . at various points the regulation underscores the fact that participation is EPSDT is voluntary. Screening, other health services, and transportation and scheduling assistance are provided only after the recipient, or recipient's family, requests the services.)

**4. The Order Enjoins the District to an Inequitable Strict Liability Standard**

The Dental Order overlooks the failure of guardianship over the minor class members, and seeks to hold the District strictly liable for a child's failure to avail him or herself of available dental services. Principles of equity underpin all orders for injunctive relief, and the equitable principle requiring Plaintiffs seeking equity to also do equity has been turned on its head to ascribe all faults and blame on the government for the failure of the Plaintiffs' guardian(s).

Plaintiffs' own pleadings show a failure of guardianship, no matter the systemic improvements instituted by the government to assure dental services to its resident children, and

is illustrated best in Plaintiffs' Reply Brief, Exhibit 34, to wit: According to the affidavit, the child's guardian, in fact the child's parent, requested a list of dental providers from her son's MCO. *(Id.)* A list was provided by the MCO.[6] *(Id.)* Thereafter, the parent called the dental providers to schedule an appointment for her son, but apparently encountered scheduling difficulties. *(Id.)* Ultimately, the class member's parent succeeded at finding a dental provider who was able to see her son. Nevertheless, the parent "declined" to take her son to this provider. *(Id.)* She made no further effort to request dental services from her son's MCO. In speaking to each of the dentists on the list provided by the MCO, Plaintiffs' Counsel learned that three of the dentists would be available to see the class member (not simply the one dentist as the class member had alleged). *(Pls.' Reply Ex. 32).*

This child's failure or inability to have his teeth cleaned, cavity filled or gum disease remediated is not the fault or responsibility of the District government. If the District is liable under the Dental Order for this child's failure to obtain dental service, then it may only be gainsaid that the Order holds the District strictly liable, and such an Order is de jure invalid.

The system envisioned by the Medicaid statute is in place: There is outreach; there is education; there is transportation to the dentists; there are dental providers and specialists; and, there is transportation from the dentist back to the home. This District has performed its conditions precedent to "lead a horse to water . . ." The dependent variable is the parent's decision whether or not to utilize the offered dental services. The Dental Order should not seek to make the District responsible for the decisions of the class-members parents. However much the Court, or indeed the District, disagrees with parental decisions not to utilize offered dental

[6] The list provided to the class member by the MCO was not a complete list of all dental providers, but only a "sample of participating dental offices." *(Pls.' Reply Ex. 33)*. Further, the list states: "If you need additional assistance in locating a dental office, please contact us at 1-800-390-1616 and we will be happy to assist you." *(Id.)*

services, nothing in the Medicaid statute gives either the District or the Court the right to compel a different decision. The Order should be vacated.

**5. Equity Does Not Support Mandating Dental Care Participation Rates upon Medicaid Families, the District Government or Dental Professionals.**

Federal law recognizes that the utilization of federal benefits is entirely voluntary. Defendants cannot force children to actually receive dental benefits in the absence of Congress establishing an affirmative duty on their parents and guardians to take advantage of services provided under the EPSDT provisions of Medicaid. The federal Medicaid Manual does not set a percentage guideline with respect to dental services; and, the CMS does not require the District to calculate specific ratios related to dental care. At most, the Congress and the HHS agency in support have issued non-binding aspirational goals for children's dental care. In Healthy People 2010, the federal Department of Health and Human Services would like for 57 percent of low-income children to receive one preventive dental visit per year; 50 percent of all 8 year olds and 50 percent of all 14 year olds should have dental sealants applied to their molars.

These federal dental care goals pall in comparison to the requirements of the Court's Dental Order. Respectfully, this Court's Order of October 18, 2004, does not flow from the requirements of federal law and constitutes health care policy making, an executive and legislative function and not a judicial function.

**6. Equity Does Not Support a Judicial Order Which Does Not Give Proper Deference to the Role of the Local Government to Resolve the Intricacies of Providing Social Services.**

The judiciary's role is to interpret and apply the laws as written by Congress, the rules of procedure adopted by the Supreme Court, and law and legal precedents announced by the

Supreme Court and the courts of appeals. Judges are **not** legislators or policymakers. The watchword for jurists should be "restraint".[7] Although judges have personal views and concerns about the policy judgments of Congress and administrative agencies, according to the Honorable David S. Tatel, U.S. Court of Appeals for the District of Columbia, "[J]udges have neither the expertise to resolve them nor the accountability to the electorate for doing so."[8] Judicial powers reach only so far, as a matter of law.

If Congress believes that a significant number of EPSDT children must receive dental sealants by the year 2007, then Congress and the administrative agencies surely have power and means at their disposal to achieve the goal. If the District administrators develop a means by which to provide dental services, this Court should respect them. It has long been held that the judiciary should defer to local government administrators who have the primary responsibility for elucidating, assessing, and solving the problem of program reforms, and resolving the intricacies of institutional programs. *Brown v. Bd of Education, 349 U.S. 294, 299 (1955).* The Dental Order invaded the purview of Congress and the Government of the District of Columbia, and as a matter of law and equity, should be vacated.

## IV. <u>CONCLUSION</u>

For the reasons of fact, law, and equity set forth above, and incorporated by reference, the Defendants should be granted the relief sought. The Dental Order dated October 18, 2004, should be vacated.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

---

7 *Toward Neutral Principles of Constitutional Law, 73 HARV. L. REV. 1, 14, 16 (1959)*

8 *Judicial Methodology, Southern School Desegregation, and the Rule of Law, 79 N.Y.U. L.R. 1071, 1074 (2004)*

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ROBERT C. UTIGER [437130]
Senior Counsel to Deputy Attorney General

RICHARD S. LOVE [340455]
Chief, Equity I

_______/s/_____________
DENISE J. BAKER [493414]
Assistant Attorney General, D.C.
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
202-442-9887