# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OSCAR SALAZAR, <u>et al.</u>,     :
                                             :

        Plaintiffs,     :

                                             :

       v.               :     Civil Action No. 93-452 (GK)

                                           :

DISTRICT OF COLUMBIA, <u>et al.</u>, :

                                           :

        Defendants.     :

## <u>MEMORANDUM OPINION</u>

Plaintiffs are a class of poor children who are eligible for Medicaid services in the District of Columbia. Pursuant to 42 U.S.C. § 1983, they initiated this action almost two decades ago in order to ensure that Defendants provide those services. During the course of this long and difficult litigation, parties were able to resolve their dispute in the form of a Consent Decree agreed to in 1999. For the past ten years, the Court has overseen Defendants' compliance with the terms of that Consent Decree.

This matter is now before the Court on Defendants' Motion to Terminate Consent Decree and Subsequent Remedial Orders and to Dismiss the Case ("Defs.' Mot.") [Dkt. Nos. 1456, 1481]. Upon consideration of the Motion, Opposition, Reply, numerous supplemental briefs and surreplies, and the entire record herein, and for the reasons stated below, Defendants' Motion is **denied** as to the private right of action issue.

**I.    BACKGROUND**

Prior opinions have described in some detail the lengthy and complicated history of this case.  See, e.g., Salazar v. District of Columbia, 123 F. Supp. 2d 8 (D.D.C. 2000); Salazar v. District of Columbia, 954 F. Supp. 278 (D.D.C. 1996) ("Salazar I").  The key pieces of the narrative are set forth herein.

In their Complaint, Plaintiffs brought seven claims against the District of Columbia.[1]    Complaint ¶¶ 103-25.    One of Plaintiffs' most far-reaching claims was that Defendants had failed to furnish "early and periodic screening, diagnostic, and treatment" ("EPSDT") services, as mandated by the Medicaid program, 42 U.S.C. § 1396a(a)(43).  Complaint ¶¶ 120-22.  Such a failure, they claim, is actionable under 42 U.S.C. § 1983.

In 1994, Judge Norma Holloway Johnson, to whom the case was originally assigned, ruled that Plaintiffs were permitted to bring six of the seven Medicaid claims under § 1983.  See Wellington v. District of Columbia, 851 F. Supp. 1, 3-6 (D.D.C. 1994).[2]  The Court held that "Section 1983 provides a private remedy for all of the Title XIX provisions except those in [P]laintiffs' third claim.

---

[1]    Three of the allegations in the Complaint were either resolved before trial or dismissed as a matter of law.  Salazar I, 954 F. Supp. at 280 n.4.

[2]    After Judge Johnson issued this Opinion, the lead Plaintiff became Salazar.

-2-

All of [P]laintiffs['] Title XIX claims except Claim III are sufficient to withstand the motion to dismiss." Id. at 6.

On July 1, 1994, the case was transferred to this Court [Dkt. No. 74]. After extensive pre-trial litigation, a seven-day bench trial was held in 1996, to resolve the dispute over Plaintiffs' EPSDT claim, as well as three additional claims. At the conclusion of the trial, a lengthy opinion set forth the Court's findings of fact and conclusions of law. Plaintiffs prevailed, under 42 U.S.C. § 1983, on each of the four claims that went to trial.[3] After the Court entered remedial orders to effectuate this ruling, Defendants appealed the judgment.

While the case was proceeding before our Court of Appeals, parties engaged in settlement negotiations. On September 23, 1998, those negotiations produced a proposed Settlement Order [Dkt. No. 624]. The next day, parties asked the Court of Appeals to remove the case from its calendar and requested remand back to this Court. On January 22, 1999, the Settlement Order was approved by the Court. Order Modifying the Amended Remedial Order of May 6, 1997 and Vacating the Order of March 27, 1997 ("Settlement Order") [Dkt.

---

[3]     The Court held that Defendants failed to "issue decisions and provide Medicaid coverage within 45 days after initial applications are submitted" (Claim 4); "provide advance notice of the discontinuance or suspension of Medicaid benefits" (Claim 5); "provide or arrange for the provision of [EPSDT] services to Medicaid recipients who request such services" (Claim 6); and failed to "effectively notify individuals of the availability of EPSDT services" (Claim 7). Salazar I, 954 F. Supp. at 280.

No. 663]. Since that time, this agreement has governed the case. There have been various consensual amendments made to the Settlement Order, as well as Court Orders resolving disputes over Defendants' compliance with the Order's requirements.

In March of 2009, the District of Columbia filed the instant Motion.[4] In it, Defendants argue, <u>inter alia</u>, that Plaintiffs have no private right of action to enforce the EPSDT provisions under § 1983, and, even if they do, Defendants have achieved compliance with federal law governing provision of such services. Defs.' Mot. at 1-2. On May 26, 2009, the Court concluded, at the suggestion of Defendants, that "the most efficient way to resolve the Defendant[s'] pending Motion" would be to first consider the discrete legal question of whether or not Plaintiffs have a private right of action to enforce the EPSDT provisions. Order (May 26, 2009) [Dkt. No. 1489]. Accordingly, briefing was conducted on only this legal issue, and was completed on September 18, 2009.

## II. ANALYSIS

Defendants argue that Rule 60(b) provides grounds for vacating the decision. Their chief argument is that a 2002 Supreme Court decision, <u>Gonzaga v. Doe</u>, 536 U.S. 273 (2002), represents an intervening change in law that alters the legal landscape on which

---

[4]     On May 20, 2009, Defendants re-filed the entire Motion, along with a complete set of numerous exhibits, as an Errata Motion [Dkt. No. 1481]. <u>See</u> Pls.' Mot. to Take Discovery, at 1 n.1 [Dkt. No. 1472].

the Settlement Order rests. Such a significant change, they maintain, makes Rule 60(b) an appropriate vehicle for re-arguing whether Plaintiffs have a private right of action to enforce the EPSDT provisions of Medicaid, a point previously decided in favor of Plaintiffs. See Wellington, 851 F. Supp. at 6.

Rule 60(b) permits a party to seek relief from a "final judgment, order, or proceeding" for various reasons. Fed. R. Civ. P. 60(b). Defendants seek relief under 60(b)(5) and (6). Defs.' Mot. at 5. Rule 60(b)(5) allows a court to grant relief where "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Rule 60(b)(6) is a catch-all provision that permits a court to grant relief for "any other reason that justifies relief." The party seeking modification of a consent decree bears the burden of showing that "a significant change in circumstances" warrants relief. Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 383 (1992).

"Modification is an extraordinary remedy, as would be any device which allows a party--even a municipality--to escape commitments voluntarily made and solemnized by a court decree." Twelve John Does v. District of Columbia, 861 F.2d 295, 298 (D.C. Cir. 1988) (discussing Rule 60(b)(5)). The district court has discretion to grant or deny a motion brought under Rule 60(b). See

id.; see also United Mine Workers of Am. 1974 Pension v. Pittston Co., 984 F.2d 469, 476 (D.C. Cir. 1993).

### A. Defendants Are Time-Barred from Seeking Rule 60(b) Relief.

A party seeking relief under Rule 60(b)(5) or (6) must do so "within a reasonable time." Fed. R. Civ. P. 60(c)(1). This standard must be applied to the specific facts of each case, after considering "whether the party opposing the motion has been prejudiced by the delay in seeking relief and . . . whether the moving party had some good reason for his failure to take appropriate action sooner." 11 Charles A. Wright, et al., Federal Practice and Procedure, § 2866 (2d ed. 2009); see also Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst., 500 F.2d 808, 810 (D.C. Cir. 1974); Evans v. Fenty, Civ. No. 76-0293, 2010 WL 1337641, at *27 (D.D.C. Apr. 7, 2010) ("Factors to consider include 'the length of the delay, the explanations for the delay, the prejudice to the opposing party caused by the delay and the circumstances warranting relief.'") (citations omitted). In this case, Defendants filed their Motion in March of 2009. The Supreme Court issued its opinion in Gonzaga--the asserted basis for Defendants' private right of action argument--in June of 2002. Nearly seven years separate the two dates.

Defendants argue that ongoing enforcement of the decree in the intervening time has minimized actual prejudice to the Plaintiffs. Defs.' Reply to Pls.' Partial Opp'n to Defs.' Mot. at 6-7 ("Defs.'

Reply") [Dkt. No. 1503]; <u>cf.</u> Order (May 26, 2009) (finding no prejudice to Plaintiff in bifurcating consideration of Defendants' Motion to Terminate because "all parts of the consent decree [would] remain in order"). That may well be true to some extent. However, underlying the limitation on Rule 60(b) relief are the important interests of finality and repose. <u>See</u> <u>Randall v. Merrill Lynch</u>, 820 F.2d 1317 (D.C. Cir. 1987) (noting that 60(b) is "a tool which trial courts are to use sparingly," as it is the "mechanism by which courts temper the finality of judgments with the necessity to distribute justice"); <u>Summers v. Howard Univ.</u>, 374 F.3d 1188, 1193 (D.C. Cir. 2004) ("Under Rule 60(b), a court must balance the interest in justice with the interest in protecting the finality of judgments."). Allowing Defendants to file a motion that strikes at the legal foundation of a ten-year-old decree, based on an issue decided seven years ago, surely prejudices Plaintiffs' interests in finality and repose.

Courts in this Circuit have found far shorter delays to be unreasonable. <u>See, e.g.</u>, <u>Gilmore v. Hinman</u>, 191 F.2d 652, 652-53 (D.C. Cir. 1951) (concluding that a 60(b) motion filed 16 months after final judgment was not filed within a reasonable time); <u>Karim-Panahi v. Washington Metro. Area Transit Auth.</u>, Civ. No. 08-7093, 2008 WL 5460693, at *1 (D.C. Cir. 2008) (finding no abuse of discretion where district court denied motion as untimely because filed after 18 months and without justification); <u>see also</u> <u>Emily Q.</u>

<u>v. Shrewy</u>, 203 Fed. Appx. 35 (9th Cir. 2006) (affirming district court denial of 60(b) motion on timeliness grounds, as Defendant in an institutional-reform case waited four years before making argument based on <u>Gonzaga</u>) (unpublished).

Defendants argue that because the "priorities of public officials" overseeing the litigation for the District of Columbia may change from one municipal administration to another, a decision not to challenge a consent decree entered into by an earlier administration should not prevent the current administration from doing so. Defs.' Reply at 4-6. In this particular case, the current administration took office in January of 2007. <u>See</u> Elected Officials, <u>http://www.grc.dc.gov/grc/cwp/view,a,1203,q,447121,pm, 1,grcNav_GID,1424,,grcNav_GID,1421.asp.</u> The current Attorney General assumed his position in November of 2008, after serving as Interim Attorney General since January of 2008 and as General Counsel to the Mayor since January of 2007. <u>See</u> OAG: AG Bio - Peter Nickles, <u>http://occ.dc.gov/occ/cwp/view,a,3,q,638711.asp.</u> Thus, over two years passed between this administration's initial handling of the case and its decision to file a 60(b) Motion in March of 2009 based on <u>Gonzaga</u>. Defendants' asserted excuse is hardly compelling and does not justify such a delay in filing.

Defendants come perilously close to asserting that the finality of a case involving a municipality in an institutional-reform context depends upon the policies and tenure of the

administration litigating it at any given time.  <u>See</u> Defs.' Reply at 4-5 ("The 'reason' for the asserted 'delay' goes to the heart of the democratic process--the priorities of public officials responsible for advancing their conceptions of the public interest. While one administration did not raise the issue, a different administration, elected by the citizens of the District of Columbia well after the <u>Gonzaga</u> decision, made the decision to raise this argument in a filing that simultaneously asserts that the District is in compliance with the law.").  To read the Rule's "reasonable time" requirement to allow a complete change of position with each election of a new administration would completely undermine the interests of finality and repose that the Rule is designed to protect.[5]

Defendants urge the Court to consider the institutional-reform context of the litigation and approach the issue with greater flexibility.  <u>Rufo</u>, they maintain, articulates a public interest in allowing public officials in institutional-reform cases to focus on "the sound and efficient operation of [the public's] institutions," <u>Rufo</u>, 502 U.S. at 381.  Defs.' Reply at 7-8.  Therefore, the delay in filing--as well as continued enforcement of the Settlement Order--has actually prejudiced the District of Columbia by prohibiting it from running its programs as it sees fit.  <u>Id.</u> at 8.

---

[5]     Indeed, such a reading would undoubtedly prejudice many interests in a community and raise doubts about whether commitments made and relied upon could be trusted for the future.

Tellingly, no such interpretation of the "reasonable time" requirement is even discussed, no less adopted, in Horne v. Flores, 129 S. Ct. 2579 (2009), a recent Supreme Court case addressing this issue, or in any other cases relied on by Defendants. In Horne, the Supreme Court observed that in "institutional reform litigation," Rule 60(b)(5) "serves a particularly important function." 129 S. Ct. at 2593. The Rule allows courts to re-examine judgments or orders that "often raise sensitive federalism concerns." Id. Accordingly, the Horne Court took care to emphasize its earlier holding in Rufo that courts should take a "flexible approach" to Rule 60(b)(5) motions addressing consent decrees. Id. at 2594-95. However, the Supreme Court also stated that "[i]t goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." Id. at 2595. The Horne Court went on to explain that the appropriate inquiry under Rufo "takes the original judgment as a given and asks only whether 'a significant change either in factual conditions or in law' renders continued enforcement of the judgment 'detrimental to the public interest.'" Id. at 2596-97.

Defendants cite two appellate decisions from other circuits that have applied Rufo's "flexible approach" in considering motions to vacate. In Shakman v. City of Chicago, 426 F.3d 925 (7th Cir. 2005), the Seventh Circuit held that it was reversible error for a district court not to factor in the "public nature of the

litigation in reaching its conclusion that the City's motion was untimely." Id. at 933-34. More recently, the Sixth Circuit upheld a district court's ruling that a Rule 60(b) motion brought 30 years late was timely, because it appropriately considered more than simply the amount of time which had passed--it looked as well at the explanations for the delay, the prejudice to the opposing party, and the circumstances of the case. Doe v. Briley, 562 F.3d 777, 781 (6th Cir. 2009).

These cases, which of course are not binding on this Court, certainly do not require a conclusion, taking into account the Rufo factors, that the Motion in this case was filed within a reasonable amount of time. At most, they counsel courts to take more than a rigid numerical view of delay in cases that implicate institutional reform and are of great public concern. See Shakman, 426 F.3d at 933-34; see also Briley, 562 F.3d at 781.

In this case, parties have actively litigated the matter throughout the time period in question. In the ten years since the Settlement Order was entered, the Court has issued numerous orders enforcing the Order's terms. As was true in Evans, Defendants "have been in Court continually and repeatedly" since agreeing to the Settlement Order. Evans, 2010 WL 1337641, at *27. They cannot, therefore, claim that they were unaware of the "existence of the [Settlement Order] or its impact." Id. To the contrary, the District of Columbia has met regularly with Plaintiffs and the

Court to narrow issues of dispute and to work through--and around--bureaucratic stumbling blocks to ensure compliance with the terms of the Settlement Order. While Defendants have sought to vacate portions of that Order, they have not, until their filing in 2009, relied on <u>Gonzaga</u> to attempt to undue the lawsuit by challenging whether a private right of action exists. To allow Defendants to do so nearly seven years after that decision was issued would deny the Plaintiffs their bargained-for interest in finality, and would put them in a position where judicial decisions made many years ago could, <u>at any time</u>, be set aside by a different city administration with different political priorities.

Given the circumstances of this case, and the prejudice that Plaintiffs would suffer, seven years of delay does, in the Court's judgment, fall outside the limits of "flexibility" discussed in <u>Rufo</u>, and represents an unreasonable time under Rule 60(b). Therefore, the Court concludes that Defendants did not file their Motion "within a reasonable time" under Rule 60(b).

> **B.  Even if Defendants' Motion Is Timely, They Have Not Satisfied the Requirements of Rule 60(b) by Showing Either the Existence of Extraordinary Circumstances or a Significant Change in Law.**

Timeliness is only one of the requirements that must be met in order to justify Rule 60(b) relief. Even if Defendants' Motion to Terminate was timely, they would still need to demonstrate that applying the Settlement Order prospectively is no longer equitable,

or that "any other reason justifies relief." Fed. R. Civ. P.
60(b)(5), (6).

### 1. Rule 60(b)(6) Relief Is Not Appropriate.

The Supreme Court has ruled that relief under Rule 60(b)(6) is
appropriate only in "extraordinary circumstances." Ackermann v.
United States, 340 U.S. 193, 199 (1950). Our Court of Appeals has
made it clear that "plaintiffs [and presumably Defendants as well]
must clear a very high bar to obtain relief under Rule 60(b)(6)."
Kramer v. Gates, 481 F.3d 788, 791-93 (D.C. Cir. 2007).

Changes in the law, "by themselves[,] rarely constitute the
extraordinary circumstances required for relief" under this
subsection of the Rule. Agostini v. Felton, 521 U.S. 203, 239
(1997). In Gonzales v. Crosby, 545 U.S. 524 (2005), the Supreme
Court held that a "change in the interpretation of the AEDPA
statute of limitations" did not represent such an extraordinary
circumstance. 545 U.S. at 536. Thereafter, our Court of Appeals
interpreted Crosby to mean that "'extraordinary circumstances' are
not present when . . . there has been an intervening change in case
law." Kramer, 481 F.3d at 792. Other courts of appeals have
adopted the same position. See, e.g., Bailey v. Ryan Stevedoring
Co., Inc., 894 F.2d 157, 160 (5th Cir. 1990); McKnight v. United
States Steel Corp., 726 F.2d 333, 336 (7th Cir. 1984); Title v.
United States, 263 F.2d 28, 31 (9th Cir. 1959).

In this case Defendants' private right of action argument rests solely on the assumption that <u>Gonzaga</u> represents a significant change in intervening law. Defs.' Mot. at 4-6. As the case law makes overwhelmingly clear, Rule 60(b)(6) provides no avenue for relief where the motion is based solely on a change in intervening law. Therefore, Defendants cannot rely on this section of the Rule to raise their private right of action argument.

> **2. Rule 60(b)(5) Relief Is Not Warranted Because <u>Gonzaga</u> Does Not Represent a Significant Change in Decisional Law.**

Thus, Defendants are left only with Rule 60(b)(5) as a possible justification for relief. <u>See</u> Defs.' Mot. at 5 (citing subsections 60(b)(5) and (6) as sole bases of relief for their assertion of private right of action argument). According to <u>Rufo</u>, parties may be entitled to relief under this subsection if they can show "a significant change either in factual conditions or law." 502 U.S. at 384. Defendants assert a change only in decisional law: they insist that <u>Gonzaga</u> rejected the analysis in cases that this Court relied on when it concluded that Plaintiffs have a private right of action, a conclusion which went on to serve as one of the legal bases for <u>Salazar I</u> and the Settlement Order. <u>See</u> Defs.' Mot. at 5-6 (citing <u>Wellington</u>, 851 F. Supp. at 3-4). Plaintiffs deny that <u>Gonzaga</u> represents a significant change in law, and insist that it merely clarifies prior Supreme Court

precedent in private right of action cases. Pls.' Opp'n to Defs.'
Mot. at 11-14 ("Pls.' Opp'n") [Dkt. No. 1499].

In Agostini, a Supreme Court case that dealt with the
provision of remedial assistance by public school teachers to
students enrolled in religious schools, the Court's 60(b)(5)
analysis "hinge[d] on whether [its] later Establishment Clause
cases have so undermined [Aguilar v. Felton, 473 U.S. 402 (1985)]
that it is no longer good law." 521 U.S. at 217-18. Addressing
the issue in the context of a consent decree, the Supreme Court
stated that "a decision that clarifies the law will not, in and of
itself, provide a basis for modifying a decree." Rufo, 502 U.S. at
390.

The question, therefore, is whether the 2002 opinion in
Gonzaga sufficiently undermines the validity of those Supreme Court
cases this Court relied upon in Wellington, where it held that a
private right of action exists to enforce Medicaid's EPSDT
provisions under § 1983, so "that [they are] no longer good law."
Agostini, 521 U.S. at 217, 18; Wellington, 851 F. Supp at 6
(analyzing 42 U.S.C. §§ 1396a(a)(10)(a) and (a)(43)).

In order to determine whether a private right of action
existed under § 1983, Wellington applied the test set forth in
Wilder v. Virginia Hospital Association, 496 U.S. 498 (1990). See
Wellington, 851 F. Supp. at 3-4 (applying Wilder and Suter v.
Artist M., 503 U.S. 347 (1992)). Wilder required that courts

inquiring into the existence of a private right of action must determine if 1) the statutory "provision was intended to benefit the putative plaintiff"; 2) the statute reflects an unenforceable "congressional preference for a certain kind of conduct rather than a[n actionable] binding obligation on the governmental unit"; and 3) the "interest plaintiff asserts is 'too vague and amorphous'" to be judicially enforceable. Wellington, 851 F. Supp. at 3 (quoting Wilder, 496 U.S. at 509-10) (internal citations and quotations omitted)). The word "benefit" used in Wilder proved to be the culprit creating much confusion in lower court decisions.

The first of the Supreme Court's two holdings in Gonzaga focused on the language used in Wilder and related cases to determine whether the statute provides an enforceable right.[6] See 536 U.S. at 283. Gonzaga aimed to resolve ambiguities within earlier private right of action cases that the Court admitted had hardly been "models of clarity." Id. at 278. The Court did clarify its precedents by holding that only "an unambiguously conferred right [will] support a cause of action brought under § 1983." Id. Because "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the

---

[6]     The Court's second holding resolved the narrow question presented in that case, regarding whether nondisclosure provisions in the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, confer enforceable rights. The Court concluded that those provisions do not confer such rights. Gonzaga, 536 U.S. at 287.

Constitution and laws' of the United States," it is "<u>rights</u>, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." <u>Id.</u> (emphasis in original).

Part of the "confusion" that the doctrine created was due to language from <u>Wilder</u> and a later Supreme Court case, <u>Blessing v. Freestone</u>, 520 U.S. 329 (1997), both of which dealt with private rights of action under § 1983. <u>See</u> <u>Gonzaga</u>, 536 U.S. at 282-83. Both cases suggested that the provision of "benefits," rather than the creation of "rights," might be sufficient to create an enforceable private right of action. <u>See</u> <u>id.</u>

As noted earlier, <u>Wilder</u> set forth a test in which the key inquiry was "whether 'the provision in question was intend[ed] to benefit the putative plaintiff.'" <u>Wilder</u>, 496 U.S. at 509 (quoting <u>Golden State Transit Corp. v. Los Angeles</u>, 493 U.S. 103 (1989)). The <u>Wilder</u> Court concluded that the Boren Amendment to the Medicaid Act does "create[] a right enforceable by health care providers under § 1983" because of the "benefits" it conferred upon those eligible for Medicaid. <u>Id.</u> at 509-10.

In <u>Blessing</u>, the Supreme Court conducted a similar inquiry but arrived at a different conclusion. It held that Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669b, "does not give individuals a federal right to force a state agency to substantially comply with" that Title's provisions. <u>Blessing</u>, 520

U.S. at 333. Using nearly the same language as <u>Wilder</u>, <u>Blessing</u> began its analysis by stating "[f]irst, Congress must have intended that the provision in question <u>benefit</u> the plaintiff." <u>Blessing</u>, 520 U.S. at 340-41 (emphasis added).

The school teacher who brought suit under FERPA in <u>Gonzaga</u> attempted to use these two cases to support his argument that a private right of action is created where a statute merely "benefits" putative plaintiffs. <u>Gonzaga</u>, 536 U.S. at 282. However, as the Court discussed, other Supreme Court cases focused on whether it was a right, rather than a benefit, was created in order to determine whether a private right of action exists.

The <u>Gonzaga</u> Court examined several of these cases, which held that for a right to be enforceable under § 1983, that right must be unambiguously conferred by statutory language. <u>See id.</u> at 279-80. <u>Pennhurst State School and Hospital v. Halderman</u>, 451 U.S. 1 (1981), "made clear that unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." <u>Gonzaga</u>, 536 U.S. at 280 (quoting <u>Pennhurst</u>). Similarly, <u>Wright v. Roanoke Redevelopment and Housing Authority</u>, 479 U.S. 418 (1987), held that tenants could bring a private lawsuit under § 1983 for violations of the Public Housing Act where a provision of that statute "conferred entitlements 'sufficiently specific and definite to qualify as enforceable

rights under _Pennhurst_.'" _Gonzaga_, 536 U.S. at 280 (quoting _Wright_). Finally, in _Suter_, the Court also grounded its inquiry in "rights" language, and found that the Adoption Assistance and Child Welfare Act of 1980 did not "unambiguously confer an enforceable right upon the Act's beneficiaries." _Gonzaga_, 536 U.S. at 281 (quoting _Suter_).

_Gonzaga_ resolved the confusion in the case law between "benefits" and "rights" by concluding that the "relatively loose" "benefits" standard advocated by respondents in that case was incorrect. The Supreme Court clarified that courts must examine whether the statute unambiguously conferred a right, instead of focusing on whether the statute granted benefits. _Gonzaga_, 536 U.S. at 282-83. In short, the Court clarified the standard to be applied in determining the existence of a private right of action.

Turning to the instant case, it is clear that _Gonzaga_ does not represent a significant change in the law applied in _Wellington_.

First, the _Wellington_ decision did not turn on application of the "benefits" language that produced the confusion resolved in _Gonzaga_. Defendants in this case never contested the issue of whether Plaintiffs were beneficiaries of Medicaid, under the first prong of the _Wilder_ test; instead, they argued only that the statutory provisions in question did not impose a "binding obligation" on the governmental unit. _Wellington_, 851 F. Supp. at 3. Because _Gonzaga_ said nothing about this aspect of the _Wilder_

test, it does not represent a significant change in the law relied on in this case which established a private right of action for Plaintiffs.  In sum, Judge Johnson did not rely on the "benefits" test in determining whether these Plaintiffs had a private cause of action.

This fact therefore distinguishes Johnson v. City of Detroit, 446 F.3d 614 (6th Cir. 2006), which Defendants argue supports adoption of a "more rigorous standard" for establishing enforceable rights under § 1983. Defs.' Mot. at 7.  In that case, the Sixth Circuit stated that "any cases premised upon a 'benefits' analysis must be reexamined in light of Gonzaga."[7]  Johnson, 446 F.3d at 624.  Wellington was not based on a "benefits analysis," and therefore the Sixth Circuit's instruction to reexamine such cases does not apply.

Second, the Supreme Court itself, in Gonzaga, essentially said that its decision does not represent a significant change in law. The Court characterized its analysis of the private right of action question as one designed to "resolve the conflict among the lower courts and in the process resolve any ambiguity in our own opinions." Gonzaga, 536 U.S. at 278.  The "ambiguity" that the Court intended to resolve sprang from "[s]ome language in [its] opinions [that] might be read to suggest that something less than

---

[7]    Johnson also described Gonzaga as having simply "allay[ed] . . . confusion" in the case law.  Johnson, 446 F.3d at 618-19.

an unambiguously conferred right is enforceable by § 1983." Id. at 282. The Court clarified that only unambiguously conferred rights are actionable, thereby dispelling any confusion on the matter. Id. at 282-83.

In explaining its ruling, the Court in Gonzaga noted that the Blessing opinion used benefits language alongside language that focused on whether "rights" were created, thereby producing confusion. Gonzaga, 536 U.S. at 283. The Wilder decision also used "benefits" language and "rights" language in crafting its test, which generated the same confusion as did the language in Blessing. See Wilder, 496 U.S. at 509-10. Gonzaga merely clarified that the first prong of these tests requires the right to be unambiguously conferred: "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced." Id. at 283 (emphasis in original). The Court did not disturb or limit Pennhurst or Golden State, upon which Wilder relied in announcing its test. In addition, it did not abandon Blessing, as discussed further below.[8]

Third, many courts which have addressed, in the Medicaid context, whether or not plaintiffs can enforce a private right of action for a state's failure to comply with that statute's

---

[8] Indeed, after clarifying its analysis, Gonzaga then relied on Blessing's reasoning in conducting its analysis of FERPA's language, thereby further suggesting that the analysis in Blessing had not been changed so significantly as to no longer qualify as good law. See Gonzaga, 536 U.S. at 287-88.

provisions, have agreed that Gonzaga simply "resolve[d] any ambiguity in [the Supreme Court's] own opinions." Gonzaga, 536 U.S. at 278. The Ninth Circuit, in a post-Gonzaga decision, was faced with the question of whether 42 U.S.C. §§ 1396a(a)(10) and (a)(17) of the Medicaid Act create private rights of action. Watson v. Weeks, 436 F.3d 1152, 1159 (9th Cir. 2006). That court began its inquiry by stating the Blessing test. Id. at 1158. According to the Ninth Circuit, "the Supreme Court clarified the first prong of [this] test in [Gonzaga]." Id. at 1159. The Weeks decision stated that Gonzaga requires a right to be "unambiguously conferred" in order to be enforceable under § 1983, and that it is only rights, and not "benefits" or "interests" that can be enforced. Id. The Ninth Circuit then went on to apply the rest of the Blessing test, and concluded that § 1396(a)(10) creates an enforceable right. Id. at 1159-60.

In a similar case, the Third Circuit explicitly explained that the Supreme Court in Gonzaga "carefully avoided disturbing, much less overruling, Wright and Wilder." Sabree v. Richman, 367 F.3d 180, 184 (3d Cir. 2004). According to the Third Circuit, Gonzaga "did not abandon [the Blessing] test"--which, again, contains language similar to Wilder--but did "dispel" confusion in the case law. Id. at 186-87. See also Westside Mothers v. Olszewski, 454 F.3d 532, 541 (6th Cir. 2006) ("Westside Mothers II") (finding that Gonzaga "clarified" Blessing requirement regarding "benefits");

S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 602-03 (5th Cir. 2004) (same); Hunter ex rel. Lynah v. Medows, Civ. No. 08-2930, 2009 WL 5062451, at *2 (N.D. Ga. Dec. 16, 2009) (noting that Gonzaga "clarified" case law, and ruling that plaintiffs could enforce private right of action for violations of 42 U.S.C. § 1396a(a)(43)).

Finally, many other courts, construing Gonzaga in contexts other than the Medicaid statute, have characterized it as doing no more than clarifying the Supreme Court's private right of action jurisprudence. See, e.g., Ball v. Rodgers, 492 F.3d 1094, 1105 (9th Cir. 2007) (reasoning that Supreme Court "clarified" first prong of test for determining federal rights under § 1983); Day v. Apoliona, 496 F.3d 1027, 1035-36 (9th Cir. 2007) (characterizing Gonzaga as "[c]larifying a potential tension in earlier cases" and "offer[ing] guidance"); 31 Foster Children v. Bush, 329 F.3d 1255, 1269 (11th Cir. 2003) (Gonzaga "clarified" first prong of Blessing test); Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 233 F. Supp. 2d 16, 22 (D.D.C. 2002) (Gonzaga "clarified" precedent with respect to enforcement of federal rights under § 1983).[9]

---

[9]     Defendants attempt to cast Gonzaga as a "conclusive adoption of a more rigorous standard" for meeting the first prong of the Wilder private right of action test.  Defs.' Mot. at 7. Admittedly, there are some appellate decisions that lend support to this position.  For instance, the Fifth Circuit acknowledged that Gonzaga may have "partially overruled" one of its own earlier decisions.  Equal Access for El Paso, Inc. v. Hawkins, 509 F.3d 697, 701 n.4 (5th Cir. 2007).  The First Circuit treated Gonzaga as
(continued...)

Based on the reasoning set forth above, the Court agrees with Sabree, Westside Mothers II, and Hood, among other decisions, that Gonzaga merely clarified Supreme Court doctrine. By the same token, the Court disagrees with Equal Access and Long Term Care to the extent that they regard Gonzaga as a significant change in private right of action case law that renders earlier Supreme Court precedents as "no longer good law" under Agostini. Consequently, the Court does not adopt the reasoning of the Fifth or First Circuits as persuasive.

**C.** **Even if Intervening Case Law Does Provide a Basis for Re-Examination of the Private Right of Action Question, Plaintiffs Have Established, Under Gonzaga, Their Private Right of Action to Enforce Medicaid's EPSDT Provisions.**

Had Defendants filed a timely motion, and had Gonzaga represented a significant change in decisional law, Defendants would still need to establish under Gonzaga that Plaintiffs have no private right of action to enforce the relevant Medicaid provisions.

**1.** **Statutory Provisions**

Parties dispute exactly which Medicaid provisions should be analyzed under Gonzaga. Plaintiffs insist that the private right

---

[9](...continued)
an intervening decision that justified departure from circuit precedent. Long Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 50, 57 (1st Cir. 2004). That same decision, however, was itself not clear on whether Gonzaga constituted "a tidal shift or merely a shift in emphasis" in private right of action case law. Id. at 59.

of action analysis must be based on the EPSDT allegations made in the Complaint. Pls.' Opp'n at 20. They alleged that the District of Columbia violated 42 U.S.C. §§ 1396a(a)(10)(a), (a)(43)(a), 1396d(a)(4)(B), and 1396d(r). Accordingly, these provisions formed the basis of the Settlement Order. See Pls.' Surreply at 4 [Dkt. No. 1508-3]. They further argue that these EPSDT provisions, though not all cited to in Salazar I, are the provisions that the Court referred to in Wellington. Pls.' Opp'n at 27, 27 n.2 (citing Salazar I, 954 F. Supp. at 328-33, and Wellington, 851 F. Supp. at 6).

Defendants maintain that the Complaint is not the source of the statutory provisions at issue. In their view, 42 U.S.C. § 1396a(a)(10) is irrelevant to the Gonzaga analysis because it was not ruled on in Salazar I and was not incorporated into the Settlement Order. Defs.' Reply at 14. Defendants argue that without a finding that Defendants violated this statutory provision, and because it "did not form the basis for the portion of the consent decree at issue," the Court cannot look to § 1396a(a)(10) as the basis of the Gonzaga analysis. Defs.' Sur-Surreply at 1.

There appears to be little case law on point. Plaintiffs attempt to patch together pieces of dicta from Supreme Court cases to support their position, but none of the cases they rely on involved a consent decree or settlement agreement. Therefore, they

ultimately are unhelpful in resolving whether the Complaint or the Settlement Order is the governing text. See Pls.' Surreply at 2 (citing Blessing and Gonzaga).

The Court need not decide, however, whether § 1396a(a)(10) applies. Assuming that Defendants are correct, and that only § 1396a(a)(43) can provide the basis for Plaintiffs' private right of action, that statutory provision does, under Gonzaga, establish such a right.

### 2. Plaintiffs Can Enforce 42 U.S.C. § 1396a(a)(43) Under § 1983.

Gonzaga requires that, in order to find a federal right enforceable under § 1983, that right must have been "unambiguously" conferred. 536 U.S. at 283. To guide analysis in this area, Gonzaga instructs us to examine whether Congress used "rights-creating" language. Id. at 284. As an example of this type of language, the Gonzaga Court looked to the provisions of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, which both provide in relevant part that "no person . . . shall . . . be subjected to discrimination." Id. at 287 (quoting statutory text). In addition to the text, courts should assess the structure of the statute to determine if Congress intended to confer individual rights. Id. at 286. If there is an unambiguously conferred right, courts then must look to the remaining factors articulated in Blessing: "the plaintiff must demonstrate that the right assertedly protected by the statute is

not so 'vague and amorphous' that its enforcement would strain judicial competence"; and, last, "the statute must unambiguously impose a binding obligation on the States." Blessing, 520 U.S. at 340-41; see Gonzaga, 536 U.S. at 295.

Beginning with the text, § 1396a(a)(43) states in part that a State plan "must . . . provide for . . . informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases . . . ." 42 U.S.C. § 1396a(a)(43)(A).

The portion of that statutory section which contains "rights-creating" language under Gonzaga is that "a State plan must provide for . . . informing all persons . . . of the availability of [EPSDT services] . . . and the need for age-appropriate immunizations against vaccine-preventable diseases." Id. This language, like that in Titles VI and IX of the Civil Rights Act, which the Gonzaga Court offered as examples of statutes that create private rights of action, is "individually focused." Gonzaga, 536 U.S. at 287. The State is required to inform "all persons" under the age of 21 who are Medicaid-eligible of the services specified in § 1396d(A)(4)(B) to which they are entitled, clearly indicating that the focus of

the provision is on the "individuals protected," as opposed to the "persons regulated." <u>Alexander v. Sandoval</u>, 532 U.S. 275, 289 (2001).[10] Therefore, under prong one of the appropriate tests, the Court concludes that the federal right is "unambiguously" conferred.

Other courts have adopted a similar textual analysis in deciding whether § 1396a(a)(43) creates a private right of action. For example, in <u>Memisovski ex rel. Memisovski v. Maram</u>, Civ. No. 92-C-1982, 2004 WL 1878332, at *10-11 (N.D. Ill. 2004), the court held that § 1396a(a)(43) of the Medicaid Act is enforceable under § 1983. The court reasoned that the EPSDT services mandated by this section "provide[] several specific entitlements that plaintiffs 'must' be provided." <u>Id.</u> (enumerating required services). Similarly, in <u>Hunter</u>, the district court found that the EPSDT requirements of § 1396a(a)(43) were focused on the individual receiving the services. 2009 WL 5062451, at *2. <u>See also</u> <u>John B. v. Goetz</u>, 661 F. Supp. 2d 871, 874 (M.D. Tenn. 2009) (denying defendants' motion to vacate in part because § 1396a(a)(43) confers private right of action); <u>Clark v. Richman</u>, 339 F. Supp. 2d 631, 640 (M.D. Pa. 2004) (holding that "§ 1396a(a)(43) affords

---

[10]    Although <u>Sandoval</u> is an implied right of action case and not a § 1983 case, its reasoning can be applied when determining whether an enforceable right exists in the § 1983 context. <u>See</u> <u>Gonzaga</u>, 536 U.S. at 284-85 ("[T]he initial inquiry [in a § 1983 case]--determining whether a statute confers any right at all--is no different from the initial inquiry in an implied right of action case.").

plaintiffs vindicable private rights"); <u>Westside Mothers II</u>, 454 F.3d at 544 (reversing lower court and ruling that plaintiffs "stated a cognizable claim under § 1983 for violations of § 1396a(a)(43)(A)"); <u>but see Charlie H. v. Whitman</u>, 83 F. Supp. 2d 476 (D.N.J. 2000).

Defendants insist that the framework of the statute belies the conclusion that § 1396a(a)(43) confers a privately enforceable right.[11]  Defs.' Mot. at 8-15; Defs.' Reply at 15-20.  They cast the EPSDT provisions as merely "plan requirements," the fulfillment of which is only one of the many conditions that a state must meet in order to receive funding.[12]  Defs.' Mot. at 9.

_____

[11]    Defendants also argue that the EPSDT language tracks closely the type of language that our Court of Appeals found insufficient to create a private right of action in <u>Doe by Fein v. District of Columbia</u>, 93 F.3d 861 (D.C. Cir. 1996) (<u>per curiam</u>).  Defs.' Mot. at 13-14; Defs.' Reply at 21-22.  That case involved a statute requiring states, as a condition of funding, to "provide that upon receipt of a report of known or suspected instances of child abuse or neglect an investigation shall be initiated promptly to substantiate the accuracy of the report."  <u>Doe by Fein</u>, 93 F.3d at 865 (quoting 42 U.S.C. § 5106(b)(2) (1994)).  This language is plainly different in focus and content from the language at issue here.  It is programmatic language that targets the persons regulated, i.e., those who administer a state's child abuse programs, and not any individual beneficiary.

[12]    In terms of the statute's structure, § 1396a(a)(43) appears in the same section, § 1396a, as provisions that are individually focused, as well as those that are focused on more systemic state obligations. Courts have found that surrounding provisions both <u>do</u> support a private right of action, <u>see, e.g.,</u> <u>Sabree</u>, 367 F.3d at 182 (finding private right of action under § 1396a(a)(8),(a)(10), and 1396d(a)(15)), and that some provisions <u>do not</u> support a private right of action, <u>see, e.g.,</u> <u>Equal Access</u>, 509 F.3d at 703 (construing § 1396a(a)(30)).  The framework (continued...)

As the Supreme Court made clear in <u>Gonzaga</u>, the text is central to determining whether Congress intended to convey a privately enforceable right. <u>Gonzaga</u>, 536 U.S. at 286. Defendants do not focus their analysis on the language in § 1396a(a)(43); instead, Defendants concentrate on that section's surrounding provisions--and not the actual text of § 1396a(a)(43)--to argue that no enforceable private rights exist. As the Third Circuit concisely put it, "[a]dmittedly, plumbing for congressional intent by balancing the specific language of a few discrete provisions of Title XIX against the larger structural elements of the statute is a difficult task. Nonetheless, it is evident, at least to us, that the statutory language, despite countervailing structural elements of the statute, unambiguously confers rights which plaintiffs can enforce." <u>Sabree</u>, 367 F.3d at 192.

In sum, the Court concludes that § 1396a(a)(43) does "unambiguously" confer a private right of action as required by <u>Gonzaga</u>. The remaining prongs of the private right of action test--whether the right asserted is so "vague and amorphous" that its enforcement "strain[s] judicial competence," and whether the statute imposes an unambiguous obligation on Defendants--also favor Plaintiffs' position.

---

[12](...continued)
argument therefore is not dispositive of the question, and does not deserve the great weight that Defendants have placed upon it. While the inquiry into the statute's structure is indeed important, it cannot ignore the actual language Congress used in the statute.

The right is not too vague and amorphous to be enforced.  It plainly requires Defendants to inform eligible individuals of certain services available to them.  The services are delineated in § 1396d(r), a sub-section referred to specifically in § 1396a(a)(43).  Section 1396d(r) sets forth in detail the types and timing of treatment that shall be provided as part of the screening, vision, dental, and hearing services due to the patient. 42 U.S.C. § 1396d(r).

These statutory provisions establish that Defendants' obligation is both clear and enforceable; further, courts can competently determine whether such statutory guidance is being followed.  The Court agrees with the Fifth Circuit's assessment in Hood that "[t]he EPSDT provisions at issue are no more 'vague and amorphous' than other statutory terms that . . . courts . . . have found capable of judicial enforcement."  391 F.3d at 605.  For instance, the right at issue in this case is no more unenforceable, and does no more to strain judicial competence, than the right to reimbursement at "reasonable and adequate rates," upheld in Wilder. 496 U.S. at 511-12.

In satisfaction of the third prong, the statutory language creates a binding obligation.  The statute speaks in terms that are clearly mandatory, as it says that states "must . . . provide."  42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(r) (describing services in

detail, including what those services "shall at a minimum include").

Courts look to such language to determine whether a binding obligation has been created. See Blessing, 520 U.S. at 340 ("[T]he provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms."); Richman, 339 F. Supp. 2d at 640 ("Section 1396a(a)(43) speaks in mandatory terms, as it mandates that a state plan 'must' provide for informing eligible individuals of EPSDT services, as well as mandates that a state plan 'must' provide or arrange for the provision of EPSDT services."). For instance, in Wilder, the Supreme Court concluded that, for purposes of § 1983, a binding obligation arose from the language, "a state plan 'must' 'provide for payment . . . of hospital[s].'" 496 U.S. at 2519 (emphasis in original).

For all the reasons just discussed, the Court concludes that the statutory text imposes a binding obligation on Defendants to provide EPSDT services.

**D.  Plaintiffs' Private Right of Action Is Not Foreclosed by Their Status as Third-Party Beneficiaries.**

Defendants also argue that, because Plaintiffs are only third-party beneficiaries of what is essentially a contract between the federal government and the District of Columbia, they cannot enforce Medicaid's provisions under § 1983. Defs.' Mot. at 15-17. To support this far-reaching position, Defendants cite a concurrence by Justice Scalia in Blessing suggesting that the only

rights that can be secured under § 1983 are those that would have been recognized as rights when § 1983 was originally enacted in 1871. He reasoned that because a third-party beneficiary had no enforceable right to compel "a State to make good on its promise to the Federal Government" in 1871, at the time of the Section's enactment, beneficiaries in such cases may have no right to sue in 2010. 520 U.S. at 349-50 (Scalia, J., concurring).

Obviously, Justice Scalia's view is not that of the Supreme Court. Further, he stresses in the remainder of his concurrence that the argument above was not even raised before the Court, and that he addresses it only because he "is not prepared without further consideration to reject the possibility that third-party-beneficiary suits simply do not lie." Id. at 350. In short, he was simply giving an advisory opinion, without even having the benefit of briefing.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Terminate is **denied** as to the private right of action issue. An Order shall issue with this Memorandum Opinion.


August 5, 2010                    ____/s/_____
                                  Gladys Kessler
                                  United States District Judge


**Copies to: attorneys on record via ECF**