———1———

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3

4   OSCAR SALAZAR, et al.,    )        Civil Action No.
                              )            93-452
5           Plaintiffs,       )
                              )
6      v.                     )
                              )
7   THE DISTRICT OF           )
    COLUMBIA, et al.,         )        April 26, 2012
8                             )
                              )        3:05 p.m.
9           Defendants.       )
    ------------------------

10                                     Washington, D.C.

11

12

13

14                TRANSCRIPT OF STATUS CONFERENCE

15

            BEFORE THE HONORABLE GLADYS KESSLER
16                UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

    COURT REPORTER:    PATRICIA A. KANESHIRO-MILLER, RMR
23                     Certified Realtime Reporter
                       Official Court Reporter
24                     Room 4704B, U.S. Courthouse
                       Washington, D.C. 20001
25                     202-354-3243

1                          APPEARANCES

2


3      FOR THE PLAINTIFFS:
       BRUCE J. TERRIS, ESQ.
4      KATHLEEN L. MILLIAN, ESQ.
       ZENIA SANCHEZ FUENTES, ESQ.
5      TERRIS, PRAVLIK & MILLIAN, LLP
       1121 12th Street, NW
6      Washington, DC 20005


7


8      FOR THE DEFENDANTS:
       ELIZABETH SARAH GERE, ESQ.
9      Office of the Attorney General
          of the District of Columbia
10     Civil Litigation Division
       441 Fourth Street
11     6th Floor
       Washington, DC 20001
12
          -and-
13
       SHERYL JOHNSON, ESQ.
14     Office of the Attorney General
          of the District of Columbia
15     825 North Capitol Street, N.E.
       Suite 4000
16     Washington, D.C.


17


18     ALSO PRESENT:
       COLLEEN SONOSKY
19     HENRY IREYS (BY TELEPHONE)

20

21

22

23

24

25

PROCEEDINGS

1

2      THE COURT:  We are on the record in Salazar versus the

3  District of Columbia, 93-452.

4      Let's go around, please, and have everyone identify

5  themselves for the record.

6      MR. TERRIS:  Bruce Terris for the plaintiffs.

7      MS. MILLIAN:  Kathleen Millian for the plaintiffs.

8      MS. FUENTES:  Zenia Sanchez Fuentes for the

9  plaintiffs.

10     MS. JOHNSON:  Sheryl Johnson for the defendant.

11     MS. SONOSKY:  Colleen Sonosky, Department of Health

12  Care Finance.

13     MS. GERE:  Elizabeth Gere for the Defendant District

14  of Columbia.

15     THE COURT:  And I'm glad everybody was able to

16  rearrange their schedules.  I appreciate that.  I know there

17  was some moving around of things.

18     Dr. Ireys, you are on the phone; am I correct?

19     MR. IREYS:  That is correct.

20     THE COURT:  I'm glad you're with us.

21     Dr. Ireys, did you get a copy of the plaintiffs'

22  letter of April 23rd and the government's response of

23  April 26th?

24     MR. IREYS:  Yes, I have them.

25     THE COURT:  Okay, good.

1          Much of what the plaintiffs have raised in their

2     letter concerns UnitedHealthcare.  I read the papers, like

3     everybody else, even though with a perhaps jaundiced

4     perspective; but let me ask, Ms. Gere, can you tell us

5     anything that's going on with United?  Are they participating

6     in the contract negotiations?  Are they going to be excluded

7     on some basis?  Are they going to be sold?  Do you know

8     anything?

9          MS. GERE:  I would probably defer to Ms. Sonosky and

10     Ms. Johnson on that, on those questions.

11          THE COURT:  Okay.  Ms. Sonosky?  Who knows most?

12          MS. JOHNSON:  United -- the RFP -- we haven't started

13     the process.

14          THE COURT:  Oh, you haven't started?

15          MS. JOHNSON:  I don't know if the RFP was supposed to

16     issue or --

17          MS. SONOSKY:  My understanding from the press was that

18     it was issued.

19          MS. JOHNSON:  If it was, it was just recently issued.

20     So we haven't -- that whole process is just beginning.  At

21     this juncture, I don't know whether they're going to bid on

22     the RFP or not because we just put that RFP out on the

23     streets.

24          THE COURT:  So you don't even know whether they're

25     going to be applying, right?

1              MS. JOHNSON:  No.  At this juncture, I don't -- we

2       don't have any information.  If it was issued, the RFP, it was

3       very recently.  If you're familiar, it takes a lot to respond,

4       and so we haven't gotten any response yet.  So I don't know.

5       I mean, they haven't indicated, to my knowledge, otherwise,

6       that they would not be bidding, but everybody knows that

7       Unison is owned by UnitedHealthcare, which is one of the

8       largest companies around and that they have been funding them

9       to the tune they have been losing money every quarter, and

10      that's all public record.

11             MS. SONOSKY:  Yes.  There have been increasing losses

12      since 2008.

13             THE COURT:  Let me just get it straight.  United owns

14      Unison?

15             MS. JOHNSON:  That's correct.

16             MS. SONOSKY:  That is correct.

17             THE COURT:  It is United that has been losing the

18      money?

19             MS. JOHNSON:  No, Unison, and they have been funded by

20      the parent company, which is United.

21             MS. SONOSKY:  In the District now, they are United.

22      Their name isn't Unison anymore; they are United.

23             THE COURT:  I see.  All right.

24             MS. MILLIAN:  When you say you don't know if they'll

25      be applying or bidding, that's for the contract to begin

1    May 2013?

2              MS. JOHNSON:  Yes, that's correct.

3              MS. MILLIAN:  They will be for the next year still --

4              MS. JOHNSON:  They're still unless they are, for

5    whatever reason, terminated.  The current contract goes

6    through 2013.  I think it's in the fourth year or fifth year.

7    It is operating under one of the option years.

8              THE COURT:  All right.  Let's proceed with the issues

9    in the April 23rd letter, some of which are really

10   interconnected.  For example, it seems to me that we should

11   talk about item number 1, which refers to United's compliance

12   with the notice and outreach requirements, past compliance or

13   noncompliance, and item -- wait one second, everybody.  Let me

14   find this.  I can't find it myself.

15             Well, let's start with number 1.  I know I thought it

16   was very much related to another point, but --

17             MS. MILLIAN:  It may be number 4, the outreach study.

18             THE COURT:  Thank you.  Yes.

19             Past compliance, have you gotten any figures yet?

20             MS. SONOSKY:  We've received one report, but that was

21   a report that was prior to United being placed on the

22   corrective action plan.  So the numbers did not show any

23   improvement, but that was because it was prior to making any

24   change.  The numbers that are due on Monday for us to review

25   with them are -- they're due Monday, so we will be looking at

1    those, and those numbers will be turned into the Court for the

2    report on June 1st.

3            THE COURT:  Can't you get them to the plaintiff

4    earlier than that?

5            MS. SONOSKY:  We are going to review with them the

6    numbers during the second week of May, but this is the process

7    for turning these numbers -- they first -- the MCOs first turn

8    them in for the District for us to review, and the required

9    date for this report is June 1st, so we will -- we will meet

10   or turn it in before June 1st, but it gives us that chance to

11   review the numbers --

12           THE COURT:  All right.

13           MS. SONOSKY:  -- so we are comfortable with them.

14           THE COURT:  No later than June 1st, then, plaintiff

15   should receive whatever defendant has received regarding

16   United's compliance with the notice and outreach requirements.

17           Now, let's talk about number 4, where there appears to

18   be a disagreement, a pretty substantial one, between

19   plaintiffs and defendant.  Plaintiffs have said that United

20   does not have a plan to pilot any outreach method; but,

21   Ms. Sonosky, you disagree with that, right?

22           MS. SONOSKY:  As of yesterday, we --

23           THE COURT:  What does that mean?

24           MS. SONOSKY:  We had -- at the last status conference,

25   we did have -- we shared with you and with the plaintiffs an

1    indication that we were not sure what the plans were for

2    United to do in conducting their pilot study.  We had a

3    conversation and a conference call with them yesterday, with

4    their compliance officer, and with a new staff member who was

5    going to be in charge of the quality division, which also has

6    oversight over the EPSDT benefit, where we had the

7    conversation with them regarding the pilot study and the

8    collection of the data on doing a face-to-face -- doing the

9    face-to-face visits, you know, throughout the pilot study.  So

10   that can be seen as a whole.  So this was -- we did have

11   a -- we did get confirmation on that yesterday.

12           THE COURT:  Of course, this person doesn't even start

13   officially until next week; right?

14           MS. SONOSKY:  That is correct.

15           THE COURT:  Does this person have any relevant

16   professional background at all?

17           MS. SONOSKY:  So, yes, I did ask for her resume before

18   the status conference.

19           THE COURT:  You're turning into a lawyer, Ms. Sonosky,

20   but that's good.

21           MS. GERE:  Actually, I think she is a lawyer.

22           THE COURT:  Excuse me.  I'm sorry.  Here I thought you

23   were a health care person all along.

24           MS. SONOSKY:  I'm that, too.

25           She has worked with New Jersey and New York Medicaid

1    and their quality and child health, you know, I would say

2    counterparts to our agency on these type of issues and

3    has -- I would say has at least 20 years' experience in

4    Medicaid managed care, from what I could tell on her resume,

5    primarily within state agencies and with managed care

6    organizations.

7          THE COURT:  All right.  But I certainly want to ask

8    some questions.  I'm not at all surprised that HSCSN has been

9    implementing the notice and outreach efforts.  I mean they are

10   a very small provider with a very discrete population in great

11   need, so it just doesn't surprise me.  I'm glad to hear it but

12   it doesn't surprise me.  What is distressing is that they

13   report very little success.  Can you talk a little bit about

14   that?

15         MS. SONOSKY:  We just received the correspondence from

16   them last week that they would like to talk to us about that.

17   So I have not received what their data are or what anecdotes

18   they have to share with us, so we are planning on doing that

19   within the next couple weeks, and we will share that with the

20   plaintiffs and with the Court.

21         THE COURT:  I would suspect, without of course

22   knowing, that that's a different subpopulation, if you will,

23   of caretakers and family.  Of course, they're not caretakers

24   because the children are all in the hospital, or most of them.

25         MS. SONOSKY:  Or have serious needs, yes.

1          THE COURT:  Right, right.  It is sad to say, but it

2     may be that those family members or parents or loved ones may

3     have just lost interest or hope because I know how sick some

4     of those children are.  But anyway, you'll find out more about

5     that?

6          MS. MILLIAN:  For plaintiffs' part of that, we would

7     just offer that we would be interested to hear what HSCSN has

8     to say about that since it is a court-ordered requirement, ask

9     you to consider inviting us to the meeting.

10          THE COURT:  Do you think there is a possibility of

11     plaintiffs attending your meeting?

12          MS. SONOSKY:  I think we would like to meet with them

13     first and then we will have that conversation.

14          THE COURT:  All right.

15          MR. TERRIS:  May I say one thing about that?  One of

16     the reasons, I think, for having us participate is, if later

17     on the District takes the position, which if HSCSN and the

18     others come up with data that they think shows that

19     face-to-face doesn't work, rather than us being in a very

20     litigation mode about that, if indeed there is strong evidence

21     it doesn't work, then we don't want to be insisting on it,

22     either; but on the other hand, if we are not part of the

23     process, the chances of us saying, oh, we're convinced, is not

24     nearly as good.  So if we're there and we hear the story --

25          THE COURT:  I understand.

1        MR. TERRIS:  -- it is much more convincing.

2        MS. GERE:  I think we have been very forthcoming with

3   the information that has been provided to us, and it seems to

4   me appropriate that the agency have its internal conversation

5   so that they can get whatever candid responses there are, and

6   we've certainly been, as I said, forthcoming in sharing the

7   information because we understand that the plaintiffs are as

8   interested in getting to a process that does work.  There

9   would be no reason for us to withhold information that

10  provides a basis for an alternate suggestion or another way to

11  proceed.

12       MR. TERRIS:  Secondhand information is not as

13  convincing, obviously, as hearing the people who do the work.

14       MS. GERE:  And perhaps there may be an appropriate

15  time, Bruce, to do that after the internal meeting, to have a

16  meeting with you where you can listen to what the concerns

17  are, if indeed there are concerns or suggestions.

18       THE COURT:  All right.  Let's get back to the United

19  pilot.  We don't have much details on that at this point, but,

20  Ms. Millian, what do you want to ask about that?

21       MS. MILLIAN:  I think that one issue that needs some

22  attention concerning the outreach studies, which now have been

23  begun by Chartered and I guess will be begun in the near

24  future by United and HSCSN, is how the data will be collected

25  and evaluated to see whether these measures are effective in

1    increasing the number of children who come in for

2    appointments.  I think the parties agreed that -- and Your

3    Honor sanctioned -- that Dr. Ireys would have a role in that,

4    with either himself personally or his colleagues from

5    Mathematica --

6              THE COURT:  Right.

7              MS. MILLIAN:  -- and plaintiffs are a bit concerned

8    that Chartered has already begun its process, yet the data

9    aspect of it has not been defined.

10             THE COURT:  Is that right?

11             MS. SONOSKY:  That is correct.  And I mean they are

12   doing -- with their new leadership and with what they would

13   like to do in terms of reaching out to as many children as

14   possible, including this targeted piece of adolescents for our

15   pilot study, they did want to get this underway at the clinics

16   with Unity.  So they have started, but, you know, they do know

17   that there is an evaluation portion, so we will be getting on

18   that and working with Dr. Ireys and the plaintiffs.

19             THE COURT:  I'm not exactly clear on the adolescent

20   component.  Are they kind of keeping two sets of data, one for

21   the younger children and one for adolescents?  Or are they

22   using different scripts, if you will, for the adolescents?

23             MS. SONOSKY:  No, I think from a few months ago,

24   within our meetings together and at one of the status

25   conferences, we decided that this pilot study for outreach

1    would be targeted primarily on the data collection piece for

2    the adolescent population because they have -- they are, you

3    know, a continued problem in terms of utilization and reaching

4    access and all of that.  So that was -- that is the main

5    reason why adolescents is still the target.

6         THE COURT:  So are they doing only adolescents, or are

7    they also including some other ages of children?

8         MS. SONOSKY:  For these pilot studies, the data

9    collection portion will be on adolescents.

10        THE COURT:  I see.

11        MS. SONOSKY:  For Chartered specifically, the change

12   in practice that they are using as part of this pilot study is

13   to make calls for all children, but for our piece of it, it

14   will be focused on data collection around the adolescents and

15   the difference that making the phone calls make.

16        THE COURT:  It seems to me, let me just say this, if

17   they're doing the work to contact the non-adolescent families,

18   why wouldn't they at the same time collect the data even

19   though that's not their primary target?

20        MS. MILLIAN:  They probably should collect it, right,

21   because under the decree they would want to show that they

22   were meeting the requirements in paragraph 39.

23        MS. SONOSKY:  Correct, because that would still be

24   part of the report that we have to turn in, the one that is

25   due on June 1st.  And as this one starts, it will be the data

1    that we turn in on December 1st.  So they still will be

2    collecting the data.  For the use of this pilot study would

3    just be the data around the adolescents.

4         MR. TERRIS:  The thing that is sort of troublesome

5    about the evaluation not having been determined is I would

6    think -- and Dr. Ireys knows vastly more about this than I

7    do -- that in order to -- what you collect in data is critical

8    to the evaluation, and if in fact you haven't decided what

9    your evaluation is going to look like, you may very well not

10   be collecting all the right data.

11        THE COURT:  This is true, a true fact, as they say.

12   Ms. Sonosky, what do you think?

13        MS. SONOSKY:  We will -- you know, I would like to

14   schedule this meeting as quickly as possible and work this

15   through and make sure that Chartered has the complete

16   understanding of what we're looking to evaluate and rectify it

17   as quickly as possible.

18        THE COURT:  Dr. Ireys, do you want to add anything to

19   this discussion about the Chartered's pilot study?

20        MR. IREYS:  First of all, yes, it is ideally -- it

21   would have been ideal had we participated in the planning of

22   the program and project itself and wrapped the data and

23   evaluation piece into it right at the start, but it didn't

24   happen, and this wouldn't be the first time that an evaluation

25   was implemented somewhat after the program project was

1    underway.  We deal with that all the time.  I think

2    Ms. Sonosky's point about getting a meeting as soon as

3    possible is exactly what we need to do.

4          THE COURT:  And Ms. Gere, for how long will you be

5    working before you take time off?

6          MS. GERE:  I will be here through Friday, May 4th.

7          THE COURT:  Next week?

8          MS. GERE:  Right.

9          THE COURT:  Well, it certainly -- I don't know how

10   busy you're going to be in this week.  Very?

11         MS. GERE:  Busy.

12         THE COURT:  Can you -- Ms. Johnson can sit in on

13   whatever --

14         MS. GERE:  Oh, certainly.  I wouldn't -- you know, I

15   wouldn't hold that up.  That will be fine.

16         THE COURT:  All right.  Well, certainly parties should

17   try to get together I would say within the next two weeks.

18   The minute we start talking about June everybody starts going

19   off on vacations and wonderful trips and things like that.

20         MS. GERE:  But this is the meeting, Your Honor, where

21   Dr. Ireys is --

22         THE COURT:  Right.

23         MS. GERE:  -- to finalize and iron out the details on

24   the study.

25         THE COURT:  Right.  And that will be with plaintiffs

1    and defendants?

2          MS. SONOSKY:  Correct.

3          THE COURT:  My own speculation, which is all it is, is

4    that the data is going to be disastrous as to the adolescents.

5    I don't mean the data collection, but I mean the responses.

6    Well, I think the reasons are pretty obvious.  Kids don't want

7    to go to doctors anyway.  These are families where probably

8    the parents are stressed out as it is in terms of time and

9    money, and if they don't see observable physical problems with

10   their kids, they're probably not going to use up whatever

11   moral suasion they have with their kids to push them to go to

12   an appointment, but let's hope I'm absolutely wrong about

13   that.

14          I think we've covered that subject pretty well unless

15   the plaintiffs have anything else to discuss about that.

16          MS. MILLIAN:  Nothing further, Your Honor.

17          THE COURT:  The 416s are clear; and that is, the

18   government granted some more time, and as soon as defendant

19   gets their form 416 completed, then plaintiffs will get a

20   copy.

21          I do want to talk about the blood lead testing pilot

22   program.  You may all have told me this last time, and I'm

23   sorry if I forgot.  Where is this community of Hope Clinic

24   located?  Is it Southeast, Northwest?  I am just interested.

25   I bet it's not Northwest.

1          MS. SONOSKY:  It's not Northwest.

2          THE COURT:  I didn't think so.

3          MS. SONOSKY:  It's either Southeast or Northeast.

4          THE COURT:  Okay.

5          MS. SONOSKY:  I went on March 15th, so I'm trying to

6     picture which direction we went.

7          THE COURT:  Okay.

8          MR. TERRIS:  There are two clinics; aren't there?

9          MS. SONOSKY:  It's one.  The Family Health and Birth

10    Center is part of the Community of Hope.

11         MR. TERRIS:  In terms of a physical location, aren't

12    there two clinics?  No?  One clinic?

13         MS. SONOSKY:  The main clinic for the lead care two is

14    at the Family Health and Birth Center.

15         THE COURT:  And it certainly sounds as if there was a

16    fair number of defendant staff people there to provide

17    training and to help everybody out.  How long were those

18    people there?  Do you have any idea?

19         MS. SONOSKY:  We were there about an hour.

20         THE COURT:  Were you part of the training actually, or

21    did you just observe it?

22         MS. SONOSKY:  I just observed, yes.

23         THE COURT:  Okay.  Plaintiffs, do you have any

24    questions about what's going on?

25         MS. MILLIAN:  I don't think we have questions.  I

1    think, you know, on this project, Your Honor, what it ended up

2    turning out to be since so many providers did not choose to

3    participate, I think what both parties hoped for is that the

4    intervention that occurred, of going to all these providers

5    and saying there is a focus of blood lead testing, we want you

6    to improve, and some of the big providers said, we have ideas

7    of our own on how we'll improve our process.  So it seems like

8    one of the important outcomes of this will be the work that

9    Dr. Ireys and his colleague are heading up of the data,

10   looking at comparison over years as to whether there was an

11   improvement of the blood lead test when the child was right

12   there in the doctor's office.

13        THE COURT:  Have we heard anything about what, for

14   example, Children's is actually doing?

15        MS. SONOSKY:  I haven't talked to them in about a

16   month, but we can find out.

17        THE COURT:  Well, I'm curious.  Because we know,

18   certainly, a major part of the problem at Children's was that

19   the lab was fairly far away even though it was still in

20   Children's Hospital, but that it was more work and time for an

21   accompanying guardian to get the child from, let us say, the

22   emergency room or downstairs up to the lab, and I'm just

23   curious as to whether they made any accommodations.  They knew

24   that was the problem.  It wasn't any secret, I don't think.

25        Now, something that I'm very unhappy about still, or

1       more than ever, is the failure of providers to take advantage

2       of the mandatory provider training.  We've gone along pretty

3       far now -- well, according to plaintiffs, it's been almost a

4       year -- and the numbers are still very low -- maybe "very" is

5       an exaggeration but low -- for those providers who have

6       participated and completed the program.  And I didn't

7       understand one sentence in the second paragraph of plaintiffs'

8       papers when you said, "These are providers that were overdue

9       or not overdue for training."  Is that correct?  Page 4.

10              MS. FUENTES:  I believe that means that were either

11      overdue or not overdue, it encompassed all providers, is what

12      we were trying to say.

13              THE COURT:  Okay.  And so what are our final figures?

14      Our final figures, I believe, are -- let me just see now.  Now

15      I'm looking at defendants' statistics.  There were 175

16      providers who were out of compliance with training

17      requirements; and of those 175, only 50 are now in compliance,

18      a small -- well, again, I don't want to exaggerate -- but

19      about a third of the people involved.  That means that

20      two-thirds are not in compliance.  Now, 10 others have logged

21      into the website but not completed the training module, so for

22      all practical purposes they're out of it; and 63 are no longer

23      on the provider list.  Does that mean that it's 175 minus 63

24      who were out of compliance?  Would that be appropriate?

25              MS. SONOSKY:  That would be one way to look at that

1    175 figure that were overdue in 2010, from last year's report,

2    and so that would leave about 52 remaining from all of those

3    figures --

4            THE COURT:  62.

5            MS. SONOSKY:  62 plus the 10, exactly, the 10 who

6    viewed the training but did not complete the -- but did not

7    complete all the requirements.  And so those providers are

8    still being targeted by the MCOs.  So we are still reaching

9    out to them to say, you are out of compliance.

10           THE COURT:  A little less than 50 percent of our

11   providers are in compliance.  It seems to me that's pretty

12   serious.

13           What do plaintiffs have to say?

14           MS. MILLIAN:  Well, Your Honor, we agree with that.  I

15   guess it was hoped that the offer of the continuing medical

16   education would be a carrot that would encourage the providers

17   to participate.  It seems like some more creative ideas have

18   to be developed to urge the providers to get this update on

19   current EPSDT requirements.  And many of the issues that we

20   talk about, oral health for children and blood lead testing

21   and all those kinds of points, providers can be reminded about

22   the key aspects of those.

23           THE COURT:  Are the requirements mandatory, required

24   by the federal government, or are they required by the local

25   licensing authorities in D.C., or both, or neither?

1          MS. MILLIAN:  I think neither.  They're required under

2     our settlement order.

3          THE COURT:  Only under our order.

4          MS. MILLIAN:  I think there is CMS guidance that talks

5     about the state having obligation to inform providers about

6     the requirements of the EPS program.  That guidance document

7     is what governed the settlement order.

8          THE COURT:  And the government expects a final report

9     on June 1; right?

10          MS. SONOSKY:  Correct.

11          MS. MILLIAN:  I wonder if I can ask:  Was the District

12     surprised that 63 providers out of the, like, 364 providers

13     were no longer participating?  Is that expected turnover?

14          MS. SONOSKY:  We are doing a claims run on these

15     specific providers on the types of -- so we'd like to look

16     into that, too.

17          THE COURT:  That's a big number, it is.

18          MS. MILLIAN:  It's a big percentage of the whole

19     number; 364 pediatric providers, 63 have left.

20          MS. SONOSKY:  Well, it could be that it might not just

21     be pediatric, so I think we might need to look at how we're

22     defining -- I mean we could have had a broader net than we

23     realized.  I think that is something we should look at.  Maybe

24     it's not, and maybe they have a different practice than

25     families and kids, and so they might not have been in

1    this -- you know, needed to be in the bucket.  So that is

2    something we'd like to look at, also.

3              THE COURT:  That is a big number.

4              Somewhere I saw that you have -- first of all, you all

5    know that I entered an order; I spoke with Ms. Wind, and I

6    entered an order, and that she will be doing this.  She raised

7    with me whether she would be allowed to bring in anybody else

8    if she thought it appropriate or useful, and I left that

9    completely up to her to decide.  She'll figure that out.

10             And did I read that you have a first date set with

11   her?

12             MS. GERE:  No, we do not.

13             MR. TERRIS:  No.

14             THE COURT:  No?  I thought I saw that.

15             Okay.  Has she contacted you at all yet?

16             MS. MILLIAN:  No.

17             MS. GERE:  No.

18             THE COURT:  I will email her and just find out.

19             MS. GERE:  We probably should come up with a date

20   before I'm gone.

21             THE COURT:  I definitely think so, so I will get in

22   touch with her.  Let me make a note of that.

23             And I did indicate that it would probably be awhile

24   before it was convenient for everybody, so I mean she knew

25   there was no immediate urgency, but I think we should get a

1    date set, I do.

2          And what do you all think about scheduling another

3    meeting?  You're going to be available by about -- what date

4    did you give me?

5          MS. GERE:  June 19th is my release, is what the doctor

6    has said.

7          THE COURT:  Right.  Does it make sense to set a

8    meeting in July?  I mean we're not going to be talking about

9    your settlement negotiations in any event.

10          MS. MILLIAN:  I think July would be great.

11          THE COURT:  Okay.  Let's everybody look in July.  We

12    could do it the first week in July or the week of the 23rd.

13    Anybody know vacation schedules yet?

14          MS. JOHNSON:  I will be gone that entire week of the

15    23rd.

16          THE COURT:  I'm sorry?

17          MS. JOHNSON:  The entire week of the 23rd is not good

18    for me.

19          THE COURT:  What about the first week, the 2nd -- I

20    want to warn you the 4th of July is right in the middle of the

21    week, on a Wednesday.  So I don't know whether --

22          MS. GERE:  That may --

23          THE COURT:  -- everybody will leave Wednesday,

24    Thursday, Friday.  Do you want to try Monday, the 2nd?

25          MS. JOHNSON:  Sure.

```
 1              MS. FUENTES:  That's fine with me.

 2              MS. MILLIAN:  Yeah, I think that's doable, Your Honor.

 3              THE COURT:  Okay, at 4.

 4              MS. GERE:  The judicial conference is the week before

 5      that.

 6              THE COURT:  That ends on the 29th, and it ends on a

 7      Friday morning midday.

 8              MS. GERE:  I'm just trying to coordinate so that I can

 9      review anything --

10              THE COURT:  We could do it July 3rd.

11              MS. MILLIAN:  That's fine.

12              MS. SONOSKY:  I'd rather do it the 2nd.

13              MS. GERE:  We'll figure something out.

14              THE COURT:  Well, I need a date for an order.

15              MS. GERE:  July 2nd is fine.

16              THE COURT:  July 2nd, okay.

17              And then, of course, you all can talk and change it

18      always and let me know.

19              MS. GERE:  And that would be at 4 p.m.?

20              THE COURT:  Yes, please.

21              Do plaintiffs have anything else you want to add or

22      question?

23              MS. MILLIAN:  I don't think so, Your Honor.

24              THE COURT:  Dr. Ireys, anything you want to say at

25      this point?
```

1          MR. IREYS:  Now, there is one matter having to do with

2    the lead testing that I just wanted to talk with you briefly

3    about here.  Perhaps, here in your chambers, after this

4    meeting, I can just call you there.

5          THE COURT:  Okay, that will be fine, and I will just

6    be in chambers as soon as this meeting is over.  Okay.

7          MS. GERE:  I would like to raise something, Your

8    Honor, that we had in our letter, which is that --

9          THE COURT:  I saw it.

10          MS. GERE:  -- the plaintiffs have filed a notice

11    advising that they intend to withdraw their pending motions

12    and to file a new motion to modify the dental order and that

13    they intend to litigate at the same time that we're mediating,

14    precisely the same topics, and that did not appear to us to be

15    an efficient use of the Court's resources nor of ours, and our

16    suggestion was that we proceed with the mediation if it is

17    unsuccessful, then we would have 30 days to respond to the

18    plaintiffs' motion thereafter, but our hope is that we are all

19    approaching this in good faith with a commitment to attempt to

20    work it out.  We're simply not going -- we don't have

21    sufficient resources, Your Honor, to litigate and mediate and

22    my program people run the program.

23          THE COURT:  Ms. Millian.

24          MS. MILLIAN:  Your Honor, we've been discussing

25    attempts to resolve the dental order issue since

1    November 2011.  This year, 2012, that has been essentially the

2    only issue we have negotiated.  The other issue we have talked

3    about some is recertification.  Really, the focus of most of

4    our meetings this year has been the dental order.  And as

5    we've informed Your Honor, we are not at an impasse but we are

6    not resolved on the significant issues that are necessary to

7    resolve to reach a new dental order.  Plaintiffs, as Your

8    Honor knows from precipes that we filed, we agreed essentially

9    to a stay of all litigation on the dental order through

10   April and then we extended that when certain circumstances

11   came up and it was clear that April 2nd was impossible to

12   meet.  The new deadline also was not met.  And plaintiffs

13   believe it's necessary to go forward with filing a motion

14   concerning the dental health of children.  As we already

15   explained, we have withdrawn the contempt motion and the other

16   pending motion, and we are ready to go forward with the

17   mediation.  We certainly, in light of Ms. Gere's medical

18   leave, would agree to a generous extension of time for the

19   response of the District to our motion, but we think that we

20   cannot allow the issues to continue to languish without some

21   schedule for resolution by the Court if our settlement isn't

22   reached.

23         MS. GERE:  Perhaps one thought, Your Honor, would be

24   to put a time certain on the length of the mediation that

25   would --

1          THE COURT:  Or the length of the mediation on this

2     issue because I'm sure there are other issues.

3          MS. GERE:  Right, on this issue.

4          THE COURT:  And we're talking your first meeting in

5     July.

6          MS. GERE:  Correct.

7          THE COURT:  It would seem to me by October 1 you all

8     would know whether you are making sufficient progress on that

9     issue, and if the plaintiffs felt that you were not, then you

10    would be free to file your motion at that point and we would

11    proceed in the normal fashion.

12         Do you have any sense as to -- and this may be very

13    premature -- as to whether you're going to be asking for

14    discovery on that motion?

15         MS. MILLIAN:  We don't anticipate asking for

16    discovery.

17         THE COURT:  That is better in this respect, and that

18    is, that once you file your motion, we can proceed in just the

19    regular orderly way with the District getting the time it's

20    entitled to and the time you're entitled to, to reply, without

21    lengthening the time in discovery, because discovery took up a

22    lot of time in the earlier motions --

23         MS. GERE:  Your Honor --

24         THE COURT:  -- a lot of litigation, too.

25         MS. GERE:  And there was discovery on the pending -- I

1      guess you've now withdrawn your other motions, but there was

2      discovery on those.

3                  THE COURT:  There certainly was --

4                  MS. MILLIAN:  That's true.

5                  THE COURT:  -- with a number of the MCOs coming in.

6                  Anyway, what were you going to say, Mr. Terris?

7                  MR. TERRIS:  It seems October in these circumstances

8      is really too long, Your Honor.  Even if there's -- the real

9      problem here is there is no pressure on the District of

10     Columbia as the defendant when there's no litigation.  The

11     entire -- I've been doing this now for 50 years, and I know

12     absolutely that the best way to get settlements is when there

13     is a considerable threat of litigation.  It's very rare that

14     if there's just a considerable lapse of time to --

15                 THE COURT:  Well, but I'm trying to be realistic, and

16     it's very hard to know how much time is necessary, what is a

17     reasonable period of time to allow for mediation.

18                 MR. TERRIS:  Let me tell you where we're at.  I'm not

19     going to tell you, of course, the issues.  Both sides have

20     presented their position in considerable detail.

21                 THE COURT:  I see.

22                 MR. TERRIS:  There's very big gaps between the two,

23     very substantial gaps, and on the major issues there have

24     been -- I think it's fair to say not movement on either side.

25     There have been some counterproposals, but there has not been

1    really substantial movement.  It seems to me within a 60-day

2    period, either one or another of the two sides on the major

3    issues, we may not be able to solve every single one of the

4    issues in the dental order, but it is only the dental order,

5    we're not talking about the whole thing, that we are going to

6    know if there's prompt responses from the District.  Very

7    frequently, the District has taken a month, six weeks to

8    respond.  And if we're going on that kind of a time schedule,

9    then, of course, I'm wrong about the 60 days, but it seems to

10   me, with the help of the mediator, the District should be able

11   to respond to things within a week or ten days, and we

12   certainly ought to be able to find out whether we're going to

13   get anywhere, I mean to specific things, specific proposals.

14          THE COURT:  We're talking only dental order now?

15          MR. TERRIS:  That's all on this discussion, is the

16   dental order.  That's right, I'm assuming that there's no

17   reason during this period that if there's other things that

18   appear to need litigating we could.  The dental is the only

19   thing under discussion at the moment.  Even then, Your Honor,

20   it seems to me, the mediator is going to know pretty well

21   within 60 days if both sides are going to get prompt

22   responses, which we will commit ourselves to doing.

23          MS. GERE:  Your Honor, I would disagree with much of

24   what Mr. Terris has said in terms of the progress that we have

25   made, but I also believe that the 90 days that Your Honor

1    proposes makes more sense.  And I am sensitive and I so

2    appreciate everyone's understanding for my situation, but this

3    will put us now into the July/August/September time frame,

4    when other people are going to be on vacation presumably.  So,

5    again, as Your Honor said, I think it's important for us to be

6    realistic.  And as these proposals have gone back and forth,

7    it is not, Your Honor, as though there is one person who has

8    the answer to everything on this side of the V.  There are a

9    number of program people involved.  There are a number of

10   other agencies involved.  And we have done, I think, an

11   excellent job -- and I understand Mr. Terris may not

12   agree -- in getting back to him with as complete a response as

13   we can, but we have to coordinate a number of people and a

14   number of agencies.  So I would ask that we leave it at

15   October the 1st.  And as far as there not being an incentive

16   for the District to resolve this case, that is absolutely

17   incorrect.  We have an agency that is consumed with making

18   sure that they are doing the best they can to meet the Court's

19   order, but there is also a significant financial incentive for

20   us to complete this litigation.  We are paying --

21          THE COURT:  Let me just interrupt you.  I'm going to

22   say October 1 and stick with it for this additional reason:

23   It is the summer.  People are in and out.  You can hold me to

24   the October 1 deadline --

25          MR. TERRIS:  Okay, Your Honor.

1        THE COURT:  -- and we're on the record, and I hope you

2    won't need it, but I think that is realistic.  I don't want

3    the District spending its time gathering statistics for an

4    opposition and jeopardizing time better spent in talking with

5    the plaintiff.  And I will send Ms. Wind an email as soon as

6    we're done, telling her that she should set up a meeting for

7    whatever date is appropriate but she needs to do that right

8    away.

9           Okay, everybody, thank you.

10          (Proceedings concluded at 3:58 p.m.)

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Patricia A. Kaneshiro-Miller, certify that the

4  foregoing is a correct transcript from the record of

5  proceedings in the above-entitled matter.

6

7

8  -----------------------------------    ------------------------

9  PATRICIA A. KANESHIRO-MILLER               DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25