## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OSCAR SALAZAR, *et al.*,                    :
                                            :
        **Plaintiffs,**          :
                                            :
    v.                                    :    **Civil Action No. 93-452 (GK)**
                                            :
DISTRICT OF COLUMBIA, *et al.*,             :
                                            :
        **Defendants.**         :

### AMENDED MEMORANDUM OPINION

Plaintiffs have filed a Motion for an Award of Litigation Costs, Including Attorneys' Fees

and Expenses, For 2011 and Certain Categories and Work From 2010 Through 2012 That Had

Previously Been Held in Abeyance or Not Decided [Dkt. No. 1803]. The Court has already awarded

Plaintiffs $476,667.78 [Dkt. No. 1841] that was undisputed by Defendants. Therefore, the amount

remaining to be dealt with in this Motion is $806,933.08, and Plaintiffs seek a total award of

$1,283,600.86.[1] Upon consideration of the Motion, the Opposition [Dkt. No. 1840], the Reply [Dkt.

No. 1859], Defendants' Surreply [Dkt. No. 1899], and the extensive record in this case, the Court

concludes that the Motion should be **granted in part and denied in part**.

Defendants raise many, many objections to the lengthy papers and supporting data filed by

Plaintiffs. Some have merit, many do not, and some are simply trivial. The Court will address in turn

those which merit analysis.

---

[1] Plaintiffs originally sought $1,311,787.26 in fees and expenses. Mot. at 2. However, in their Reply, they reduced their request by $28,186.40. See Reply at 1 n.1.

## I.   APPROPRIATE BILLING RATES FOR COUNSEL

In Salazar I, 123 F. Supp. 2d 8 (D.D.C. 2000), and in all subsequent fee rulings, the Court ruled that the methodology under which the Laffey rates should be updated is properly measured by the Legal Services Index ("LSI") of the Nationwide Consumer Price Index ("CPI"), rather than by the All-Items CPI for the Washington, D.C. area. The Court remains convinced that this methodology is appropriate.

First, despite the fact that Defendants did not appeal the adoption of this method in the 2000 decision, they have recently begun to challenge the use of the LSI. Three years ago, the Court wrote a lengthy explanation of why it rejected use of the All-Items CPI, finding that the LSI is a more reliable index for measuring legal hourly billing in the Washington, D.C. area. Salazar v. Dist. of Columbia, 750 F. Supp. 2d 70, 72-74 (D.D.C. 2011) ("Salazar II"). As the Court originally explained in Salazar I, 123 F. Supp. 2d at 14-15, "the [LSI-adjusted][ Laffey index has the distinct advantage of capturing the more relevant data because it is based on the legal services component of the Consumer Price Index rather than the general CPI on which the U.S. Attorney's Office matrix is based."

In an extremely thorough and well-researched opinion issued recently, Judge Beryl A. Howell of this Court cited data further supporting this conclusion:

> [T]he USAO Matrix is based on a logical assumption, namely, that the rate for legal services in the Washington, D.C. area increases in lock step with the overall rise in the costs of all goods and services, including pizza delivery and cleaning services for this area . . . . There is simply no evidence, however, that this is, in fact, a correct presumption.

> On the contrary, the [Bureau of Labor Statistics] CPI shows that the
> cost of legal services nationally has far outstripped the increase in
> overall prices. The nationwide cost of legal services has jumped
> ninety-one percent, nearly twice as much as the general CPI, since
> 1997. . . . Considering that the Washington, D.C. market is ranked
> third nationally for the highest cost of legal services, behind only New
> York and San Francisco, a nationwide average for the cost of legal
> services logically would be expected to underestimate the rates
> charged in this area. . . . [T]he LSI-adjusted rates are corroborated by
> recent survey data . . . . This survey, reported in Corporate Counsel
> magazine, revealed that the average hourly rate in 2013 for a law firm
> partner in the Washington, D.C. market is $649.24 per hour . . . which
> is $25 per hour higher than the highest rate the LSI-adjusted matrix
> predicts for an attorney with between eleven and nineteen years of
> experience, see LSI-adjusted matrix, and more than two hundred
> dollars more per hour than the corresponding rate in the USAO
> Matrix.

Eley v. Dist. of Columbia, No. 11-309, __ F. Supp. 2d __, 2013 WL 6092502, at *9-*10 (D.D.C.

Nov. 20, 2013); see also Karen Sloan, NLJ Billing Survey: $1,000 Per Hour Isn't Rare Anymore,

National Law Journal (Jan. 13, 2014).

Judge Howell goes on to point out that, "considering that Washington, D.C. is among the

most expensive legal services markets in the country, . . . it would appear that the use of a nationwide

legal service index is, if anything, likely to underestimate the costs of local legal services because

such a rate is an average of all costs nationwide. In short, the LSI-adjusted matrix is probably a

conservative estimate of the actual cost of legal services in this area, but at the very least it appears

to be a more accurate reflection of the cost of legal services both in this community and nationwide."

Eley, 2013 WL 6092502, at * 10 (emphasis in original).

Second, Defendants now claim that use of the LSI contravenes the Supreme Court's ruling

in Purdue v. Kenny A., 559 U.S. 542 (2010). Defendants' reading of Purdue is simply inaccurate.

In that case, Justice Alito set forth the basic applicable law relating to the calculation of attorneys'

fees and expenses in our legal system. Id. at 550-52. In the course of that discussion, he addressed various methodologies used to determine "a reasonable attorney's fees as part of the costs" under 42 U.S.C. § 1988. Id. Recognizing that Congress' purpose in enacting Section 1988 was to "ensure that federal rights are adequately enforced," id. at 550, Justice Alito pointed out that, at this point in time, the overwhelmingly accepted methodology for assessing attorneys' fees under federal fee-shifting statutes is the well known "lodestar method," which "roughly approximates the fee that the prevailing attorney would have received if he or she had been represented by a paying client who was billed for the hours in a comparable case." Id. at 551 (emphasis in original). This method is often referred to as "the number of hours reasonably expended multiplied by a reasonably hourly rate." Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc).

After setting forth the "six important rules" that governed the case, Justice Alito focused on the particular facts involved, the ruling of the District Court Judge granting a 75 percent increase of the lodestar amount, and the ruling of the Court of Appeals affirming the District Court. 559 U.S. at 552-59. The Supreme Court concluded that "the District Court did not provide proper justification for the large enhancement that it awarded." Id. at 557.

This case does not involve an enhancement. Rather, it involves a totally different issue -- the method for updating the lodestar amount over time to reflect the direction in which hourly legal fees are moving throughout the country. That is a far cry from the issues in Purdue where the trial judge increased the lodestar by 75 percent without giving any justification for his actions.

Thus, in this case, the issue is whether an index which measures the movement of national legal service costs to calculate increased legal fees is more reasonable and accurate than an index which measures the costs of numerous non-legal consumer items, calculated for the Washington

-4-

D.C. area. Defendants have made no attempt and offered no evidence to show that the methodology focusing on all consumer goods in the Washington, D.C. area provides more accurate rates than the methodology that focuses on the costs of legal fees throughout the country.

Defendants argue that Purdue was an intervening change in the law that "provides district courts with clarity as to how to calculate reasonable attorneys' fees under § 1988." Defendants' Opp'n at 53. Since Purdue was decided more than nine months before Salazar II was issued, it cannot exactly be considered an "intervening" change in the law. Regardless, as noted above, the analysis in Purdue dealt solely with an enhancement of the lodestar, an issue irrelevant to this case. Using a particular method (i.e., applying the LSI to the Laffey rates) to calculate attorneys' fees does not constitute an enhancement. Consequently, the Supreme Court's ruling does not provide guidance on this issue.

The Court is not insensitive to the fact that this case, filed in 1993, has generated very substantial attorneys' fees for Plaintiffs -- fees which are ultimately paid by D.C. taxpayers. However, as our Court of Appeals noted more than thirty years ago, although "the government has a deep pocket . . . we think . . . that fees should be neither lower, nor calculated differently, when the losing defendant is the government." Copeland, 641 F.2d at 896 (internal quotation marks omitted).

Moreover, the bottom line is that Defendants entered into a Settlement Order in this case which requires Plaintiffs' counsel to provide extensive monitoring of the provision of EPSDT services to class members. The day that the Parties are able to come to a final settlement in this case,[2]

---

[2] The Court is well aware that the Parties have over the course of this litigation settled some relatively minor issues, and that they are even now attempting to settle some major issues relating to the Settlement Order. The Court has always encouraged their efforts and has done whatever it could appropriately do to support their efforts.

it will no longer be necessary to calculate reasonable attorneys' fees in order to ensure that children

in the District of Columbia obtain all the EPSDT benefits to which they are entitled. Both Supreme

Court and D.C. Circuit precedent is clear that party identity is not a legally cognizable reason for

reducing an attorneys' fee award in civil rights litigation. Id.; Save Our Cumberland Mountains, Inc.

v. Hodel, 857 F.2d 1516, 1524 (D.C. Cir. 1988).

## II.     APPROPRIATE BILLING RATES FOR SERVICES OF PARALEGALS TO INDIVIDUAL CLASS MEMBERS, PURSUANT TO PARAGRAPH 64 OF THE SETTLEMENT ORDER

First, Defendants argue that Paragraph 64 of the Settlement Order prohibits "non-lawyers,"

i.e., paralegals and law clerks, from being compensated for their work on behalf of individual class

members. Defs.' Opp'n at 10-12. As already noted, Paragraph 64 provides in relevant part that:

> Plaintiffs' counsel may respond to all calls which come to their office and make reasonable inquiry to determine whether the caller is a member of the plaintiff class. If the caller is a member of the plaintiff class, Plaintiffs' counsel may provide the caller with legal assistance. The reasonable time and expenses of Plaintiffs' counsel in making such inquiry and providing such legal assistance shall be deemed compensable monitoring of this Order under 42 U.S.C. § 1988 and applicable law interpreting that statutory provision. The hourly rate for handling the claims of individual class members shall be $75/hour, regardless of the experience level of the lawyer who performs the work.

Order Modifying the Amended Remedial Order of May 6, 1997 and Vacating the Order of March

27, 1997, at 40 (emphasis added) [Dkt. No. 663] ("Settlement Order").

It is undisputed that section 1988 and the "applicable law interpreting that statutory

provision" governs the computation of "reasonable time and expenses" for responding to all calls

that come into Plaintiffs' office and, if the caller is a member of the plaintiff class, for providing that

caller with legal assistance. Moreover, Paragraph 64 sets an hourly rate far below what would have

-6-

been charged in the legal community in 1999 when the parties agreed to the Settlement Order. See Salazar I, 123 F. Supp. 2d at 10 (noting that Paragraph 64 sets out an hourly rate of $75.00 per hour, regardless of experience, while Paragraph 65 sets a scale of billing rates for attorney work between $200 and $315 per hour).

In Missouri v. Jenkins, 491 U.S. 274 (1989), the Supreme Court explained that Section 1988's "reasonable attorney's fees cannot have been meant to compensate only work performed personally by members of the bar." Id. at 285 (internal quotations omitted). The Court then noted "the self-evident proposition" that attorney's fees would encompass "the work of paralegals." Recently, in Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571 (2008), the Supreme Court reaffirmed Jenkins, and said that they "were so confident that Congress had given the term 'attorney's fees' this traditional gloss that we declared it 'self-evident' that the term embraced the work of paralegals as well as attorneys." Id. at 580 (quoting Jenkins, 491 U.S. at 285).

In sum, the Supreme Court has made it crystal clear that paralegals may be compensated for providing certain types of legal services to clients.

Second, Defendants' claim that both Plaintiffs and Defendants never "contemplated . . . that these legal services would be performed by paralegals" lacks any factual foundation. Defs.' Opp'n at 11.

Finally, it should be noted that Plaintiffs have filed 23 prior fee applications since entry of the Settlement Order.[3] On each of those occasions, Defendants paid compensation for paralegals and law clerks to assist individual class members as provided in Paragraph 64 of the Settlement Order. It is a little late for Defendants now -- after the passage of many years -- to challenge the

---

[3] Defendants did not dispute this assertion.

interpretation of one of the key provisions of that Order. They had 23 prior chances to do that and failed to raise the arguments they are now making.[4]

## III.   ADEQUACY OF TIME RECORDS

Defendants make an across-the-board argument that Plaintiffs' time records are vague and inadequate because Plaintiffs have not recorded separately the work that their paralegals performed for each of the 1,276 individuals for whom Plaintiffs provided assistance in 2011. Defs.' Opp'n at 13-14. In its Memorandum Opinion of October 28, 2009 [Dkt. No. 1520, p. 7 n.10], the Court rejected the same argument, and also noted that the parties had reached an agreement in 2003 to use the individual-caller chart which Plaintiffs created to present adequate information regarding the work done on the behalf of individuals.

Moreover, Plaintiffs have, in this fee application, filed Exhibit 22 (under seal).  It contains a brief summary as to each individual and, complying with the parties' 2003 agreement, provided Defendants with information as to each of the 1,276 individual claimants assisted. Finally, Plaintiffs have presented summaries of how much time was spent on various work for individual cases, i.e., recertification, reimbursement, referral for non-class members, etc. Pls.' Ex. 8, at 1-9.

Defendants have asked the Court to reduce fees in this category by 40 percent or to require Plaintiffs to resubmit their time records with additional data. The Court sees no justification for the request and it is **denied**.

---

[4] The irony is that if Defendants' argument prevailed, they would have to pay far more in fees for the work of attorneys than they have been paying for the work of paralegals.

## IV.     LEGAL WORK ON BEHALF OF INDIVIDUAL CLASS MEMBERS

### A.     Unsuccessful Individual Claims

Defendants object to fees that Plaintiffs have requested for work on particular individual claims on which they did not prevail. Defs.' Opp'n at 15. However, Defendants ignore the Supreme Court's statement that in a case involving post-judgment monitoring of a consent decree, "measures necessary to enforce the remedy ordered by the District Court cannot be divorced from matters upon which [Plaintiffs] prevailed in securing the consent decree." Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 558-59 (1986). Plaintiffs are entitled to attorneys' fees for the work they do to monitor Defendants' compliance with the extensive and detailed Settlement Order, negotiated and consented to by all parties in this case, as long as the efforts of Plaintiffs' counsel are "reasonably related to the claims upon which Plaintiffs were definitely successful." Turner v. Orr, 785 F.2d 1498, 1504 (11th Cir. 1986)).

The Court agrees that each individual claim has to be examined separately to establish that a reasonable amount of hours was expended, but Plaintiffs' failure to prevail on a particular claim does not mean automatic non-payment of all requested fees. Defendants have failed to demonstrate that the four individual claims they challenge involved claims "distinct in all respect from [Plaintiffs] successful claims." Nw. Coal. for Alternatives to Pesticides v. Browner, 965 F. Supp. 56, 65 (D.D.C. 1997)). The Court finds that those four claims presented issues that "were inextricably intertwined" with the issues underlying the original suit and the Settlement Order in this case. See Blackman v. Dist. of Columbia, 390 F. Supp. 2d 16, 20 (D.D.C. 2005) (noting that

"test is whether the later issues litigated were inextricably intertwined with those on which the plaintiff prevailed in the underlying suit.") (quotation and citation omitted).

Representing Plaintiffs in administrative hearings to enforce claims upon which Plaintiffs prevailed at an earlier stage of this litigation is a form of monitoring that this Court has long recognized as compensable. See, e.g., Mem. Op. of Aug. 7, 2003, at 2-4 [Dkt. No. 966]; Mem. Op. & Order of Mar. 14, 2011 [Dkt. No. 1723]; Mem. Order of March 14, 2011 [Dkt. No. 1724]. To hold otherwise would be inequitable and discourage Plaintiffs' counsel from aggressively representing clients who needed their help. Finally, it should not be forgotten that, pursuant to Paragraph 64 of the Settlement Order, attorneys working on such "monitoring" cases are paid far below the updated Laffey rates.

In sum, there is no justification for the reduction of all fees for the four claims challenged by Defendants in which Plaintiffs were not successful.

### 1. The "D.C." Claim

Plaintiffs brought a case before the Office of Administrative Hearings ("OAH") regarding the denial of dental services to "D.C." The case was dismissed with prejudice, and Plaintiffs billed $17,318.20 for 132.2 hours of legal services. There is no question that the denial of EPSDT services was "inextricably intertwined" with the claims on which the Plaintiffs prevailed in this law suit. Defendants are simply wrong that this claim is "distinct in all respects from [the] successful claims." Northwest Coal., 965 F. Supp. at 65.

### 2. The "A.M." Claim

Plaintiffs billed the District of Columbia $18,399.87 for 140.46 hours for the representation of A.M. During the pendency of the case, A.M. was removed by the District Child

and Family Services Agency to a foster home due to allegations of neglect. After A.M.'s removal, Plaintiffs voluntarily dismissed the law suit. Defendants argue that the requested fees are excessive and that no work related to the neglect allegations should be compensated because that does not fall within the scope of work for individual claims pursuant to Paragraph 64.

It is true that work related to the neglect allegations does not fall within the scope of the Settlement Order. It also appears that the number of hours spent on this claim was excessive, and Plaintiffs have not responded to several of Defendants' examples of overbilling. Taking all matters into consideration, the Court concludes that the claim for $18,399.87, less the 3.4 hours already reduced by Plaintiffs, see Pl. Ex. 23, ¶ 15(a), should be reduced by 25 percent.

### 3.    The "N.W." and "R.H." Claims

Plaintiffs filed a petition for N.W., but withdrew it when the firm lost contact with her and the case was dismissed. Plaintiffs represented R.H. until he failed to keep a dental appointment and the firm lost contact with him. That case was also dismissed by OAH. Defendants identify no evidence that indicates the representation of these two children was outside the scope of the Settlement Order, nor that the dismissals were on the merits. Indeed, in Defendants' Surreply, they concede that Plaintiffs prevailed on N.W.'s claims before the OAH. Defs.' Surreply at 11 n.4. However, the amounts claimed ($5,311.70 for 40.547 hours, and $4,273.88 for 32.625 hours for N.W. and R.H., respectively) are somewhat excessive. Therefore, there will be a 10 percent reduction for these claims.

**B.    Alleged Excessive Billing for Claims of "T.H.," "J.H.," "B.R.," and "L.C."[5]**

Defendants' second argument is that Plaintiffs billed an excessive amount of time for work on particular individual claims. First, Plaintiffs billed the District of Columbia $39,690.38 for 302.98 hours work on the OAH hearing of a single petitioner, T.H.. The claim related to the denial by Chartered Health Plan, Inc. of physical therapy, occupational therapy, private physical fitness classes, and case management services to the petitioner. Defendants argue that the hours are particularly high considering counsel had only two status conferences regarding this petitioner, one of which was a telephone conference. Moreover, Plaintiffs also billed for an unsuccessful motion for reconsideration of a discovery order. The parties eventually settled the matter.

Second, Plaintiffs billed Defendants $19,909.82 for 151.983 hours related to the case of "J.H." Counsel had only one status conference and the claim was ultimately settled.

Third, Plaintiffs billed Defendants $15,740.70 for 120.158 hours related to the case of "B.R." In their Reply, Plaintiffs asserted that Defendants have mistaken this case for the case involving L.C.. The "B.R." case was resolved for the claimant through a confidential settlement agreement. Defendants have not responded to the contrary in their surreply.

Finally, Plaintiffs did bill Defendants $25,210.69 for 192.448 hours of work for the "L.C." claim. This case was a successful claim for approximately $5,000 in orthodontic services for the child.

---

[5] Plaintiffs complain that Defendants make no representation as to how many hours their own counsel spent on these cases. Such a comparison would, for many reasons, be of little use to the Court.

As to the "T.H.," "J.H.," and "L.C." claims, Defendants argue that the number of hours and the resulting fees claimed were excessive. In looking over the figures submitted by both sides, and taking into account the fact that a number of these children were seeking treatment for disabilities, the Court still concludes that the number of hours spent by Plaintiffs were excessive.[6]

In sum, Plaintiffs billed close to $85,000 for work on three cases presenting similar issues. The Court concludes that a reduction of 15 percent is appropriate for these three claims.[7]

## V.   WITHDRAWAL OF ASSOCIATE

Defendants accuse Plaintiffs' counsel and, in particular, Mr. Tabesh, of "misrepresentation" and a "lapse of professional conduct." Defs.' Opp'n at 38-39. These very serious allegations have no support in the record. Defendants dispute fees incurred resolving the erroneous appearance of Mr. Tabesh, who had been a member of the California Bar, but who was not eligible to practice in the District of Columbia for some period of time. Eventually, Administrative Law Judge Claudia Barber ruled "that Ehsan Tabesh has clarified all questions surrounding his entry of his appearance in this matter and remains eligible to practice before this administrative court." Pls.' Ex. 74.

Although there was nothing illegal or unethical in Mr. Tabesh's conduct, Plaintiffs did bill the District of Columbia 16.517 hours to prepare materials to correct the issue of Tabesh's

---

[6]   For example, Mr. Tabesh billed over 9 hours to file a motion to continue a status conference for B.R. and 1.583 hours to draft a simple notice of appearance. Those amounts are clearly excessive.

[7]   Defendants' compare the hours spent by counsel for the Managed Care Organizations in these matters and the hours spent by Plaintiffs' counsel. So many different factors enter into the reasons for the differences between the two set of counsel that the Court finds the comparison of no help whatsoever.

appearance and eligibility to practice in the District of Columbia. The District of Columbia is not
required to pay for these 16 hours costing $2,163.68.

## VI.    INTRA-OFFICE CONFERENCES

Defendants claim that Plaintiffs billed approximately $25,000 for inter-office
conferences. Even though their estimate is approximate, due to "block billing and the scattered
references to inter-office conferences throughout the over 6,000 billing entries," Defs.' Opp'n at
41, Plaintiffs do not dispute that they spent at least that amount in conferences. Pls.' Reply at 40
n.25. This Court has commented previously on the tendency of Plaintiffs to over-staff their work.
See e.g., Mem. Op. of May 29, 2008, at 5 [Dkt. No. 1367]; Mem. Op. of May 29, 2008, at 5 [Dkt.
No. 1370]; Mem. Op. of June 4, 2008, at 4-5 [Dkt. No. 1373]; Mem. Op. of Jan. 14, 2011, at 9, 9
n.5 [Dkt. No. 1680]. There are certainly instances in the billing entries in which 3, 4, or 5 lawyers
attended, and presumably participated in, such conferences. As the Court has held previously,
this is unnecessary, and the amount shall be reduced by 20 percent.[8]

## VII.   APPELLATE WORK

Plaintiffs have billed the District of Columbia $219,633.05 for appellate work on behalf
of their clients.

On August 5, 2010, the Court denied a portion of the District of Columbia's Motion to
Terminate the Consent Decree [Dkt. No. 1619]. In 2011, the District appealed that ruling. The
Court of Appeals held that the August 5, 2010, Order was not a "final decision," as required by

---

[8] While it is true that our Court of Appeals has held that the District Court has discretion to
allow billing for time spent by lawyers conferring, that does not mean that four or five lawyers need
to participate in -- or need to bill for -- so many conferences. Concerned Veterans v. Sec'y of
Defense, 675 F.2d 1319, 1337 (D.C. Cir. 1982).

28 U.S.C. § 1291(a)(1), and dismissed the appeal for lack of jurisdiction. Salazar v. Dist. of Columbia, 671 F.3d 1258, 1259 (D.C. Cir. 2012).

Based on Plaintiffs' billing records, 11 different individuals, including partners, associates, and paralegals, worked on this appeal, mostly between March and October 2011. The District of Columbia notes that it was billed $5,553.02 for four attorneys to simply watch the oral argument in the Court of Appeals, and that one associate billed $14,961.55 for "legal research" and $59,240.94 to "page proof version of the brief." Defs.' Opp'n at 24-25. Finally, Ms. Perkins and Rev. Cunningham billed another $5,578.40 for working on the appeal.

Plaintiffs respond that writing their 58 page appellate brief was particularly time-consuming because of the complex substantive issues raised by Gonzaga University v. Doe, 536 U.S. 273 (2002), as well as a significant procedural issue. Plaintiffs did finally prevail on the procedural issue, and, thereafter, the appeal was dismissed. Plaintiffs also argue that Defendants are mistaken when they claim they were billed $5553.02 for four attorneys to watch the oral argument "because they included in that calculation the $2,446.49 represented by Kathleen Millian's oral argument." Only Ms. Millian's time should be charged to Defendants.[9]

Plaintiffs' factual assertions are correct, but do not address the Defendants' argument that there was substantial overbilling in this case.[10] The Court agrees with the Defendants, but concludes that their request for a 40 percent reduction in the fees is far too large. The fees for this

---

[9] It should be noted that observing attorneys were free to read the transcripts. While it may have been an enjoyable and educational experience for three other attorneys to witness the oral argument, that does not justify the District of Columbia paying for that experience.

[10] Again, almost $15,000 was spent on legal research and almost $60,000 was spent on page proofing the brief.

appellate litigation should be reduced by 20 percent, plus the fees for the three attorneys who observed oral argument.

## VIII.  LITIGATION OF THE 2005 FOIA REQUEST

Plaintiffs billed the District of Columbia $7,445.98 for reviewing documents which were "apparently produced in response to a 2005 Freedom of Information Act ("FOIA") request." Defs.' Opp'n at 40.

Plaintiffs argue that their time records show that they spent 20.9 hours reviewing the documents received in response to their FOIA request, drafting an internal memorandum, and selecting relevant documents to be placed on the firm's website. The Court concludes that the amount sought by Plaintiffs is not unreasonable.

## IX.  ATTENDANCE AT MEETINGS OF THE D.C. MEDICAL CARE ADVISORY COMMITTEE ("MCAC")

Plaintiffs billed the District of Columbia $4,222.79 for two lawyers and four paralegals to attend the monthly conferences of the MCAC. Plaintiffs explain that it is important that they keep up to date on plans and announcements of the District of Columbia Department of Health Care Finance about the Medicaid program. Moreover, they also point out that by sending paralegals rather than lawyers, they have been efficient and have saved the District of Columbia money that would have been charged if lawyers had attended these eight meetings. Consequently, Plaintiffs are entitled to $4,222.79 for attending these meetings.

## X.  CLERICAL ACTIVITIES

Defendants claim that Plaintiffs should not receive $14,401.09 for "numerous billings for purely clerical activities that are designated as 'Document/Database Management.'" Defs.'

Opp'n at 42. Plaintiffs agree with the principle that "purely clerical or secretarial tasks should not be billed at a paralegal rate regardless of who performed them." Pls.' Reply at 50 (citing Missouri v. Jenkins, 491 U.S. at 288 n.10). Plaintiffs deny that the tasks performed by the paralegals were clerical, and remind Defendants that it would cost far more if lawyers were entering all the relevant information into the related database and managing and tracking the large number of cases for the individual claims that Plaintiffs were handling. Id.

The Court concludes that billing $14,401.09 for document and database management over a period of more than a year is not unreasonable or excessive.

## XI.   SETTLEMENT DISCUSSIONS

During 2011, the Parties engaged in settlement discussions on a number of different issues for all of which Plaintiffs billed the District of Columbia $150,449.85.[11] Defendants claim that the Plaintiffs had at least three attorneys at each meeting, with four more attorneys and four paralegals working "behind the scenes," whereas the District of Columbia was represented by only one lawyer at these settlement discussions.

First, the comparison between Plaintiffs' participants and Defendants' participants at settlement discussions is a comparison between apples and oranges. Plaintiffs do not have health care professionals on their staff, whereas the Government has access to Ms. Sonosky and numerous other experienced professionals who come and go at settlement discussions depending upon the topic discussed.

Second, Plaintiffs deny that the Defendants had only one lawyer at these settlement discussions. To the contrary, according to Plaintiffs, at 11 of the 15 settlement meetings,

---

[11]   Plaintiffs voluntarily deducted $1,038.45 in their Reply. Pls.' Reply at 32 n.19.

Defendants were represented by two or more lawyers. In addition, some of the agency professionals present at each meeting were also lawyers, and at 10 of the 15 meetings, Defendants had more representatives present than Plaintiffs. Defendants retort that those attorneys were participating as agency clients, not as litigation attorneys. Defs.' Surreply at 17. Still, the Court notes that Defendants had a lot of experienced, knowledgeable individuals participating and Plaintiffs were entitled to have numerous individuals on hand to respond to the issues they raised.

Third, it should be remembered that Plaintiffs bill for Settlement Discussions at the low monitoring rate contained in Paragraph 65 of the Settlement Order, not at the rate they are receiving for non-monitoring work under Paragraph 66. Mot. at 2 n.1, 4. In sum, the Court does not find any basis for reducing the fees requested in this category.

## XII.   AGENDA LETTERS AND STATUS CONFERENCES

Plaintiffs request $52,730.52 for preparation for and attendance at six Status Conferences during 2011. Plaintiffs' overcharging for their preparation for and attendance at Status Conferences has long been an issue, and requests for that category of fees have been reduced multiple times. On January 4, 2011, the Court held that the approximately $4,800 that the Plaintiffs billed for each Status Conference for the period of July through December 2007 and for 2008 should be reduced by 10 percent, i.e., approximately $4350 per conference. Salazar II, 750 F. Supp. 2d at 74. The $52,730.52 sought in this petition works out to an average of $8,788.41 for each of the six Status Conferences conducted in 2011. Thus, even though Plaintiffs' last fee request for Status Conferences was cut by 10 percent, they have now submitted a request that is almost double the average amount of fees per conference permitted by the Court.

-18-

Plaintiffs raise several arguments. First, they claim that Defendants' statement that seven attorneys billed for preparation of the Agenda Letters is incorrect and that, with one exception, only one associate and two partners billed for preparation of Agenda Letters in 2011. Second, Plaintiffs assert that only one partner and one associate usually represented Plaintiffs in Status Conferences in 2011. These are both in accord with the Court's recollection. Third, Plaintiffs emphasize the usefulness of the Agenda Letters to convey complex information in an accessible and efficient manner.

Although Plaintiffs' arguments are accurate and reasonable, they do not alter the fact that $8,788.44 in fees for each Status Conference is unreasonably high. Hopefully, this issue will not have to be raised again in subsequent fee petitions.[12] It is particularly hard to understand why, after being told in <u>five</u> previous fee decisions that their billing per Status Conference was too high, Plaintiffs would now come in with a fee request that is almost double the amount last granted. <u>See</u> Mem. Op. of May 29, 2008, at 4-5 [Dkt. No. 1367]; Mem. Op. of May 29, 2008, at 3-4 [Dkt. No. 1370]; Mem. Op. of June 4, 2008, at 4 [Dkt. No. 1373]; Mem. Op. of Oct. 28, 2009, at 9-10 [Dkt. No. 1520]; Mem. Op. of Jan. 14, 2011, at 7 [Dkt. No. 1680]. Consequently, the Court will reduce this fee request by 35 percent.[13]

---

[12] The Court is still of the view that the letters are informative and are very helpful in highlighting important issues. However, the Court firmly believes useful letters can be produced in less time.

[13] The District of Columbia points out that in addition to the average billing of $8,788.41, Rev. Cunningham billed an additional $4,463.10 in this category, averaging out to $743.85 for each of these same six Status Conferences. The Court cannot imagine what Rev. Cunningham had to contribute to the preparation of these conferences, and those fees shall not be allowed.

## XIII. BILLING MORE THAN EIGHT HOURS A DAY

Defendants claim that on 22 occasions in 2011, at least six lawyers billed the District of Columbia more than eight hours in one day for a total of $63,375.67. Defendants do not give any substantive reason as to why these fees should not be paid. While this Court does not endorse forcing lawyers to work exhausting hours, it has absolutely no business telling them how many hours a day they should work if they are capable of doing so. Thus, the Court will not reduce Plaintiffs' fees on that basis.[14]

## XIV. FEES REQUESTED BY CO-COUNSEL

Plaintiffs billed the District of Columbia a total of $52,917.10 in 2010 and 2011 for legal services of two co-counsel who had minimum involvement in this lawsuit. Jane Perkins billed $26,458.50 in 2010 and 2011, and Rev. Lynn E. Cunningham billed fees in the amount of $20,135.30. Both of these individuals have extensive experience in public interest litigation attempting to secure the rights of poor people for adequate health care. However, that experience, in and of itself, does not justify the work claimed to have been done in this case. Neither one of these lawyers have appeared in any Court proceeding in this case; neither one has attended any of the informal status conferences which this Court has held on a regular basis; and neither appears to have written any major pleading in the case. Moreover, Ms. Perkins lives in Carrboro, North Carolina, and Rev. Cunningham lives in Dubois, Wyoming. Virtually all of the work that they claim to have done is either research which could easily have been done by Plaintiffs' lawyers or paralegals in their District of Columbia office, or brief telephone consultations about written pleadings being prepared for filing.

---

[14] Plaintiffs already reduced the request by $4,666.55, after identifying a billing error. See Pls.' Reply at 50 n.34.

Plaintiffs have simply not made a convincing case for the use of these attorneys to provide additional legal advice. Moreover, the senior partner at Plaintiffs' law firm, Bruce Terris, has been in public interest practice at least as long as Ms. Perkins and Rev. Cunningham; has litigated public interest cases on behalf of poor people extensively in cases in the District of Columbia, as well as other areas of the country; and, therefore, is fully qualified to do the kind of last minute oversight that Ms. Perkins and Rev. Cunningham seem to be providing.

In short, as the Court has already noted, there is over-lawyering in this case. See supra Sec. VI (noting the many prior fee petitions wherein this Court has found overstaffing). The research and critiques that Perkins and Cunningham have supplied are simply excessive and not necessary to provide the high quality legal work that the Court has often acknowledged that Plaintiffs' counsel provides. Consequently, the Court is going to limit the fees for co-counsel to 50 percent of what is being sought.

## XV. FEES ON FEES

Plaintiffs have billed the District of Columbia $143,886.51 for "fees on fees." Of that amount, a little less than 50 percent was for discussions that ultimately resulted in settlement of disputed fee issues. Defendants admit that billing for "fees on fees" is permissible. See INS v. Jean, 496 U.S. 154, 162-66 (1990) (evaluating fee petitions under the Equal Access to Justice Act). After considering all the arguments presented by counsel, the Court concludes that the fees requested should be reduced.

### A.    Plaintiffs' Motion for Reconsideration of the Court's Decision in Salazar II

Plaintiffs are seeking $46,934.83 for the hours that they spent on their successful Motion for Reconsideration [Dkt. No. 1700] of the Court's January 24, 2011 Decision [Dkt. Nos. 1679,

1680], which imposed a 50 percent reduction in the fees requested by Plaintiffs relating to an underlying 2010 Motion relating to blood/lead testing enforcement [Dkt. No. 1526]. In granting the Motion for Reconsideration, the Court noted that the amount of fees in dispute was $19,798.86. Mem. Op. & Order of March 14, 2011, at 2 n.1 [Dkt. No. 1723]. As Defendants point out, "Plaintiffs are now seeking $46,934.83 (more than twice the amount of money at issue in the original motion) for the preparation and filing of this one motion . . . . What is more, Plaintiffs are requesting additional fees of $9,957.35 in connection with reading and reviewing the Court's Orders of January 4 and 11, 2011[.]" Defs.' Opp'n at 27.

In short, Plaintiffs have spent a total of $56,892.15 to successfully obtain fees of $19,798.86 -- almost three times the underlying successful fees ruling. While the Court understands Plaintiffs' argument as to how important the Motion for Reconsideration was, the lack of proportion between the costs of litigating that Motion versus the success that was obtained, makes no sense and is unreasonable. Consequently, the Court concludes that the total request for $56,892.15 should be reduced by 30 percent.

### B.    Parties' Settlement of Fee Requests for Fees Incurred During 2009 and 2010, and Attempted Settlement of Fees Requested for 2011

Plaintiffs seek $73,650.45 for the time they spent settling their fee requests for the periods January 2009 to December 2010 [Dkt. Nos. 1748, 1786]. As a result of these successful settlement proceedings, the Parties agreed that Defendants would pay $2,044.090.00 for the work done during the period of time covered by the two Motions.[15]

---

[15] This Opinion originally stated that the amount requested was close to one third of the total settlement of the underlying petitions. Plaintiffs filed a Notice identifying that the amount sought was 3.6% of the total settlement [Dkt. No. 1920], and Defendants agreed and had "no objection to the Court amending its Memorandum Opinion to correct this mathematical error."[Dkt. No. 1921].

Again, the number of hours spent on settlement of the two underlying fee requests is unreasonably high. Plaintiffs billed as much in fees for filing two unopposed motions as they billed for filing two opposed motions. Defs.' Opp'n at 28-29. There is no explanation by Plaintiffs for this billing.

Moreover, Plaintiffs seek an additional $12,272.42 for attempted settlement of this fee request for work done in 2011. Again, the amount is quite high. For example, the 23.633 hours which Plaintiffs devoted to attempted settlement of the 2011 fees were supported by billing records put together by a partner and an associate with only one paralegal being used; much of this work could have been done by additional paralegals. The result was that approximately 92 percent of the total fees for this category was billed by lawyers, not paralegals.

In sum, the Court concludes that the request for fees for hours spent in settlement negotiations should be reduced by 15 percent.

## XVI.   MOTION TO ENFORCE PARAGRAPH 46

Defendants object to Plaintiffs' request for $13,900.33 for work on their Motion to Enforce Verification of Certain EPSDT Information, Pursuant to Paragraph 46 of the Settlement Order [Dkt. No. 1635]. Ultimately, the Court denied the Motion [Dkt. No. 1743].[16]

Defendants repeat their argument which the Court has already dealt with in Section IV.A. In Sierra Club v. EPA, 769 F.2d 796, 801-02 (D.C. Cir. 1985), our Court of Appeals stated that the District Court must conduct an issue-by-issue analysis of fees requested to prevent a party from "piggybacking" fees for unsuccessful claims upon unrelated successful claims. However, Sierra Club did not hold that the prevailing party in the law suit must be denied all attorneys' fees

---

[16]   The Court notes that the Motion was denied without prejudice.

for every unsuccessful motion it brings. Plaintiffs' request for Defendants to comply with Paragraph 46 of the Settlement Order by performing an independent verification of the Centers for Medicare and Medicaid Services Form 416 data is "inextricably intertwined" with all the EPSDT issues upon which they prevailed in this lawsuit.[17] See Blackman, 390 F. Supp. 2d at 20. Moreover, Plaintiffs' Reply Brief for their Motion was also a successful Opposition to Defendants' Cross-Motion to suspend the operation of the independent audit requirement of Paragraph 46 of the Settlement Order.

For all these reasons, the Court concludes that no reduction in fees for work on this Motion is warranted.

## XVII. REVIEW OF NASHP REPORT

As part of this litigation, the Court commissioned a report on certain EPSDT measures. That Report was funded by the Penalty Fund created in connection with this case [Dkt. No. 1657]. The Report, titled Using Measures and Electronic Reporting to Improve Well Child Care for Medicaid Enrolled Children:  Implications for the District of Columbia (2011), was prepared by the National Academy For State Health Policy ("the NASHP Report").

Defendants object to the request for $13,339.98 for five different individuals to review, make notes on, and discuss the Report. In addition, Defendants object to the billing by Ms. Perkins of $2,830.40 for 6.1 hours for reading the report, and object to the billing by Rev. Cunningham of $1,515.25 for 2.75 hours. In other words, Defendants object to $15,478.07 for review of the NASHP Report and request a 70 percent reduction in this figure. The Court concludes that while the fees are excessive, a 70 percent reduction is far too high. The fee

---

[17] As counsel well know, the accuracy of Form 416 data has been in doubt for many years.

amounts attributed to Perkins and Cunningham will be **denied** because there was no adequate justification or explanation for their participation, and the $13,339.98 shall be reduced by 15 percent.

## XVIII. THE HSCSN-McKESSON APPEAL

Plaintiffs seek $24,371.76 in fees for 57.548 hours of work[18] related to the appeal by non-party McKesson Health Solutions ("MHS") of this Court's decision ordering MHS to provide the InterQual® Criteria to Plaintiffs [Dkt. No. 1646].

Plaintiffs engaged in extensive litigation with Defendants, their contractor HSCSN, and HSCSN's subcontractor MHS to obtain via discovery the InterQual® Criteria used by HSCSN in deciding whether to provide home health care services to members of the class. The Court repeatedly ordered that this material be produced to Plaintiffs. What is more, on four different occasions, the Court has awarded fees for this work. Salazar II, 750 F. Supp. 2d. at 74; Mem. Op. of Oct. 28, 2009, at 5 [Dkt. No. 1520]; Mem. Op. of June 4, 2008, at 1-2 [Dkt. No. 1373]; Mem. Op. of May 29, 2008, at 1-2 [Dkt. No. 1370].

Once again, it is abundantly clear that the efforts of Plaintiffs to obtain the InterQual® Criteria in order to adequately evaluate HSCSN's decision about providing home health care services to children is "inextricably intertwined" with and relevant to the issues upon which Plaintiffs prevailed in this lawsuit.

Defendants argue that Plaintiffs should be denied all fees for this effort because (1) Defendants had no direct control over MHS since it was HSCSN's contractor, and (2) the confidentiality agreement Plaintiffs ultimately entered into with MHS required Plaintiffs to enter

---

[18] Plaintiffs allege that this is the amount sought for this work, not the higher amount identified by Defendants in their Opposition. Pls.' Reply at 38 n.24.

a Protective Order which was almost identical to the terms MHS requested prior to its intervention in this lawsuit. While it is true that Defendants did not have immediate control over MHS in its role as a subcontractor to HSCSN, Plaintiffs are correct that HSCSN itself did have direct control over MHS and could have forced it to provide the requested discovery. Undoubtedly, this litigation was important to members of the Plaintiff class so that Plaintiffs' counsel could understand the criteria being used to decide whether to provide home health care services to disabled children. Thus, the amount of hours worked, 57.548, approximately one and a half weeks of lawyer time, was reasonable. Defendants' request to deny all fees for this portion of the litigation is **denied**.

## XIX.  WORK PERTAINING TO DENTAL ORDER

Plaintiffs seek a total of $47,332.39 in fees for work related to discovery regarding their Motion to Modify the Dental Order of October 18, 2004 [Dkt. No. 1627]. Plaintiffs filed their Motion on September 3, 2010, which the Defendants opposed [Dkt. No. 1649]. Thereafter, Plaintiffs filed a Motion for Leave to Conduct Limited Discovery Concerning the Provision of Dental Services to Children in the Plaintiff Class in 2009 and 2010 [Dkt. No. 1661]. The Court granted Plaintiffs' Motion in part and permitted them the right to pursue limited discovery [Dkt. No. 1706]. Ultimately, Plaintiffs withdrew their request after conducting a certain amount of discovery and engaging in settlement discussions. Plaintiffs requested, with Defendants' consent, that the Court stay further briefing on the Motion to Modify [Dkt. No. 1771]. The Court granted that request. Ultimately, Plaintiffs withdrew their Motion to Modify the Dental Order [Dkt. No. 1789].

While the parties disagree as to the extent to which Plaintiffs were successful in their Motion for Leave to Conduct Limited Discovery, Plaintiffs argue that they obtained substantial relief because the discovery produced was sufficient to determine whether Defendants were complying with Paragraph 2(a)(2) of the Dental Order. The provision of dental services to the Plaintiff class has been a long-standing problem. Unquestionably, seeking discovery about a subject "inextricably intertwined" with the underlying issues in this case was appropriate, and the hours spent were not excessive. Thus, the Court will permit these fees.

## XX.  EXPENSES

Finally, for the first time, Defendants raise several challenges to various expenses sought by Plaintiffs.

### A.    Standard of Review

The Settlement Order in this case established that "[t]he reasonable time and expenses of Plaintiffs' counsel shall be deemed compensable monitoring of this Order under 42 U.S.C. § 1988." Section 1988 establishes that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.

"This section provides two possible avenues by which plaintiffs may recover outlays made in the course of litigation. First, plaintiff's 'costs,' as defined by statue, are clearly recoverable; second, certain 'expenses' may be considered part and parcel of the 'attorney's fee' and thus compensable as part of that fee." Harvey v. Mohammed, No. 02-2476, 2013 WL 3214873 at *14 (D.D.C. June 26, 2013).

As to the first category, "costs" are defined by 28 U.S.C. § 1920, which allows for certain categories of fees, including fees for "printing" and "making copies," among other things. 28 U.S.C. § 1920 ("Section 1920") (establishing that judge may "tax as costs" various items, including "fees and disbursements for printing and witness fees" and "fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case").

As to the second category, expenses that are considered part of the traditional "attorney's fee," "neither the Supreme Court nor the D.C. Circuit appear to have directly addressed the particular expenses that may be claimed as part of an attorney's fee under § 1988." Harvey, 2013 WL 3214873, at *15.

### B. Defendants Have Not Waived Their Arguments Regarding Litigation Expenses

Plaintiffs argue that Defendants' challenges to their claimed litigation expenses are foreclosed by the doctrine of law of the case and the doctrine of waiver. Defendants have never raised a "serious challenge" to any expense claimed by Plaintiff, and, thus, this Court has never addressed these issues. See Salazar I, 123 F. Supp. 2 at 17 (upholding Plaintiffs' claims for expenses in the absence of "serious challenge" by Defendants). Thus, nothing forecloses the Court from addressing Defendants' arguments at this time.

### C. Defendants' Specific Challenges

After noting the lack of Supreme Court or Court of Appeals precedent on these issues, Judge Royce Lamberth recently determined that certain expenses, including "postage," "long-distance telephone service," and "certain transportation costs" are recoverable expenses under

Section 1988. Harvey, 2013 WL 3214873, at *15 (citations omitted); Heller v. Dist. of Columbia, 832 F. Supp. 2d 32, 60-61 (D.D.C. 2011) (allowing reimbursement for travel expenses and postage); Smith v. Dist. of Columbia, 466 F. Supp. 2d 151, 161 (D.D.C. 2006) (allowing reimbursement for long distance telephone expenses and postage); Sexcius v. Dist. of Columbia, 839 F. Supp. 919, 927 (D.D.C. 1993) (allowing reimbursement for postage, long distance telephone, . . . and transportation and parking costs"). Defendants have identified no cases addressing attorneys' fees under Section 1988 that hold otherwise.[19] Based on these cases, the Court concludes that Plaintiffs are entitled to reimbursement for their ground transportation costs, telephone charges, and postage.

As to messenger services, Defendants cite only one case finding that "messenger services" are properly excluded under Section 1988. Smith, 466 F. Supp. 2d at 161-62. However, the court in that case based its determination on Role Models. Am., Inc. v. Brownlee, 353 F.3d 962, 965 (D.C. Cir. 2004), which addressed reimbursable expenses under the EAJA. Smith, 466

---

[19] Some of the cases cited by Defendants related to fees and expenses under the Equal Access to Justice Act ("EAJA"), a statute that reimburses expenses differently from the statute at issue her. See 28 U.S.C. § 2413 (statute setting out calculation of fees for cases brought under the EAJA); Miller v. Holzmann, 575 F. Supp. 2d 2, 55 (D.D.C. 2008) (distinguishing reasonable expenses under False Claims Act cases, which look to section 1988 for guidance, from reasonable expenses under the EAJA), vacated in part sub nom. United States ex rel. Miller v. Bill Harbert Int'l Const., Inc., 786 F. Supp. 2d 110 (D.D.C. 2011). Thus, the EAJA cases cited by Defendants are inapplicable. See Precision Concrete v. N.L.R.B., 362 F.3d 847, 854 (D.C. Cir. 2004) (holding that telephone costs are not reimbursable under the EAJA); Mass. Fair Share v. Law Enforcement Assistance Admin., 776 F.3d 1066, 1069-70 (D.C. Cir. 1985) (holding that ground transportation is not reimbursable litigation expense under the EAJA).

The other cases relied on by Defendants evaluated cost requests brought solely under Section 1920. Berke v. Fed. Bureau of Prisons, 942 F. Supp. 2d 71, 81 (D.D.C. 2013) (holding that postage expenses and telephone services are not reimbursable under Section 1920); Zdunek v. Washington Metro. Area Transit Auth., 100 F.R.D. 689, 690-91 (D.D.C. 1983) (same). As discussed above, Section 1988 allows for the reimbursement of more expenses that those set forth in Section 1920. See Harvey, 2013 3214873, at *14.

F. Supp. 2d at 161-62 ("Role Models also ruled that expenses incurred by messenger services and ground transportation are properly excluded.") (citation omitted).

Defendants also argue that messenger services and delivery fees are not taxable costs. Our Court of Appeals rejected such a narrow interpretation of Section 1988 in Laffey v. Northwest Airlines, Inc., 746 F.2d 4 (D.C. 1984).  The Court observed:

> The gist of the appellant's argument is that only taxable costs may be awarded in addition to fees calculated with regard to the hourly rate. This interpretation is overly narrow. . . . As several other courts have held, the authority granted in section 1988 to award a "reasonable attorney's fee" included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services.

Id. at 30 (citations omitted). Because the weight of authority[20] has found that messenger and delivery fees are reimbursable expenses under section 1988, Plaintiffs are entitled to reimbursement for such expenses.

The district courts have similarly permitted recovery for money spent on fax transmissions and photocopying in section 1988 cases. Harvey, 2013 WL 3214873, at *15 (permitting recovery for photocopying and faxes); see also Heller, 832 F. Supp. 2d at 60-61 (allowing reimbursement for photocopy/printing expenses); Sexcius, 839 F. Supp. 2d at 927 (holding that "reasonable photocopying" is "customarily considered" part of a reasonable attorney's fee). Defendants cite no section 1988 cases holding otherwise.[21]

---

[20] The Harvey court also found "messenger and delivery services" to be reimbursable expense under section 1988. Harvey, 2013 WL 3214873, at *15; see also Heller, 832 F. Supp. 2d at 60-61 (allowing reimbursement for messenger fees).

[21] The only case cited by Defendants holding either type of expense not reimbursable was also an EAJA case. Defs.' Opp'n (citing Precision Concrete, 362 F.3d at 854).

Defendants argue that, even if reimbursement is permitted, ths Court should reimburse Plaintiffs at lower rates than those requested.[22] Defendants suggest that the rate for faxing, copying, printing, and scanning should be .15/page, and the rates for color printing should be lowered from 1.00/page to .25/page. Defs.' Opp'n at 48 (citing Johnson v. Dist. of Columbia, 850 F. Supp. 2d 74, 81-82 (D.D.C. 2012), and McClam v. Dist. of Columbia, 808 F. Supp. 2d 184, 190-91 (D.D.C. 2011)).

The Court in Johnson found that the appropriate rate for reimbursing faxes and photocopies was .15/page. 850 F. Supp. 2d at 82 (citing McClam, 809 F. Supp. 2d at 191); see also Interfaith Cmty. v. Honeywell Int'l, 426 F.3d 694, 717 (3d Cir. 2005) (noting that most federal courts find rates between 10 to 15 cents per page to be reasonable). Plaintiffs' affidavits fail to explain why their higher rates are justified.

Plaintiffs claim .50/page for sending fax transmissions, more than three times what was found reasonable in Johnson. Their only response to Defendants' challenge is that the rate has "remained the same since 2000." Pls.' Mot., Ex. 2, Affidavit of Bruce J. Terris ("First Terris Affidavit") ¶ 28(d); Pls.' Reply, Ex. 23, Second Affidavit of Bruce J. Terris ("Second Terris Affidavit") ¶ 148(b). This is insufficient, and the Court shall reduce Plaintiffs' fax rates to .15/page.

---

[22] Defendants also argue that Plaintiffs' copying charges are subject to a $300 limit under Local Civil Rule 54.1(d). Defs.' Opp'n at 49. The local rules provide guidance for what the court clerk can tax under Federal Rule of Civil Procedure 54(d), which applies "unless a federal statute . . . provides otherwise." Fed. R. Civ. P. 54(d)(1). Because Plaintiffs seek fees under section 1988, not Rule 54, Defendants' argument about the $300 cap lacks merit. See Kakeh v. United Planning Org., 657 F. Supp. 2d 15, 17-18 (D.D.C. 2009) (limiting photocopying costs to $300 under local rules because Court's discretion under Rule 54 is limited "in the absence of other statutory authority").

Plaintiffs' claim for .20/page for copying, printing, and scanning is similarly unexplained. First Terris Affidavit ¶ 28(b); Second Terris Affidavit ¶148(c). Plaintiffs insist that they have reduced the rate they charge from .25/page, but provide no argument as to why they lowered their rates or why their rates are higher than the .15/page rate approved in Johnson. See Interfaith Cmty., 426 F. 3d at 717 (lodging "serious concerns about the District Court's decision to grant ICO reimbursement at the rate of 20 cents per page"). In addition, Plaintiffs claim these copies were made on in-office printers, not by outside vendors who might be more expensive. First Terris Affidavit ¶28(m); see Johnson, 850 F. Supp.2d at 82 (limiting rates to .15/page in the absence of any indication that the fee application paid a higher amount to an outside vendor). Thus, the Court shall reduce Plaintiffs' copying/scanning/printing rates to .15/page.

Finally, Plaintiffs have not supported the need to charge 1.00/page for color copies made on in-house printers. First Terris Affidavit ¶ 28(l). A district court in Colorado recently held that half of that rate, .50/page, was too high a reimbursement rate for color copying without additional supporting information. Squires ex rel. Squires v. Breckenridge Outdoor Educ. Ctr., No. 10-309, 2013 WL 1231557, at *7 (D. Colo. Mar. 27, 2013) ("Without some fuller explanation for these pricing differences, I am hard-pressed to utilize the $.50 per page rate for color copying.") Thus, the Court will allow reimbursement for color copying at the lower rate of .25/page chosen by the Colorado court.

Defendants' final argument is that they should not have to reimburse Plaintiffs for Public Access to Court Electronic Records ("PACER") fees. Plaintiffs insist that they use PACER for various reasons, including as a back-up to the CM-ECF notification system, as a research mechanism, and as a way to find prior filings in an expeditious fashion. See Second Terris

Affidavit ¶ 148. Reimbursement under section 1988 for Westlaw and Lexis fees incurred for "computer-assisted legal research" is standard in this Circuit. See Harvey, 2013 3214873, at *15; Adolph Coors Co. v. Truck Ins. Exch., 383 F. Supp. 2d 93, 95 (D.D.C. 2005) (nothing that "[i]t would be perverse to disallow costs for a device that lowers the hours that attorneys would have to spend doing legal research if they did not use [it]"). Given Plaintiffs' assertion that they use PACER to research and quickly locate documents, and Defendants' failure to respond to these allegations, the Court will permit full reimbursement of these fees.

In sum, the Court finds that Plaintiffs are entitled to reimbursement under Section 1988 for all the various challenged categories of litigation expenses. However, Plaintiffs have failed to justify their higher-than-average fax and copying rates, and, thus, those will be reimbursed at the standard rates recognized as reasonable in this Circuit.

## XXI.   ACROSS THE BOARD REDUCTION

The Court has spent many hours on this Opinion. Given the fact that there are very specific reductions in certain categories of the Fee Petition, there is no need to impose the across-the board 20 percent reduction Defendants request.

January 30, 2014

Gladys Kessler
Gladys Kessler
United States District Judge

**Copies via ECF to all counsel of record**