UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OSCAR SALAZAR, *et al.*, on behalf of themselves and all others similarly situated, )<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE DISTRICT OF COLUMBIA, )<br>*et al.*, )<br>Defendants. )<br>) | Civil Action No. 93-452 (GK)<br>*In Forma Pauperis* |

NOTICE CONCERNING AGENDA FOR STATUS CONFERENCE
SET FOR JUNE 4, 2014

Plaintiffs propose the following agenda items for the status conference in the above-captioned matter scheduled for Tuesday, June 4, 2014, at 4:00 p.m.

1. <u>Defendants Report Declines in the Delivery of EPSDT Services to Children in Several Key Respects in the FY 2013 CMS Form 416: the Participant Ratio, Blood Lead Testing and Dental Sealants</u>. On April 15, 2014, and April 21, 2014, defendants provided the District-wide, managed care organization (MCO), and fee-for-service FY 2013 CMS Form 416 reports to plaintiffs and the Court. Copies of these reports have been labeled by plaintiffs and attached as Plaintiffs' Exhibits 1-8. The reports show decreases in several key performance measures from the prior year. Plaintiffs discussed the reports with defendants in a telephone call on May 15, 2014, and provide a brief summary below.

First, the overall participant ratio, *i.e.*, the percentage of children who were due for a well-child visit with a physician who received at least one such visit, decreased from 69% in FY 2012 to 63% in FY 2013. Defendants explain that this occurred, in large part, because of an update in the DC Periodicity schedule requiring annual well-child visits for children between 6 and 9 years old, which was done in order to match the American Academy of Pediatrics (AAP) periodicity schedule. Although defendants report that they informed providers and beneficiaries of this change through transmittals, communications with local chapters of the AAP, and other means, the outreach did not achieve the outcome that all children between 6 and 9 years of age received at least one well-child visit in FY 2013. Instead, only 64% of children in that age category received a well-child visit. Plaintiffs request a further report from defendants as to the steps that are being taken to improve this performance for FY2014.

Second, defendants report a significant decrease of approximately 38% in the provision of blood lead tests to young children from FY 2012 to FY 2013, "with nearly identical enrollment numbers between the two years." *See* Transmittal Letter to Judge Kessler re CMS Form 416, April

15, 2014. Pl. Ex. 1, p. 1. The number of blood lead tests provided decreased from 10,238 in FY2012 to 6,321 in FY2013. In their letter to the Court, defendants reported that the District Department of the Environment (DDOE) "confirmed that their data shows similar patterns and is investigating whether there are any systemic causes for the decrease that need to be addressed." *Ibid*. Defendants have also informed plaintiffs that the DDOE is performing a data analysis of all of the District's EPSDT-eligible children to find out if more children were screened than those reflected through the claims data. Defendants stated that the outcome of this data analysis is expected to be completed in June 2014. As discussed in Item 4 below, plaintiffs are preparing written comments on defendants' blood lead testing CAP. Plaintiffs request any further updates from defendants on steps to address the decline in delivery of blood lead testing to young children when they are present in their providers' offices for the 12-month and 24-month well-child visits.

Third, defendants report a decrease in the number of dental sealants provided to children from 21% in FY 2012 to 18% in FY 2013. Pl. Ex. 1. The number of sealants applied to the permanent teeth of children dropped from 7,346 in FY 2012 to 6,784 in FY 2013. CMS Form 416, Line 12d. Defendants were unable to explain why this number decreased, but informed plaintiffs that they had previously informed the MCO's and DentaQuest, the dental benefits administrator, that the delivery of sealants is a measure that is important to the District of Columbia. Plaintiffs urge defendants to find out where the problem lies, *i.e.*, with a particular MCO, group of providers, or Ward of the District, and whether more outreach to parents would be helpful, etc. Plaintiffs also request that the District make a coordinated effort with the MCO's and other District of Columbia agencies, such as the District Department of Public Schools and the Child and Family Services Agency, to target and reach the parents and guardians of children who have not received sealants.

2. <u>Plaintiffs Do Not Intend to Seek Penalties from Certain MCO's Based on Their FY2013 Performance, despite the Terms of the Settlement Order, but Request that Corrective Action Plans be Required</u>. Paragraph 45(e) of the Settlement Order provides in relevant part that:

> Defendants shall, at a minimum, require the MCO's * * * to develop and implement an effective corrective action plan if the MCO has a participant ratio of less than 80% and, if the MCO has a participant rate of less than 75%, it shall also be required to pay Defendants at least at a rate of $45 for each enrollee that is required to be added to the numerator in the MCO's EPSDT participant ratio to meet the 80% requirement.

Two of the three MCO's that joined the DC Medicaid program in FY2013 – Trusted and Medstar – failed to achieve the benchmarks that would exempt them from the requirements under paragraph 45(e) of the Settlement Order.[1] Trusted reported a participant ratio of 52%. Pl. Ex. 6, line 10. Medstar reported a participant ratio of 69%. Pl. Ex. 5, line 10. These percentages take into account the fact that the MCO's only had members for part of the year. Trusted reported that the

---

[1] Amerihealth DC reported achieving a participant ratio of 87% in the CMS Form 416. Pl. Ex. 4, Line 10.

average period of eligibility for its members was 0.61. Pl. Ex. 6, line 3b. Medstar reported that the average period of eligibility for its members was 0.38. Pl. Ex. 5, line 3b.

Health Services for Children with Special Needs, Inc. (HSCSN), which has long been a DC Medicaid MCO, reported a participant ratio of 74% (Pl. Ex. 7, line 10) requiring both a corrective action plan and financial penalties under paragraph 45(e) of the Settlement Order.

In their letter to the Court of April 22, 2014 (Pl. Ex. 3, p. 1), defendants take the position that because Trusted and Medstar only participated for part of FY2013, "the reports * * * should not be interpreted as complete annual reports because they [the new MCO's] do not yet have a full year's worth of data." Defendants' letter does not directly address the paragraph 45(e) provisions which, by their terms, require both financial penalties and corrective action plans from Trusted and Medstar for FY 2013. However, in our discussion with defendants' representatives on May 15, defendants took the position that no fines or CAP's should be required of the new MCO's. With respect to HSCSN, defendants request that "with the Court's permission, the District proposes that HSCSN be placed on a Corrective Action Plan rather than a fine for this year." *Ibid*.

As explained above, the Form 416 data for Trusted and Medstar takes account of the fact that the plans only participated for part of FY 2013 in the calculations that result in their low participant ratios. However, plaintiffs understand defendants' desire not to begin the contractual period with Trusted and Medstar by imposing financial penalties. Therefore, plaintiffs request defendants' agreement to require corrective action plans for Trusted and Medstar to address their poor part-year performance in FY2013.[2] Such plans are required under paragraph 45(e) of the Settlement Order. Plaintiffs are also willing to forego insisting on the imposition of the paragraph 45(e) financial penalties on HSCSN. Given how close HSCSN came to meeting the 75% participant ratio, the penalty would be too low to give any added incentive to HSCSN to improve performance for FY 2014 beyond that provided by the imposition of a corrective action plan. Plaintiffs request defendants' agreement to require that HSCSN submit a corrective action plan.

We request to know defendants' position on whether it is willing to require corrective action plans from Trusted and Medstar prior to or at the June 4 status conference. Since the parties would be modifying the requirements of paragraph 45(e) of the Settlement Order for FY 2013, plaintiffs submit that a consent order should be presented to the Court for its approval.

We also call to defendants' attention the further requirement of paragraph 45(e) of the Settlement Order:

> Plaintiffs' counsel shall have the opportunity to comment on any corrective action plan before approval by Defendants. Defendants shall enforce these contractual requirements and the corrective action plans.

---

[2] We note that Trusted and Medstar participated in July-September, the months in which, according to defendants, families commonly seek back-to-school check-ups for their children.

Plaintiffs look forward to providing comments to defendants to make the CAP's as useful as possible towards the goal of improved delivery of well-child screening services.

3. <u>Dr. Ireys' Blood Lead Testing Data Report for 2010-2012 Will Be Useful in Addressing the Decrease in Blood Lead Testing Rates for FY2013</u>. The significant decrease in the delivery of blood lead testing services to children in FY 2013 highlights the importance of the Court Monitor Dr. Henry Ireys' work in preparing a blood lead testing data report comparing the performance of various pediatric providers in the District of Columbia from 2010 to 2012.

At the April 8, 2014, status conference, Dr. Ireys stated that he hoped that benchmark data concerning the performance of pediatric practices with regard to the children who should have received a blood lead screening at 24 months of age (the so-called second cohort of children) would be finalized by June 2014. Plaintiffs request an update from Dr. Ireys concerning the status of his work and an approximate date when the final report will be completed.

4. <u>Plaintiffs Are Reviewing and Preparing Comments on Defendants' 2014 Blood Lead Corrective Action Plan ("CAP")</u>. Plaintiffs are reviewing defendants' 2014 Blood Lead CAP which was received on April 30, 2014. Plaintiffs intend to provide written comments to defendants. In general, plaintiffs note that the majority of the action items which defendants state that they intend to take in 2014 to eliminate barriers to the improved delivery of blood lead testing to young children are the same or very similar to those action items in the CAP's from past years. However, the significant decline in the delivery by DC Medicaid providers of the blood lead testing services to children who are seen by a physician for a well-child visit would appear to require a new approach and new action items be developed by defendants. We emphasize that the vast majority of one- and two-year-old children see a physician at least once – 90% of children under age 1 and 84% of children from ages 1-2 years, were seen by a physician for a well-child visit in FY 2013. These children should receive a blood lead test as part of their well-child visit.

5. <u>The 2013 Fourth Quarter EPSDT Report Shows a Significant Decrease in Enrollment with Medstar Family Choice ("Medstar") MCO</u>. Defendants' EPSDT quarterly reports continue to show the same data inconsistencies which plaintiffs have highlighted in the past. Because these inconsistencies are the result of different methods of reporting by the MCO's, which defendants have identified and expect will be corrected with the implementation of the new reporting templates and instructions, plaintiffs will not provide detailed comments on defendants' 2013 fourth quarter EPSDT report. However, plaintiffs note that the total number of children enrolled with Medstar, as reported in defendants' 2013 EPSDT fourth quarter report, decreased substantially from 9,115 in the third quarter to 2,084, while the number of children enrolled with the other MCO's remained stable. *See* EPSDT Reports for 2013 Third and Fourth Quarters, Pl Ex. 9, 10. Plaintiffs request an explanation for this large decrease in the reported enrollment with Medstar.

6. <u>The Parties Are Negotiating Revised Formats for the EPSDT Quarterly Report and Notice and Outreach Report</u>. Since plaintiffs' last Notice to the Court, plaintiffs met with defendants and the Court Monitor, Dr. Henry Ireys, on March 27, 2014, to discuss their comments on the revised

reporting templates and instructions to improve the reliability and consistency of the data reported by the MCO's in the EPSDT quarterly report and EPSDT Biannual Notice and Outreach reports, required under paragraph 47 of the Settlement Order and the Order of April 27, 2009, respectively. On May 13, 2014, defendants sent plaintiffs revised templates and instructions reflecting many of the changes discussed and agreed to by the parties at their last meeting. Defendants informed plaintiffs that they hoped to present these materials to the MCO's and their data teams to begin implementation as soon as possible. The parties are in the process of scheduling a follow-up meeting to finalize the report templates and instructions with the hope of having a proposed consent order for submission to the Court shortly thereafter.

7. <u>Plaintiffs Request Information Concerning the Provision of Dental Services by Small Smiles and how This May Affect the Provider Network</u>. On February 26, 2014, as part of their submission of their Dental Action Corrective Action Plan, defendants submitted lists of dental providers to plaintiffs. These lists appear to indicate that the ratio of dental providers to beneficiaries as a whole for the District of Columbia and, for each MCO, exceed the ratio of 1 active dentist for every 750 enrollees required under the MCO's contracts with the District.[3/] Plaintiffs are pleased that the MCO's dental provider networks meet and exceed the District's required ratio.

However, plaintiffs recently became aware that the manager and operator of one of the largest chains of providers of children's dental services in the nation and in the District of Columbia, Small Smiles, will no longer be eligible to provide services under Medicaid because it breached a prior agreement with the federal government related to allegations of fraud and malpractice. As plaintiffs understand, FORBA Holdings and Church Street Health Management (CSHM), Small Smiles's corporate manager and operator, have recently entered into an agreement with the federal government to shut down its operations and divest its assets by September 2014. *See* OIG Press Release, Pl. Ex. 11. From now until September 2014, CSHM will continue to provide dental services to children. After September, the clinics will be sold and the new owners will presumably be eligible to receive payment from Medicaid for services to children. *Ibid.*

Plaintiffs request information from defendants regarding the District's role in monitoring of the sale of the Small Smiles clinics in the District of Columbia and any contingency plans it has, in the event of a clinic closure, concerning how current patients will be effectively transitioned to other dental providers without disruption.

8. <u>Plaintiffs Request an Update Concerning the Number of Primary Care Providers who Have Submitted Reimbursement Claims for Fluoride Varnish Applications since the Service Became Reimbursable</u>. At the April 8, 2014, status conference, defendants reported that although 68 primary

---

[3/]The lists provided by defendants do not indicate whether each of the dental providers are "active" providers, *i.e.*, that he/she submitted at least one claim for reimbursement for services to a Medicaid beneficiary. However, given the large margins by which the MCO's exceed the provider to enrollee ratio, it is likely that inactive dentists would not lower the ratio below 1 provider for every 750 enrollees. Plaintiffs request a confirmation from defendants that this assumption is correct.

care providers had completed training to apply fluoride varnish to young children, no provider had yet sought reimbursement for fluoride varnish applications for children under three years of age. Plaintiffs request to be informed whether, since the last status conference, any primary care providers have sought reimbursement for fluoride varnish applications. We also request to be informed if more physicians have been trained to apply fluoride varnish.

9. <u>Plaintiffs Have Sent Defendants a Paragraph 80 Notice Letter Regarding Defendants' Failure to Provide Adequate Notice to Medicaid Applicants and Recipients of Reimbursement Procedures</u>. Paragraph 6 of the Order Partially Modifying the Reimbursement Procedures of the Amended Remedial Order of May 6, 1997 and the Reimbursement Procedures Order of September 15, 1997, ECF No. 617, entered on July 30, 1998 (hereafter "Amended Reimbursement Procedures Order") requires that defendants provide notice to Medicaid applicants, at the time of application, and recipients, in all eligibility notices, of the procedures for them to obtain reimbursement, the time frame within which they must submit a claim for reimbursement, the availability of free legal assistance through plaintiffs' counsel, contact information for plaintiffs' counsel, and contact information for the Office of Administrative Hearings.

Neither defendants' paper application nor their online application, available through the new Health Link health insurance marketplace, provide the notice required by the Amended Reimbursement Procedures Order. Sample eligibility notices, created through HealthLink, and provided to plaintiffs through a FOIA request and at a recent Medical Care Advisory Meeting, also fail to provide such notice. (These notices will presumably be sent out to recipients when defendants implement passive renewal for the first group of beneficiaries beginning in September 2014.)[4]

The lack of adequate notice causes real harm to Medicaid beneficiaries. Without adequate notice, some individuals learn about their rights under the Reimbursement Procedures Order after they have been subject to multiple collection efforts and have missed the six-month deadline to submit a reimbursement claim. Their credit histories reflect these unpaid bills and providers may be inappropriately refusing to see them unless they pay a bill. These problems can be prevented.

Plaintiffs provided defendants with notice under paragraph 80 of the Settlement Order of this deficiency on May 14, 2014. Plaintiffs hope that the parties will engage in productive discussions regarding this matter. In the absence of an amicable resolution, an enforcement motion will become necessary.

---

[4] In their last Notice (ECF No. 1967, p. 3), plaintiffs informed the Court that defendants had postponed passive recertification (now called renewal) for the first group of Medicaid beneficiaries from April 1, 2014 to July 1, 2014. Plaintiffs learned at a public meeting on May 8, 2014, that defendants have recently sought a further extension from the Centers for Medicare and Medicaid Services of the date to begin passive Medicaid renewal to September 1, 2014.

10. <u>Plaintiffs Continue to Urge Defendants to Provide Notice to All Medicaid Beneficiaries about the Upcoming Changes in Medicaid Renewal Procedures</u>. In their last Notice (ECF No. 1967, pp. 2-3), plaintiffs requested that defendants provide them information regarding the notices they were sending to Medicaid beneficiaries concerning the upcoming changes in recertification processing, both those whose Medicaid eligibility determinations were being stayed for a period of time (the so-called modified adjusted income group, "MAGI") and those who continue to be subject to active recertification.

At the April 8, 2014, status conference, plaintiffs expressed concern that beneficiaries had not been informed of the changes in eligibility processing affecting them and informed the Court that they continued to receive some calls from the MAGI group concerning the status of their eligibility, but received many more from the non-MAGI group, *i.e.*, those beneficiaries who continue to be subject to active recertification. Defendants stated that they did not believe lack of notice was a problem, that sending a notice would not be practical, and would only lead to confusion among beneficiaries. The Court noted that a simple notice could be fashioned without the need to confuse beneficiaries.

The Court asked plaintiffs to maintain a log of individuals in the MAGI group who called our office. In the period of time since the last status conference on April 8, 2014, plaintiffs have received telephone calls from four MAGI beneficiaries concerning the status of their recertification. Plaintiffs continue to receive the vast majority of calls concerning recertification processing from the non-MAGI group of beneficiaries who are subject to active recertification. Although the number of telephone calls from MAGI Medicaid beneficiaries received by our office is extremely low, we note that since these beneficiaries are not receiving any notices, they are also not receiving the name and telephone number of plaintiffs' counsel as they previously did under the former recertification procedure. Plaintiffs reiterate their position, as stated at the last status conference, that beneficiaries are entitled to basic information concerning major changes in the District's eligibility system that concern them.

11. <u>The Dental Mediation Process Is Continuing</u>. Since the last status conference, plaintiffs met with the mediators on April 11 and May 8 and provided a counter-proposal to the mediators concerning modifications to the Dental Order. Plaintiffs await a response from defendants and/or the mediators.

\*   \*   \*

Thank you for the Court's consideration of these matters.

        Respectfully submitted,

        */s/ Zenia Sanchez Fuentes*

        BRUCE J. TERRIS, Bar #47126
        KATHLEEN L. MILLIAN, Bar #412350
        LYNN E. CUNNINGHAM, Bar #221598
        ZENIA SANCHEZ FUENTES, Bar #500036
        Terris, Pravlik & Millian, LLP
        1121 12th Street, N.W.
        Washington, DC  20005-4632
        (202) 682-2100, ext. 8484

        JANE PERKINS
        NATIONAL HEALTH LAW PROGRAM
        101 East Weaver Street, Suite G-7
        Carrboro, NC  27510
        (919) 968-6308

May 21, 2014        *Counsel for Plaintiffs*