UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OSCAR SALAZAR, *et al.*, on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 93-452 (GK) |
| | ) | *In Forma Pauperis* |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| | ) | |

**PLAINTIFFS' COMMENTS ON THE BLOOD LEAD TESTING REPORT SUBMITTED BY COURT MONITOR HENRY IREYS ON DECEMBER 17, 2014**

Pursuant to paragraph 5 of the Settlement Order of January 25, 1999, plaintiffs hereby submit comments to the Report submitted by Henry T. Ireys, Court Monitor, on December 17, 2014, titled "Rates of Lead Screening for Children Enrolled in the Medicaid Program in the District of Columbia," data tables submitted to the parties on December 11, 2014, and a Technical Addendum, submitted on December 30, 2014 (collectively "2014 Report"). The 2014 Report has been filed as ECF No. 2029-1.

**INTRODUCTION**

In November 2009, as part of an agreement by the parties to avoid litigation over defendants' compliance with the requirements of the Medicaid statute, federal regulations, paragraphs 36 and 37 of the Settlement Order, and the Court's February 28, 2003 Order, concerning the provision of blood lead tests for Medicaid-eligible children (ECF No. 928), the Court entered a Consent Order Concerning Blood Lead Testing Study ("2009 Consent Order"), directing defendants to conduct a study, with the assistance of two consultants and under the oversight of the Court Monitor, Dr. Henry Ireys, to determine the number of children due for blood lead tests who actually received them as part

of a well-child visit in calendar year 2008.  ECF No. 1526.  The 2009 Consent Order provided that

if the study showed that less than 95 percent of children who were due for a blood lead test, received

a blood lead test as part of a well-child visit, Dr. Ireys would submit a report "on the barriers to

children receiving their blood lead tests and possible measures to increase the numbers of Medicaid

eligible children who receive their required blood lead tests." ECF No. 1526, p. 3, para. 4.

The results of the data analysis conducted by the District's contractor, Thompson Reuters,

in conjunction with defendants, showed that in calendar year 2008, 52% of 14-month olds and 40%

of 26-month olds had received single blood lead tests at the time that they should have received them

under District of Columbia law.[1]  Pl. Ex. 1, p. 13.  In addition, 29% of children received two blood

lead tests by age 26 months as required by federal and District of Columbia law.  *Ibid*.  As a result,

Dr. Ireys submitted a report to the Court and the parties, pursuant to the Court's 2009 Consent

Order, concerning obstacles to blood lead testing for Medicaid eligible children and possible measures

to address them.  *See* Obstacles to Lead Testing of Children Enrolled in the District's Medicaid

Program, July 30, 2010 ("2010 Report"), Pl. Ex. 1.

In the 2010 Report, after conducting a literature review of academic articles concerning

childhood blood lead testing and conducting interviews with eight directors of primary care clinics

in the District, Dr. Ireys identified several barriers to lead screening, among them, "the need for

---

[1]Federal law requires that children be tested at 12 months and again at 24 months, and once between 36 months and 72 months, if they have not been previously screened.  42 U.S.C. 1396d(r)(1)(B)(iv); CMS, State Medicaid Manual, Section 5123.2D.   The study used the age parameters provided by District of Columbia law, requiring that all children residing in the District receive a blood test for lead as part of a well child visit "once between the ages of 6 months and 14 months, and a second time between ages 22 months and 26 months. If a child's age exceeds 26 months, and a blood lead screening has not been performed, the child shall be screened twice prior to the age of 6 years." D.C. Code § 7-871.03(b).  *See* Pl. Ex. 1, pp. 14-16.

2

parents to take their child to a lab away from the clinic or the provider's office." Pl. Ex. 1, p. 7.

Shortly thereafter, in October 2010, the parties agreed, as part of a pilot project, to address this

obstacle by using a portion of the funds in the escrow account containing penalty funds related to

defendants' failure to meet court deadlines to offer portable lead screening devices to individual

pediatric practices to allow them to conduct blood testing on-site through a simple finger prick and

thereby allowing them to obtain results within minutes.  Agenda Letter, December 13, 2010, p. 7, No.

5.  At the October 29, 2010, status conference, the parties requested that Dr. Ireys be involved in

developing the pilot project.  *Ibid*.

As part of the discussions surrounding the pilot project, the parties and Dr. Ireys agreed that

it would be beneficial to collect 2010 data, by pediatric practice, for children who had a well-child

visit, but did not receive a blood lead test when they were due.  *Ibid.*  These data would serve as

baseline data that could be compared to data in 2011 and future years to determine whether the use

of the portable lead testing device improved the performance of individual practices.  *Ibid*.

Ultimately, only one pediatric practice, Community of Hope and Family Health and Birth

Center clinics, accepted the portable lead testing device.  Agenda Letter, March 12, 2012, p. 3, No.

3.  However, in order to encourage improvement by individual practices based on their own

performance, the parties and Dr. Ireys agreed to continue the development of the baseline data for

2010 on a practice-by-practice basis to compare with data for future years, despite the lack of

widespread implementation of the portable lead testing device.  Agenda Letter, January 11, 2012, p.

5, No. 5.  The parties agreed that the result of the data analysis comparing the baseline data and data

from 2011 would be presented in a report by Dr. Ireys.

The data collection from the District of Columbia computer data systems was significantly delayed by many technical and staffing complications.

In the meantime, the District of Columbia's fiscal year 2013 CMS Form 416, submitted in April 2014, showed a significant decline in the delivery of blood lead tests to young children in the District of Columbia from FY2012 to FY2013, even accounting by defendants for blood lead tests that were provided, but not reported, as a Medicaid claim.  Letter to Judge Kessler from Defendants, April 15, 2014, Pl. Ex. 2, p. 1.

On December 17, 2014, Dr. Ireys submitted his 2014 Report, comparing baseline data from 2010 of children receiving blood lead tests, by pediatric practice, with the same data for 2012, to determine whether the blood lead testing rates for one-year-old children at pediatric Medicaid practices in the District of Columbia increased, decreased, or remained the same from 2010 to 2012. ECF No. 2029-1.[2]  Unlike the 2010 Report, which looked at children receiving blood lead tests when they were due at ages one and two years, according to District of Columbia law, the 2014 Report used different, broader age parameters.[3]  *Id.,* pp. CM 0015-0016.

Despite the fact that the 2010 and 2012 data do not allow for comparison with the requirements of District of Columbia law because different age parameters were used, the 2014 Report shows generally that a significant number of children are still not receiving blood lead tests

---

[2]Dr. Ireys also compiled data in 2012 for two-year old children, but it is not comparable to baseline data from 2010 for two-year-old children because the data for 2010 was determined to be "unreliable." ECF No. 2029-1, p. CM 0003.  "[H]ence, we are unable to assess changes in screening rates between 2010 and 2012 [for two-year-old children]." *Ibid*.

[3]During a conversation on January 5, 2015, with Dr. Ireys, his Mathematica Policy Research colleague, Paul Montebello, and defendants, Dr. Ireys explained that the age parameters for children receiving a blood lead test were expanded in the 2014 Report in order to be able to attribute children as being served by particular pediatric practices.

at approximately one and two years of age.  ECF No. 2029-1, pp. CM 008-009.  The 2014 Report further shows that there are large disparities in performance among large pediatric practices and smaller disparities among the large, medium, and small providers considered as groups.  *Id.*, pp. CM 0010-0013.

Plaintiffs provide below their comments as to how the data should be used to increase the number of children who receive a blood lead test when they are due.  In addition, plaintiffs provide comments regarding some of the conclusions drawn in the 2014 Report.

## PLAINTIFFS' COMMENTS

**I.      Defendants Should Focus on Changing the Behavior of the Largest Pediatric Practices**

The majority of children included in Dr. Ireys's 2014 Report received blood lead tests from the 9 to 10 pediatric practices who serve 100 or more children in the District.  ECF No. 2021-9, pp. CM 0010-0013.   In 2012, the two largest providers of well-child care in the District, Children's National Medical Center ("CNMC") and Unity Health Care, provided blood lead tests to only 52.5% and 52.9%, respectively, of one-year olds who were on their rosters.  *Id.*, p. CM 0011.  Only 48.5% of two-year old children at CNMC and 48.1% at Unity Health Care received a blood lead test between 14 months and 27 months of age in 2012.  *Id.*, p. CM 0013.

With the exception of Mary's Center, which provided 73.9% of children ages 4 to 16 months with a blood lead test, the performance of other large providers was similarly poor.  ECF No.  2029-1, CM 0011.  For example, in 2012, only 33.7% of children ages 4 to 16 months served by Children's Pediatricians & Associates and 47.7% of children of that same age served by MedStar Georgetown received a blood lead test during this time period.  *Ibid*.  If rates are improved for the large providers, who serve a majority of children, District-wide rates of blood lead testing will also significantly

improve.  Therefore, defendants should focus on improving the performance of the large practices in the District.

Defendants should investigate the practices and procedures, including clinical, billing, and reporting practices, followed by the 9-10 largest practices identified in the 2014 Report, with a priority on the two largest practices, CNMC and Unity Health Care, to ascertain why so few children are receiving blood lead tests at their well-child visits.  Based on this investigation, defendants should develop, in conjunction with the managed care organizations (MCOs), a plan of action to be implemented over the 2015 calendar year to address these deficiencies for each of these providers. Defendants should consider a variety of incentives and disincentives, such as increased or reduced per capita payments to MCOs based on performance, encouragement of the use of portable lead screening devices,[4] and on-site training for pediatricians and their staff concerning billing and reporting requirements.

Eighty-four percent of children aged one to two years see a physician for a well-child visit. ECF No. 1987-2, p. 2, line 10.  Therefore, 84% of children are with a physician for a visit at an age when they should receive a blood lead test.  This is not a question of parents failing to take the children for well-child visits.  If physicians followed District of Columbia law and the federal EPSDT mandate for blood lead testing, the percentage of children receiving blood lead tests should be nearly identical to the percentage of those receiving well-child visits.   This is not the case.  Only 54.6% of children between 4 and 16 months and 47.9% of children between 14 and 27 months are receiving

[4]In an e-mail on January 12, 2015, Dr. Ireys reported to the parties that the sole practice participating in the portable lead testing device pilot, Community of Hope, improved its performance significantly for the younger group of children from 42.9% in 2010 to 62.3% in 2012.  *See* Electronic Mail from Henry Ireys to Parties, Pl. Ex. 3.

blood lead screens.  ECF No. 2029-1, pp. CM 0008-009.  Thus, it is essential that the clinical practices of the providers are changed to eliminate this discrepancy between the numbers of children who see a physician at ages one and two and those who receive blood lead tests at those ages.

For example, attention should be given to having the blood drawn for blood lead tests done at the same location as other parts of the well-child visit.  This will eliminate the need for parents to take their child to different offices or floors.  Plaintiffs have been informed that the children do not always arrive at the locations where the blood is drawn.   If providers do not have the physical capacity to provide the test at their office during a well-child visit, volunteers or staff should accompany the parent and child to the place where the blood is drawn.

II.     **Defendants Should Ensure that Primary Care Practices Understand and Follow to the Federal and District of Columbia Requirements Concerning Blood Lead Testing**

The 2014 Report states that õ[i]f the District wishes to improve lead screening rates substantially, we believe it needs to consider strategies to address (or address further) the four factors noted above: the absence of on-site blood drawing, missed appointments with inadequate follow up, clinical judgment that lead screening is not needed for a particular child, lack of parental awareness of the importance of lead screening.ö[5]   ECF No. 2029-1, p. CM 0005.  Of these four factors, in the absence of more up-to-date research with representatives of the large District of Columbia pediatric practices which serve children on Medicaid, plaintiffs agree that Dr. Ireysøs conclusion that providersø clinical judgment about the need for blood lead test appears to be an extremely important factor in

---

[5] Dr. Ireys did not conduct any further literature review for the 2014 Report. ECF No. 2029-1, p. CM 0005.  He stated during a telephone call with the parties on January 5, 2015, that he and his associate, Mr. Montebello, also did not conduct follow-up interviews with pediatric practices in 2014 to confirm whether the barriers identified in 2010 continue to exist or to identify additional barriers.

the low number of timely blood lead tests since, as we have seen above, large numbers of children who are in physicians' offices for well-child visits do not receive blood lead tests.

In the past few years, the District has issued transmittals to EPSDT providers, with strong language describing their obligation to provide timely blood lead tests, explaining that the District of Columbia is a "high-risk jurisdiction for exposure to lead" since "[c]lose to 90% of its residential housing was built prior to 1978, the first year that use of lead-based paint was restricted by law" and that more than 37,000 homes in the District are connected to water lines with lead, which pose an increased risk to lead exposure.  DHCF Transmittals to Providers, Pl. Exs. 4, 5.   Moreover, the District's website providing online training to EPSDT providers also clearly states the importance of timely blood lead tests.[6]  Based on the low percentage of children receiving blood lead tests set forth in the 2014 Report and the significant decrease in blood lead tests from FY 2012 to FY 2013 (*see* Pl. Ex. 2), the District's transmittals and online training materials do not appear to have been effective in changing providers' behavior.

 Plaintiffs propose that defendants identify and take additional steps to increase awareness among the provider community of the mandatory requirement to provide blood lead tests to children during their one and two-year old well-child visits.  Defendants should consider a variety of actions, including identifying and training "champions" at provider practices to encourage their colleagues to provide blood lead tests to every child who is due for one during his well-child visit; closely monitoring claims data from individual providers; providing training to registered nurses, nurse practitioners, and other support staff  working at pediatric practices concerning the mandatory requirements to provide blood lead tests at one and two years of age; and developing targeted

---

[6] Available at  http://www.dchealthcheck.net/trainings/labs/lead.html (last accessed on January 13, 2015).

messages to providers about the need to set aside their clinical judgment concerning the risk for individual one and two year-old children and treat all children on Medicaid as high-risk.

**III.    The Data Reported in the 2014 Report Does Not Show the Extent to which the District Is Failing to Comply with Federal or District of Columbia Law**

Federal EPSDT law requires that each child on Medicaid receive a minimum of two blood lead tests at one year and two years of age. 42 U.S.C. 1396d(r)(1)(B)(iv); CMS, State Medicaid Manual, Section 5123.2D ("All children are considered at risk and must be screened for lead poisoning.  HCFA requires that all children receive a screening blood lead test at 12 months and 24 months of age. Children between the ages of 36 months and 72 months of age must receive a screening blood lead test if they have not been previously screened for lead poisoning").[7] Moreover, separate from federal law, District of Columbia law requires medical providers to "perform a blood test for lead poisoning on every child who resides in the District of Columbia as part of a well-child care visit, once between ages 6 months and 14 months and a second time between ages 22 months and 26 months. If a child's age exceeds 26 months, and a blood lead test has not been performed, the child shall be screened twice prior to the age of 6 years." D.C. Code § 7-871.03(b).   As set forth above, p. 2, the most recent analysis of District of Columbia data concerning blood lead testing of one and two-year-olds, based on District of Columbia law, was for 2008, as set forth in Dr. Ireys's 2010 Report.

Based on conversations among the parties and status reports provided to the parties by Dr. Ireys, plaintiffs understood that Dr. Ireys would follow the age parameters set forth in District of Columbia law as to when a blood lead test is due to calculate lead screening rates for children.  *See*

---

[7] Available at: http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html (last accessed January 13, 2015).

Status Report Submitted by Henry Ireys, October 9, 2014, Pl. Ex. 6 ("The study focuses on two age groups: children 6-14 months of age (the younger group) and children 22-26 months of age (the older group)"); Status Report Submitted by Henry Ireys, August 12, 2014, ECF No. 2026-1 (citing same focus on 6 to 14 and 22 to 26 month age groups).  However, as acknowledged by Dr. Ireys, his 2014 Report does not use the age parameters specified in District of Columbia law as to when children should be screened for lead.  ECF No.  2029-1, p. CM 0003, n. 3, 4 ("The data sources and methods for that [the 2010 Report] study were slightly different from the ones used in the current study").

Instead, the 2014 Report, uses different parameters to approximate the one-year and two-year tests, namely, 4 to 16 months for the one-year blood lead test and 14 to 27 months for the two-year blood lead test.  *Id.*, pp. CM 0015-0016.  This means that for one-year-old children, the 2014 Report counts blood lead tests for one-year-old children as timely if the test occurred within two months prior to or two months after the test is required by District of Columbia law.  D.C. Code § 7-871.03(b).  For two-year-old children, the 2014 Report counts blood lead tests as timely if they occur eight months before they are due per District of Columbia law (14 months versus 22 months) and one month after they are due per District of Columbia law (27 months versus 26 months).  *Id.*, pp. CM 0015-0016.  The two-year-old data in the 2014 Report count as a timely blood lead test for a two-year-old, a test given during the 14th month.  However, under District of Columbia law, a blood lead test given during the 14th month is a timely test for a one-year-old, not for a two-year-old.  D.C. Code § 7-871.03(b).  Thus, the 2014 Report of data concerning two-year old children includes a count of children who are receiving their one-year-old test, not their two-year-old test.

According to the District of Columbia Department of the Environment:  "More than 25% of high blood lead levels are identified on the second test, and not on the first."  ECF No. 2029-2.

However, the 2014 Report does not provide any data as to whether children received the required two blood lead tests by age two, as required by federal and District of Columbia law.  Adherence to this requirement is particularly important since, as of 2012, *"only 30% of all children receive the two legally required lead screenings prior to age three"* (emphasis in original).  DHCF Transmittal to Providers, December 18, 2012, Pl. Ex. 5, p. 2.

Although the 2014 Report provides very useful information concerning blood lead tests, plaintiffs are disappointed that it does not permit the Court and the parties to determine the extent of defendants' compliance with federal and District of Columbia law, as plaintiffs understood that it would.[8]  Information concerning providers' compliance with these laws could have aided defendants in persuading providers of the need to change their practices.   In order to avoid similar misunderstandings in any future study, plaintiffs request that all future studies undertaken in this case include a written protocol defining the parameters and methods that will be studied prior to the start of the study.

Despite these limitations, the data in the 2014 Report show that, even using the much broader age ranges for timely receipt of a blood lead test, significant numbers of children, 45.4% of children between 4 and 16 months and 52.1% of children between 14 and 27 months are not  receiving blood lead tests at roughly one and two years of age.  ECF No. 2029-1, pp. CM 008-009.

IV.   **The Data Reported Does Not Permit Any Conclusion Concerning the District's Performance as Compared to Other States**

Dr. Ireys states in his report that (ECF No. 2029-1, p. CM 004):

---

[8]Plaintiffs requested the Court Monitor to conduct the additional data analysis to provide estimates of the timely delivery of tests to children between 6 and 14 months of age, between 22 and 26 months of age, and two tests by age 26 months.  Dr. Ireys reported that, after consultation with the Court, the additional analysis would not be conducted at this time because of cost.

Although the screening rates found in this study are lower than desired, they are likely to be similar to or higher than corresponding rates for Medicaid-enrolled children in other states. The previous report submitted in 2010 came to this conclusion through a comprehensive literature review.  Although we did not update the review for this report, a recent study from the Centers for Disease Control and Prevention (CDC), published in September 2014, supports this conclusion.  The CDC study found that 33.4 percent of all children aged 1-2 years in 35 states, including the District, were screened for high blood lead levels in 2010.

A review of the CDC Report[9] cited by Dr. Ireys, shows that the data in the 2014 Report are not comparable for a variety of reasons.  First, as acknowledged by the authors of the CDC Report, the quality of the data reported by each state likely under-reports blood lead tests because of the inaccuracy of the Medicaid claims data reported by each state.  *See* Pl. Ex. 7, p. 40.  In contrast, the 2014 Report set out to correct this data discrepancy by supplementing the Medicaid claims data with data reported in the database maintained by the District's Department of the Environment. *See* Technical Addendum, ECF No. 2029-1, pp. CM 0016-0017.

Second, the data in the CDC Report compared all children in the reported states receiving blood lead tests (*see* Pl. Ex. 7, pp. 40-41), not only Medicaid enrolled-children, as the 2014 Report does.  Due to the higher risk of blood lead poisoning in Medicaid children, the federal requirements for screening Medicaid children are mandatory at ages one and two and do not allow providers to forego blood lead tests for one- and two-year-olds on Medicaid on the grounds of their own professional judgment as to the child's risk status.  Pl. Ex. 5.  Thus, it would not be surprising for the national average screening rate for all children to be lower than the screening rate for Medicaid children in the District of Columbia.

_____

[9]Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, September 12, 2014, Lead Screening and Prevalence of Blood Lead Levels in Children Aged 1-2 Years,  Child Blood Lead Surveillance System, United States, 2002-2010 and National Health and Nutrition Examination Survey, United States, 1999-2010, Excerpt, Pl. Ex. 7 ("CDC Report").

Finally, the age parameters studied in the CDC Report were different than those in the 2014 Report.  The CDC Report looked at children receiving blood screenings between 1 and 2 years old (*see* Pl. Ex. 7, p. 37), whereas the 2014 Report looked at children between 4 and 16 months and 14 and 27 months (ECF No. 2029-1, pp. CM 0014-0015).  Because the age parameters are different, it is not appropriate to compare the national percentage in the CDC Report with those in the 2014 Report.

In a telephone call with the parties on January 5, 2015, Dr. Ireys acknowledged that, while the CDC Report provides useful information, the blood lead screening rates in the CDC Report are not comparable to those in his 2014 Report.

## CONCLUSION

As the 2014 Report makes clear, significant numbers of Medicaid eligible children are not receiving blood lead tests.   A majority of these children are seen by the largest 9-10 providers in the District.  Over 80% of children ages 1 to 2 years receive well-child visits, yet much smaller numbers receive blood lead tests as part of their well-child visit.  Therefore, in order to ensure most effectively that children are receiving blood lead tests when they are due, defendants should take immediate steps to change the behaviors of the largest children's providers in the District and work with providers and their staff to ensure that they understand and follow the federal and District of Columbia requirements concerning blood lead testing.

Respectfully submitted,

*/s/ Zenia Sanchez Fuentes*

BRUCE J. TERRIS, Bar #47126
KATHLEEN L. MILLIAN, Bar #412350
LYNN E. CUNNINGHAM, Bar #221598
ZENIA SANCHEZ FUENTES, Bar #500036
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100, ext. 8484


JANE PERKINS
NATIONAL HEALTH LAW PROGRAM
101 East Weaver Street, Suite G-7
Carrboro, NC  27510
(919) 968-6308

January 16, 2015                     *Counsel for Plaintiffs*