UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **OSCAR SALAZAR**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 93-452 (GK) |
| v. | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE OF THE DISTRICT OF COLUMBIA TO NOTICE CONCERNING
AGENDA FOR STATUS CONFERENCE SET FOR JANUARY 28, 2015**

    The District of Columbia (the District) responds to plaintiffs' Notice Concerning Agenda for Status Conference Set for Wednesday, January 28, 2015 at 4:00 p.m. (plaintiffs' Agenda Notice), plaintiffs' Comments on Mathematica's Study on Blood Lead Testing (Comments), and plaintiffs' Supplemental Notice Concerning an Agenda Item for the Status Conference Set for January 28, 2015 (plaintiffs' Supplemental Agenda Notice).

    As an initial matter, the District again questions the need for plaintiffs' voluminous filings and urges the Court to impose a reasonable limitation on the volume of these submissions. Combined, plaintiffs' current Agenda Notice and Supplemental Agenda Notice are 13 single spaced pages in length, with a total of 100 pages of attachments. In addition, on January 16, 2015, plaintiffs filed 14 pages of "comments" on the blood lead screening study performed by Mathematica with another 36 pages of attachments. (ECF No. 2031.) Although the District recognizes that plaintiffs are to serve a monitoring function, that role simply does not require the filing of endless, often repetitive or historical summary, pages of material.

    These submissions could, and should, have been more concise. Plaintiffs continue to file lengthy Agenda Notices approximately every six weeks before the scheduled Status Conferences regardless of the number or significance of the issues to be discussed. The parties and the Court then discuss the topics identified in the correspondence. The District long has objected to the excessiveness of plaintiffs' agenda letters. The Court too has observed that plaintiffs' counsel expend too much time preparing these materials, yet the problem grows worse. In addition to the high cost to the District's taxpayers, who ultimately pay attorney's fees for plaintiffs' filings, responding to plaintiffs' submissions puts an increasing strain on the very agency staff who are working diligently to ensure and improve EPSDT outreach and service delivery and to exit from this decades-old matter. Indeed, despite the District's significant improvements in EPSDT outreach and service delivery for the District's children, the plaintiffs generate even more paper in this Court, on which the District must expend great effort to respond. The District requests

that the Court set a limit of five pages for the parties' agenda materials in advance of future status conferences.

1.  **Blood Lead Testing CAP**

Plaintiffs devote many pages in their Agenda Notice (ECF No. 2029 at 1-4), their Comments on the Court Monitor's Blood Lead Testing Report (ECF 2031), and their Supplemental Notice Concerning the Blood Lead Testing Corrective Action Plan (CAP) (ECF 2032) to addressing the District's purported shortcomings in connection with blood lead testing. Plaintiffs' complaints are overstated.

First, with respect to the Blood Lead Testing CAP, the District provided plaintiffs with a draft CAP on April 30, 2014. Correspondence, meetings and telephone conversations with plaintiffs and, often, the Court Monitor regarding the CAP and the District's work to improve lead screening followed. On December 19, 2014, the District provided plaintiffs with a detailed Quality Improvement Plan (QIP) that captures DHCF's strategy for improving EPSDT service delivery, including blood lead screening. Yet more discussion took place with plaintiffs on January 6, 2015 to explain and walk through the QIP and, among other topics, the District's efforts regarding blood lead screening. Despite all the information shared with plaintiffs, they provided no recommended changes to the CAP. Instead, exalting form over substance, plaintiffs insisted on "finalizing" a Blood Lead Testing CAP, and sought more information. On January 15, 2015 the District provided the final CAP (unchanged from April 30, 2014 in the absence of substantive recommendations), and responded to plaintiffs' further inquiries on the CAP. (*See* Letter from the District of Columbia to plaintiffs dated January 15, 2015, Ex. 1.)

As discussed in the District's four page January 15, 2015 letter to plaintiffs, the contents of which the District does not repeat exhaustively here, and at previous Status Conferences, DHCF staff continues to meet with DDOE staff to address lead data reporting and service delivery issues. In addition, the District repeatedly has identified lead screening as a priority to the MCOs during operational as well as service delivery meetings. Further, as described at past Status Conferences, the District developed a Quality Improvement Plan to address issues related to data reporting and improvement of service delivery in order to ensure that Medicaid-enrolled children are receiving blood lead screens at the appropriate times and ages. (*See* Quality Improvement Plan, Ex. 2.) An earlier version of this document was shared with plaintiffs on December 19, 2014 to further illuminate the District's work in this area, which has been a high priority for DHCF, DDOE and the MCOs. The QIP is developed from a National Committee for Quality Assurance (NCQA) form to summarize the clinical and service quality activities that a state (or an MCO) uses to demonstrate meaningful improvement in certain performance areas. It is a comprehensive plan formulated by an internal working group composed of DHCF's children's health services, managed care and quality staff and other agencies who also serve children in the District. The QIP is the blueprint for moving forward and demonstrates that the District actively is engaged in improving still further the delivery of EPSDT services, including blood lead testing. To the extent plaintiffs profess not to understand the QIP, the District is available to provide further information.

Notwithstanding all the above, plaintiffs suggest that DHCF's adoption of the April 2014 CAP was inappropriate. But plaintiffs offered no recommendation for change to the CAP nor

any disagreement with the QIP. All plaintiffs provided were requests that the District consider strategies employed in New York, Iowa, and Maine, which, to the extent the experience of these dissimilar jurisdictions is relevant, the District will continue to do. (*See* ECF No. 2032-3, at 6-7.) The goals here should not be focused on paper but on plans for going forward and positive results though DHCF and the MCOs.

## 2. Mathematica Study on Blood Lead Testing Rates

The District participated in a conference call with plaintiffs and Mathematica (including the Court Monitor, Dr. Henry Ireys, and his colleague, Paul Montebello) on January 5, 2015 regarding Mathematica's recent study. The District looks forward to using the information in Mathematica's final report to, among other uses, target the larger provider groups to improve the rates of blood lead testing in the District. The District agrees with Dr. Ireys that the numbers on the CMS Form 416 do not reflect the true number of children screened and tested for blood lead.

In addition to the DDOE-DHCF joint letter to providers concerning lead screening requirements that was sent in October 2014 during Lead Poisoning Prevention Week, the District is working with DDOE to ensure that provider practices understand DDOE's authority to sanction providers who do not screen and make referrals to DDOE's HealthyHomes Program. The information from the Mathematica study will be helpful in targeting provider practices that are not performing or reporting blood lead tests in well-child visits. In addition, the District also is involved in other events to promote lead screening, including the coordination of community screening events across the District and plans for re-running of an advertising campaign (Twice by Two) that was launched in 2012 and resulted in measurable success.

Again, despite extended discussions and correspondence among the parties, the Court Monitor and the Court, plaintiffs filed fourteen pages of "Comments" on the Mathematica blood lead testing report on January 16, 2015. (ECF No. 2031.) The first five pages are a recitation of the history giving rise to the report. The next two and a half pages make the same uncontroversial suggestion as the report itself: that "defendants should focus on changing the behavior of the largest pediatric practices." (*Id.* at 5-7.) This has been the District's strategy all along, as it has conveyed to plaintiffs. The next page and a half of comments, (*id.* at 7-8), focus on the need to affect physicians' clinical judgment on whether to do lead testing on children. Plaintiffs go on to acknowledge and highlight how the District already is addressing the issue. (*Id.* at 8.) Plaintiffs offer a few other considerations but do not mention a step the District has identified through DDOE—to issue sanctions to those failing to provide lead testing, as District law requires. Plaintiffs spend the remaining five pages attempting to convince the Court that the Mathematica study does not accurately reflect the District's improved performance in connection with blood lead testing. Suffice to say that the District agrees with the report in this regard. At the end of the day, plaintiffs' Comments, while permitted by Paragraph 5 of the Settlement Order, were excessive and unnecessary. The parties and the Court know the history; the plaintiffs' primary suggestion is one already identified by DHCF; the other suggestion already is implemented; and the argument about the meaning of the report is not commentary but argument, inappropriate in the context of comments on the report. (*Id.* at 9-14.)

3. **Dental Corrective Action Plan**

   The District submitted the Dental CAP to Plaintiffs and the Court, along with the dental provider listing, on January 15, 2015. As explained at the last Status Conference, the District, along with four other states, was selected by the Centers for Medicare and Medicaid Services (CMS) to participate in its Children's Oral Health Initiative (OHI). The federal government, through the OHI, has set two oral health goals for states—increasing utilization for preventive dental services for all children and dental sealants for children ages 6-9. Much of the work described in the Dental CAP is shared with the oral health goals of the OHI. As part of the OHI, the District participates in a Learning Collaborative with CMS, dental and quality experts and the four other states. Through the Learning Collaborative, the District will develop and submit a State Oral Health Action Plan (SOHAP) to the federal government by March 31, 2015. As the District develops the SOHAP and learns from other states, the District will continue its work on high priority issues for the District and federal governments to increase preventive dental service utilization and dental sealants for Medicaid-enrolled children.

4. **Trusted/MedStar Well-Child Visit Utilization**

   The District participated in a conference call with plaintiffs on January 6, 2015 to discuss EPSDT service delivery, among other issues. One of the topics of conversation concerned the EPSDT QIP submitted to plaintiffs on December 19, 2014, which is DHCF's comprehensive plan to improve EPSDT service delivery. The EPSDT QIP incorporates strategies to improve utilization for well-child visits, dental services, and to increase lead screening services. Since the FY13 CMS-416 data submission, two of the MCOs, Trusted Health Plan and MedStar Family Choice, have identified well-child visit utilization as a high priority for their health plans.[1] The MCOs have been continuing to perform community outreach and target due and overdue beneficiaries to receive well-child visits by their primary care providers. The District is in the process of beginning the review of the FY14 CMS-416 submissions. If the data shows that Trusted and MedStar require it, the District will submit an improvement plan (or corrective action plan) to plaintiffs and the Court along with the CMS Form 416 submission.

5. **Well-Child Visit Billing Changes**

   The District continues to implement the changes for well-child visit billing requirements and will monitor the new coding by EPSDT providers. DHCF's Division of Children's Health Services is working with DHCF Director Wayne Turnage on this reporting requirement, which also is included as part of DHCF's performance plan for Mayor Muriel Bowser.

6. **EPSDT Provider Training Requirement Reporting**

   According to the latest reports from the District's HealthCheck contractor, Georgetown University, 69% of all EPSDT providers have taken the online training (523 out 759). Thus, the

---

[1] Plaintiffs note in their Agenda Notice a discrepancy between the participant ratio reported in the FY13 CMS-416 for MedStar and the Quality Improvement Plan provided to plaintiffs on December 19, 2014. The District has corrected this discrepancy in the attached version of the Quality Improvement Plan to reflect that MedStar's participant ratio for FY13 was 69%.

percentage of providers who have never taken the training has dropped to 31%. Since July 2014, DHCF and Georgetown University have improved using the monthly reports in order to contact more providers in need of training. Georgetown provides monthly reports to the MCOs so that the MCOs can target providers paneled exclusively with each MCO; each MCO then uses that list to make updates and perform outreach to providers on a monthly basis. In addition, reports are sent to the four large provider groups. In that time, compliance rates continue to improve: AmeriHealth (from 61% in July 2014 to 73% in December 2014), HSCSN (from 70% in July 2014 to 82% in December 2014), MedStar (from 64% in July 2014 to 79% in December 2014), and Trusted (from 83% in July 2014 to 87% in December 2014).

Compliance of Fee-for-Service Medicaid providers also increased to 38%. DCHF and Georgetown University plan to focus on Fee-For-Service providers in early 2015 with targeted mailings (email and postcard) requesting providers to log into the online system, update their information, and take the training. Currently, DHCF is updating the provider postcard for contact and new mayoral information; once printed, postcards will be sent out, along with letters to targeted fee-for-service Medicaid providers who have not taken the training.

The overall provider network continues to remain at approximately the same number (currently at 759), which results from new providers being paneled with the MCOs and registering via the online system. However, approximately 46 providers that do not see patients in the 0-20 age range have been removed from the system.

As stated at earlier Status Conferences, the District continues to work on improving the compliance with the provider training requirement. Training is an agenda item on every EPSDT meeting with the MCOs and a summary of the requirement is included in DHCF's bi-monthly provider bulletin, along with the monthly tracking of providers by Georgetown University.

### 7. CY2014 Q2 EPSDT Utilization Report

The District is collecting information from the MCOs in response to the issues raised by plaintiffs on the CY2014 Q2 EPSDT Utilization report. The CY2014 Q3 EPSDT Utilization report is due on January 30, 2015, and is being reviewed by the District in light of the plaintiffs' concerns. We are hopeful that the year-to-date numbers will show how children are served throughout the year and any increase in dental sealant utilization. The District will continue to discuss with plaintiffs the role these reports serve as one tool in monitoring MCOs' performance.

### 8. Status of Fluoride Varnish Training and Claims Submission

Since fluoride varnish training first became available in the fall of 2013, 142 primary care providers have completed the training. An additional 20 to 30 individuals, primarily nurses and other support staff, have attended in-person trainings or also taken the on-line training. The District worked with the primary care clinic at Georgetown University to ensure that the fluoride varnish application claims have been submitted and reimbursed. A Medicaid claims run of code D1206 (the fluoride varnish code) showed over 150 claims were submitted, with representation from each MCO. DHCF will continue to monitor the claims submission by Medicaid primary care providers serving young children's oral health needs.

9. **HSCSN Corrective Action Plan**

As explained in past Status Conferences, the District continues to work with HSCSN on improving well-child visit utilization, including monitoring of case management staff to meet the needs of HSCSN enrollees. The District also hopes that the QIP for well-child visit utilization will be beneficial to the HSCSN population as well. As with MedStar and Trusted, the District is working with HSCSN on its FY14 CMS-416 submission. The District will be monitoring closely the need for a corrective action plan so that, if necessary, a CAP for HSCSN will be prepared to submit with the FY14 CMS-416 report in April 2015. HSCSN also has placed a high priority on ensuring children are receiving required outreach and follow-up in order for children to receive well-child visits, along with addressing the problems with its information technology system.

10. **Revised Notice and Outreach Report**

As discussed with plaintiffs on January 6, 2015, the District submitted the revised Notice and Outreach report for Quarters 2 and 3 of CY 2014 on January 26, 2015. In addition, the District is finalizing the templates to the Notice and Outreach report for plaintiffs' review with the expectation that the parties will jointly move to modify the Notice and Outreach reporting requirements. As previously discussed with plaintiffs, the District also proposes a more streamlined reporting structure for both the Utilization and Outreach reports so that the same quarter of data is submitted on the same day. The District hopes to begin this practice with the submission on January 31, 2015 of both the CY2014 Q3 Utilization and Outreach reports and expects that it will be more useful to review MCO activity in any particular quarter of the calendar year.

11. **Care Coordination/Case Management for Medicaid-enrolled Children**

The discussion with the plaintiffs on January 6, 2015 briefly included the topic of care coordination and case management services for Medicaid-enrolled children. The District will schedule time with the plaintiffs in February 2015 to further discuss the issue.

12. **HSCSN Coverage of Therapy Services for Children During School Breaks**

The parties have discussed plaintiffs' comments on the HSCSN policy. The District needs additional time to work with HSCSN on any further necessary revisions to its policy, and will inform plaintiffs of any changes by the end of February 2015. Again, the District intends to monitor this policy with HSCSN to ensure Medicaid-enrolled children receive medically necessary services during the school breaks.

13. **Dental Mediation**

The District remains hopeful that the parties will reach a resolution shortly.

**14. DHCF Update**

CMS recently awarded the District approximately $1 million through a State Innovation Model (SIM) Initiative for 12 months beginning on February 1, 2015. The District was among 21 states to receive a Model Design award in Round Two of this Initiative to develop a State Health Care Innovation Plan for submission to CMS. SIM Design awards were created to support states' engagement of public and private sector stakeholders in developing proposals for innovative payment and service delivery models to cost-effectively improve the health outcomes and health care services of Medicaid beneficiaries. One key component of this grant will be coordinated with EPSDT/Primary Care Integration work already ongoing at DHCF. The CMS website on this Initiative shows that "now over half of states representing 61 percent of the U.S. population (38 total SIM awardees, including 34 states, three territories and the District of Columbia) will be working on efforts to support comprehensive state-based innovation in health system transformation." *See* http://innovation.cms.gov/initiatives/state-innovations/.

As reported by Mayor Muriel Bowser, Director Wayne Turnage will remain as the Director of the Department of Health Care Finance. We are pleased that Director Turnage will continue his commitment to improving child health service delivery for Medicaid-enrolled children in the District of Columbia. In addition, Ms. Sonosky, Associate Director of the Division of Children's Health Services, was selected for a scholarship by AcademyHealth to attend the National Child Health Policy Conference (CHPC) in Washington, D.C. on February 11, 2015. The CHPC brings together a diverse group of stakeholders to review and discuss policy priorities at the forefront of child health. The CHPC will feature sessions that highlight the key policy priorities for child health in the evolving health care systems on the federal, state, and local levels. Sessions will cover policy initiatives for child health while addressing relevant evidence to bridge gaps in child health services research.

    Respectfully submitted,

    KARL A. RACINE
    Attorney General for the District of Columbia

    ELLEN EFROS
    Deputy Attorney General
    Public Interest Division

    /s/ Elizabeth Sarah Gere
    Elizabeth Sarah Gere, D.C. Bar No. 186585
    Assistant Deputy Attorney General,
    Civil Litigation Division
    Office of the Attorney General for the
    District of Columbia
    441 Fourth Street, NW
    Suite 630 South
    Washington, DC 20001
    (202) 724-7272; (202) 727-6295 (main)

sally.gere@dc.gov

<u>/s/ Bradford C. Patrick</u>
BRADFORD C. PATRICK, D.C. Bar No. 1004979
Assistant Attorney General
441 Fourth Street, NW, Sixth Floor South
Washington, DC 20001
Telephone: (202) 724-6627
Facsimile: (202) 741-0599
Email: bradford.patrick@dc.gov

*Counsel for Defendants*