UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OSCAR SALAZAR, et al.,          :
                               :
          Plaintiffs,          :
                               :
     v.                        :     Civil Action No. 93-452 (GK)
                               :
DISTRICT OF COLUMBIA, et al.,  :
                               :
          Defendants.          :

MEMORANDUM OPINION

I.    INTRODUCTION

The District of Columbia ("the District," "D.C." or "Defendants") manages a large Medicaid program, see 42 U.S.C. § 1396 et seq., which provides healthcare benefits for eligible children and adults. In 1993, Plaintiffs filed a Complaint alleging various statutory and constitutional violations in the course of the District's provision of these much-needed benefits for children and low income adults.

In 1996, following a bench trial, the Court found the District liable for violations of statutory provisions of the Medicaid statute and other federal law: (1) the District did not process and decide applications for Medicaid eligibility in a timely manner; (2) the District did not provide adequate advance notice before suspending or terminating benefits; (3) the District failed to provide early and periodic screening, diagnostic and treatment

("EPSDT") services for children under 21 years of age when requested; and (4) the District did not adequately notify eligible families regarding the availability of EPSDT services. See Salazar v. District of Columbia, 954 F. Supp. 278, 324-34 (D.D.C. 1996).

On January 25, 1999, the Parties' negotiated, and the Court entered, a Settlement Order memorializing the District's obligations to remedy these violations. See Order Modifying the Amended Remedial Order of May 6, 1997 and Vacating the Order of March 27, 1997 [Dkt. No. 663] (referred to throughout as the "Settlement Order"). Some elements of that Settlement Order remain in place today.

On March 23, 2010, President Obama signed the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, et seq., ("ACA"), ushering in major reforms in many different areas of the American health care system, including far-reaching changes to the District's Medicaid program.

The Court predicted that "implementation [of the ACA's reforms] w[ould] undoubtedly be both rocky and fairly long in coming." Amended Memorandum Opinion and Order of Oct. 17, 2013 at 6 [Dkt. No. 1886]. That prediction has been borne out, but no one -- neither the Parties nor the Court -- anticipated the scope and difficulty of the problems that have arisen. Although the District has devoted huge amounts of staff time and other resources to, essentially, rewrite the Medicaid program to comply with the

-2-

ACA, Plaintiffs have identified severe technical and logistical problems in the processing of initial Medicaid applications and in the Medicaid benefits renewal process. These problems have affected thousands of Medicaid beneficiaries and have deprived many District residents of necessary medical care to which they are entitled.

In light of the severe backlogs in the processing of Medicaid applications, delays in the Medicaid renewal process, and a number of computer glitches caused by ACA-related changes to the District's administration of the Medicaid program, Plaintiffs filed, on December 22, 2015, a Motion for Preliminary Injunction Concerning District of Columbia Medicaid Applications and Renewals ("Pls.' Mot. for P.I.") [Dkt. No. 2070], seeking preliminary relief on behalf of Medicaid applicants and recipients in the District who may be prejudiced by these implementation difficulties. Plaintiffs' Motion seeks a two-pronged order requiring

    1) that [the District] shall provisionally approve all
       Medicaid applications pending over 45 days until a
       final determination can be made; [and] . . .

    2) that [the District] shall continue the eligibility
       of all Medicaid recipients due [to have their
       Medicaid benefits] renewed or recertified[.]

See Proposed Order accompanying Pls.' Mot. for P.I. [Dkt. No. 2070-1].

On January 15, 2016, the District filed its Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Defs.' Opp'n to P.I.") [Dkt. No. 2077], and on January 29, 2016, Plaintiffs filed their Reply in Support of their Motion ("Pls.' Reply in Support of P.I.") [Dkt. No. 2083].

On February 9, 2016, Plaintiffs chose to supplement their request for preliminary relief with a Motion for Modification of the Settlement Order ("Pls.' Mot. for Mod.") [Dkt. No. 2093], which seeks relief on a permanent basis that is nearly identical to the relief requested in their Motion for Preliminary Injunction. Compare Proposed Order accompanying Pls.' Mot. for P.I. [Dkt. No. 2070-1] with Proposed Order Accompanying Pls.' Mot. for Mod. [Dkt. No. 2093-5]. Plaintiffs' requests for relief are identical except that the Proposed Order accompanying their Motion for Modification adds one additional duty: "that during the time this Order is in effect, [D]efendants shall report monthly on their compliance with its terms." Proposed Order Accompanying Pls.' Mot. for Mod. at 2.

On February 26, 2016, the District filed its Opposition to Plaintiffs' Motion for Modification ("Defs.' Opp'n to Mot. for Mod.") [Dkt. No. 2097]. On March 9, 2016, Plaintiffs filed their Reply in Support of their Motion for Modification ("Pls.' Reply in

Support of Mot. for Mod.") [Dkt. No. 2102]. On March 28, 2016, the District filed its Surreply [Dkt. No. 2108].[1]

Before Plaintiffs' second Motion was fully briefed, on February 19, 2016, the Court held an on-the-record teleconference with the Parties to discuss how best to resolve Plaintiffs' Motions. Both Parties agreed with the Court that the two Motions are deeply intertwined and best resolved concurrently.[2]

Thus, on February 19, 2016, with the Parties' consent, the Court decided to resolve the two Motions simultaneously. Plaintiffs and the District rely to a large extent on the same factual and legal arguments in support of their positions on the Motion for Preliminary Injunction as they do with respect to the Motion for Modification of the Settlement Order. See Pls.' Mot. for Mod. at 2 (incorporating into Motion for Modification all

---

[1] On March 14, 2016, the District filed a Motion to Strike New Evidence Submitted in Plaintiffs' Reply Brief in Support of Their Motion for Modification of the Settlement Order [Dkt. No. 2103]. The Court denied that Motion, and instead, permitted the District to file a Surreply. See Order [Dkt. No. 2104].

[2] Federal Rule of Civil Procedure 65(a), which governs preliminary injunction motions, supports consolidated consideration of the merits and a request for preliminary injunction. See Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."); see also United States v. W. Elec. Co., 46 F.3d 1198, 1207 n.7 (D.C. Cir. 1995) ("[A] trial court has inherent power to control the sequence in which it hears matters on its calendar and to decide whether to consolidate the proceedings on motions.").

"briefing and evidence submitted in connection with [] Motion for a Preliminary Injunction"); Defs.' Opp'n to Mod. for Mod. at 1. Additionally, Plaintiffs request precisely the same relief in their Motion for Preliminary Injunction and in their Motion for Modification (with the one exception of a request for monthly reports from the District, which appears only in the latter Motion). Because Plaintiffs' two Motions rest on the same factual and legal foundations and call for nearly identical relief, it is clear that the merits question presented by the Motion for Preliminary Injunction is the same as the question presented by the Motion for Modification.

Although the District has made substantial progress since Plaintiffs' initial filing on December 22, 2015, in addressing the problems caused by changes in its administration of the Medicaid program to comply with the ACA, it is clear from the Parties' submissions that significant obstacles remain. These obstacles stand between Medicaid eligible individuals and the healthcare to which they are entitled. For that reason, as well as others, Plaintiffs' Motion for Modification of the Settlement Order shall be **granted** with certain modifications to the requested relief, and

Plaintiffs' Motion for Preliminary Injunction shall be denied as moot.[3]

## II.   BACKGROUND

### A.   Prior Relevant Orders in This Case

In 1993, when Plaintiffs filed this class action the Plaintiff class ultimately certified consisted of "a collection of several sub-classes, with each sub-class consisting of Medicaid applicants and recipients with a particular set of claims." Memorandum Opinion at 2 [Dkt. No. 2046]. At the time of trial, the following sub-classes remained:

> All persons who have applied, have attempted to apply, or will apply in the future during the pendency of this litigation, for medical assistance pursuant to Title 19 of the Social Security Act ("Medicaid"), and all persons who have received, are receiving, or will receive in the future during the pendency of this litigation, Medicaid in the District of Columbia with respect to the following claims:
>
> .  .  .  .
>
> Any claims for declaratory, injunctive, or other relief premised on an alleged delay in excess of 45 days in the processing of Medicaid applications [Sub-class III]
>
> Any claims for declaratory, injunctive, or other relief premised on an alleged lack of advance notice of the discontinuance, suspension or obligation to recertify Medicaid benefits, after being found eligible [Sub-class IV]
>
> Any claims for declaratory, injunctive, or other relief premised on an alleged lack of effective notice of the

_____

[3]   The Court notes that both Parties submitted extremely well-written briefs, which made its job a trifle easier.

availability of early and periodic screening, diagnostic
and treatment ("EPSDT") services for children under 21
years of age, and/or an alleged lack of EPSDT services
for eligible children under 21 years of age [Sub-
class V].[4]

Order at 1-2 [Dkt. No. 100] (brackets in original).

After years of litigation and some successful negotiation by
the Parties, on October 16, 1996, the Court issued a 58-page
Opinion setting forth extensive findings of fact and conclusions
of law. See Salazar, 954 F. Supp. 278. "In particular, the Court
ruled that Defendants had failed to process Medicaid applications
for non-disabled, non-foster care [non-public assistance]
applicants within 45 days, had terminated or suspended eligible
persons' benefits without adequate notice, had failed to provide
EPSDT services to eligible families, and had failed to notify those
eligible families about the availability of such services."
Memorandum Opinion of December 28, 1998 at 2 [Dkt. No. 653]
(summarizing findings detailed in Salazar, 954 F. Supp. 278).

In order to remedy these violations of the law and to avoid
further litigation, the Parties crafted and agreed upon the terms
of a Settlement Order, which the Court entered on January 25, 1999.
See Settlement Order at 1 [Dkt. No. 663]. Section II of the
Settlement Order detailed steps the District was to take to redress
problems related to the timely processing of initial applications

---

[4] Claims corresponding to Sub-classes I and II were resolved before
trial. See Memorandum Opinion at 4 n.2 [Dkt. No. 2046].

for Medicaid on behalf of members of Sub-class III. Settlement
Order ¶¶ 6-16. In general, Section II required the District to
decide Medicaid applications and notify beneficiaries of its
decision within 45 days of receiving an application. Id. ¶ 6(a).
The Settlement Order also provided that if the District
demonstrated compliance over three consecutive years, Section II
of the Order would terminate. Id. ¶ 74.

On February 24, 2009, the District notified the Court that it
had satisfied the exit criteria for Section II and represented
that Plaintiffs were in agreement with that position. See Consent
Motion to Vacate Sections II and IV of the Settlement Order of
January 22, 1999 [Dkt. No. 1443].⁵ The District therefore
requested, with Plaintiffs' consent, that the Court vacate
Section II. Id. The Court granted the District's Motion to Vacate
that same day. See Minute Order of Feb. 24, 2009.

Section III of the Settlement Order concerned the annual
recertification⁶ of Medicaid benefits on behalf of Sub-class IV.

---

⁵ Section IV of the Settlement Order concerned the Eligibility
Verification System by which the District determined the Medicaid
eligibility of District residents. That Section was also vacated.
See Minute Order of February 24, 2009.

⁶ As Plaintiffs note, "recertification" of Medicaid benefits is
now generally referred to as "renewal." It is the process by which
Medicaid beneficiaries are annually subject to review of their
continued eligibility for Medicaid benefits based on income,
family status, and other factors. See Pls.' Ex. 23 at 009-010 [Dkt.
No. 2070-21]. This Memorandum Opinion uses "recertification" and
"renewal" interchangeably.

See Settlement Order ¶¶ 17-28. At the time the Settlement Order
was issued, Medicaid required the District to provide annual
recertification forms to beneficiaries that they were required to
complete in order to retain their Medicaid benefits. Section III
required the District to mail recertification forms and various
notices to advise beneficiaries of their recertification status.
Id. ¶ 17. Section III's requirements were specific, setting forth
a schedule which the District was required to adhere to and
language that the District was required to use. Id.

Passage of the ACA in March of 2010 ushered in a host of
changes to the Medicaid program, including significant
modifications to the Medicaid recertification process. The ACA
requires the District to move to a "passive renewal" model in which
beneficiaries' eligibility is determined to the extent possible on
the basis of reliable information available to the District, such
as data available through the IRS or the Social Security
Administration. See 42 C.F.R. § 435.916. Section III of the
Settlement Order does not rest on the ACA's passive renewal model.
Instead, it assumes that Medicaid beneficiaries would have to
actively renew their benefits on an annual basis.

In light of the ACA's October 1, 2013 effective date for
significant changes to the Medicaid renewal process, see Amended
Memorandum and Order at 2 [Dkt. No. 1886], on September 20, 2013,
the District filed a Motion to Modify the Settlement Order [Dkt.

No. 1870] pursuant to Federal Rule of Civil Procedure 60(b)(5).
The District asked the Court to relieve it from complying with
Section III entirely, contending that it could not implement the
ACA's passive renewal system while still bound by the conflicting
provisions of Section III. Motion to Modify the Settlement Order
at 1. Plaintiffs opposed the District's Motion, arguing that
limited modifications to Section III could address any apparent
conflicts between the ACA and Section III. Plaintiffs' Brief in
Opp'n at 1-2 [Dkt. No. 1876].

On October 17, 2013, the Court granted the District's Motion.
See Amended Memorandum Opinion and Order [Dkt. No. 1886]. The Court
found that "[t]here is simply no comparison between the statutory
framework that existed at the time this Court made its factual
findings in 1996 and what implementation of the ACA envisions[.]"
Moreover, many of the ACA's renewal provisions "are in direct
conflict with the renewal process in Section III." Id. at 6.
Accordingly, the Court "conclude[d], pursuant to Fed. R. Civ. P.
60(b)(5), that passage of the ACA has created a 'significant change
in circumstances' that justifies termination of the provisions of
Section III of the Consent Order." Id. at 5. Notably, Plaintiffs
declined to appeal the Court's termination of Section III.

Thus, following the termination of Section III, no provisions
of the Settlement Order relating to Medicaid application
processing or benefits renewal remained in effect. The only

portions of the Settlement Order affecting programmatic elements of the District's Medicaid program that remained in force related to the delivery of EPSDT services. See Settlement Order Sections V & VI.

Sections V & VI of the Settlement Order resolve the claims of Sub-class V, which were premised on the lack of effective notice of the availability of EPSDT services for children under 21 years of age and the failure to provide those services. Order at 1-2 [Dkt. No. 100]. Section V sets forth detailed procedures for providing and tracking the provision of EPSDT services through entities that participate in the District's Medicaid program. See Settlement Order Section V. Section VI sets forth similarly detailed procedures for providing notice to eligible Medicaid beneficiaries regarding the availability and nature of EPSDT services. See id. Section VI.

In 2014, the District reported to the Centers for Medicare and Medicaid Services ("CMS") that there were 98,350 children in the District eligible for EPSDT services under Medicaid. Form CMS-416, line 1a [Dkt. No. 2039-1]. As of October 2014, there were a total of 247,850 District residents on Medicaid. Pls. Ex. 61, column 1 [Dkt. No. 2102-1] (figure reflects subtraction of certain non-Medicaid beneficiaries included in the District's data). Thus, children eligible for EPSDT services constitute a large portion of the District's Medicaid population.

### B.    ACA Implementation

Beginning on October 1, 2013, the District began processing Medicaid applications pursuant to new eligibility rules established by the ACA and its implementing regulations. See 42 U.S.C. § 1396a(e)(14); 42 C.F.R. §§ 435.603, 457.315(a). In order to facilitate implementation of the ACA's new rules, the District took steps to build a new, automated Medicaid application and eligibility determination system called the DC Access System ("DCAS"), which is intended to eventually entirely replace the District's legacy system, called the Automated Client Eligibility Determination System ("ACEDS"). Schlosberg Decl. ¶¶ 14-15 [Dkt. No. 2077-1].

As required by ACA regulations, the District also implemented a "no wrong door" approach to applications under which individuals may apply for Medicaid benefits online through DCAS, on paper, by telephone, or in person at D.C. Department of Human Services ("DHS") Economic Security Administration ("ESA") Service Centers ("Service Centers"). See 42. C.F.R. § 435.907(a). Finally, the District took steps to establish a system for processing "passive renewals" of Medicaid benefits, as required by the ACA. See 42 C.F.R. § 435.916.

These changes did not go smoothly. The Parties disagree as to the scope of the problems that developed; however, it is clear that thousands of Medicaid beneficiaries were affected by (1) the

District's failure to process Medicaid applications within 45 days in violation of 42 C.F.R. § 435.912(c)(3) and D.C. Code § 4-205.26 (2014); and (2) the District's failure to timely renew Medicaid benefits or to provide adequate notice to Medicaid recipients before terminating their benefits in violation of federal law.

The roots of these failures are technical in nature, but the facts below demonstrate the deeply personal calamity that befell many Medicaid applicants and beneficiaries when they and their children were unable to get the care to which they were entitled. The number and narratives of affected District residents demonstrate the gravity of the situation, as the following information shows.

### 1.   Initial Processing

The District of Columbia is required to make an eligibility determination on all Medicaid applications within 45 days of submission. 42 C.F.R. § 435.912(c)(3); D.C. Code § 4-205.26.[7] During 2015 and the beginning of 2016, the District failed to comply with this duty.

Around March or April 2015, the District became aware that as many as 12,000 applications were listed as pending in the DCAS system for 45 days or more. Pl. Ex. 1 at 3 [Dkt. No. 2070-2]. The

---

[7] The one exception is for applicants who apply for Medicaid on the basis of disability, whose applications must be adjudicated within 90 days. 42 C.F.R. § 435.912(c)(3)(i).

District had previously been unaware of this backlog until staff-members ran new queries as part of their backlog reports. Id.

The District states that the 12,000 application figure overstates the number of District residents who had actually been denied Medicaid coverage. For instance, of the approximately 12,000 cases appearing on the report, around 15 percent already had active Medicaid coverage. Schlosberg Decl. ¶ 69. Another quarter of these cases were applications that had been determined to be ineligible, but the system simply had not closed them out. Id. Even if these figures are accurate, approximately 7,000 applications - and people -- were affected.

In August 2015, the District reported that there were still 5,263 applications[8] that had been pending in DCAS for more than 45 days. Pl. Ex. 2 at DHCF 32 [Dkt. No. 2070-3]. District staff "work[ed] overtime to resolve these cases as soon as possible," but as of November 23, 2015, there were still 5,215 Medicaid applications in DCAS pending over 45 days. Pl. Ex. 21 Response 5(c)&(d) [Dkt. No. 2070-19]. By December 2015, the District had reduced the number of pending applications to 4,497. See Pl. Ex.

---

[8] A household with several members will sometimes submit a single application, Pl. Ex. 21 Response 5(b) [Dkt. No. 2070-19]; thus, the number of individuals affected by the backlog may be larger than the application backlog figures.

1 at 3 [Dkt. No. 2070-2] (figure combines pending and stuck/malformed applications).

The backlog of applications can be divided into two main groups, based on the source of the problem.[9] The first group of backlogged applications, the "stuck/malformed" group, consisted of approximately 1,970 cases as of December 2015. "A malformed case is a case that did not generate all the information to create a fully formed case when it was entered into the system [case worker portal] because of a technical system issue." See Pl. Ex. 23 at 6 [Dkt. No. 2070-21]. As the District of Columbia Department of Human Services explains, "[w]hat this means . . . [is that] [t]here are individuals who are not getting Medicaid that should be." Pl. Ex. 2 at DHCF 34.

The second group of backlogged applications, the "case processing backlog," consisted of 2,527 individuals as of December 2015. Pl. Ex. 1 at 3. The case processing backlog is a catch-all category, which consists of applications that have not been processed due to the District's inability to verify income, residency, or some other type of required verification or due to other "[computer] system performance issues." Id.

---

[9]   In addition to the serious backlog of applications in the DCAS system, as of August 2015, "there [wa]s a paper application backlog" as well. Pl. Ex. 2 at DHCF 35 [Dkt. No. 2070-3]. However, the Parties have not indicated the size of the paper application backlog.

As of August 2015, over 1,500 applicants in the case processing backlog had not been notified that their applications could not be processed because of the District's inability to verify some piece of information. Pl. Ex. 2 at DHCF 32. Plaintiffs point out that since the backlog was discovered in March or April of 2015, it is possible that, as of late December, 2015, many of the backlogged applications had been pending for nine months or longer.

In addition to the serious application backlogs, Plaintiffs also describe significant hurdles facing Medicaid applicants as they attempt to file their initial applications. Plaintiffs cite evidence that documents scanned into the District's document management system cannot always be found and must often be resubmitted. See Pls. Ex. 42 at 20 [Dkt. No. 2070-40]. The testimony of Medicaid advocates who assist Medicaid beneficiaries on a daily basis demonstrates that lost or misplaced paperwork is a substantial problem. See, e.g., Loubier Decl., Pl. Ex. 27 ¶ 9 [Dkt. No. 2070-25]; Bread for the City Decl., Pl. Ex. 24 ¶ 11 [Dkt. No. 2070-22]; Legal Aid Decl., Pl. Ex. 26 ¶¶ 5, 17 [Dkt. No. 2070-24].

A review of DHS Service Centers conducted by Medicaid advocates in February 2015 observed widespread problems with document processing. See Legal Aid Decl., Pl. Ex. 26 ¶¶ 2(b)-(c), 7-15, 18. As part of this review, Medicaid advocacy organizations,

including Plaintiffs' counsel, made 12 visits to three DHS service centers in February 2015 and spoke with approximately 309 people in line. Id. ¶ 7. In March 2015, the DC Fiscal Policy Institute and the Legal Aid Society of the District of Columbia provided testimony to the District of Columbia City Council's Committee on Health and Human Services that analyzed the data from these visits. They testified that consumers were often required to "make return trips to Service Centers to correct improper benefits terminations and denials caused by ESA failing to process their paperwork." Pl. Ex. 8 at 2 [Dkt. No. 2070-9].

Subsequent visits by these same organizations to the service centers in June 2015 again found numerous individuals standing in line to resubmit documentation they had already provided, many now facing denial or termination of benefits due to Defendants' failure to process the paperwork in the first instance. See Legal Aid Decl., Pl. Ex. 26 ¶¶ 13(a), (c), (d), (e), (g), (h); 15(a), (c).

After Plaintiffs filed their Motion for Preliminary Injunction on December 22, 2015, the District continued its efforts to reduce the two backlog groups. It made impressive progress. "As of February 24, 2016, zero individuals were in the case processing backlog (down from 1,247 individuals on January 11, 2016), and as of February 23, 2016, . . . 67 initial applications were affected by the [stuck/malformed] issue (down from 1,408 on January 11,

2016)." Defs.' Opp'n to Mot. for Mod. at 3 (citing Second Schlosberg Decl. ¶¶ 4-5 [Dkt. No. 2097-1]).

The District has attempted to make whole applicants who were eventually determined to be Medicaid eligible: "Where a beneficiary was determined eligible but had not received a determination, the individual was notified and approved retroactively to the date of the initial application along with instructions on how to request reimbursement for any eligible out-of-pocket expenses." Defs.' Opp'n to P.I. at 14 (citing Schlosberg Decl. ¶ 70).

The District also represents that many of the "root causes of problems have been identified and will be resolved in an upcoming update to DCAS," and that "in the meantime caseworkers have been provided additional training and guidance to navigate any new or remaining [stuck/malformed] cases while managers continue to receive reports to track pending cases." Defs.' Opp'n to Mot. for Mod. at 3 (citing Second Scholsberg Decl. ¶ 6). "In addition, the District has also implemented automated batch processes through which initial applications [that do not require the verification of additional information] . . . are automatically activated with Medicaid coverage." Id. (citing Second Scholsberg Decl. ¶ 7).

Finally, to provide a sense of scale, the District notes that "[s]ince October 2013, over 33,000 new electronic applications for Medicaid were processed in DCAS on the same day they were

submitted." Gov't's Opp'n to Mot. for P.I. at 7 (citing Schlosberg Decl. ¶ 99).

While the District's progress in reducing the Medicaid application backlogs is laudable, Plaintiffs argue that the District has not "put in place a durable remedy to ensure that Medicaid applications will be decided within 45 days." Pls.' Reply in Support of Mot. for Mod. at 13. They note that "four of the root causes for the stuck/malformed defect in the District of Columbia computer system remain unresolved and that several new applications are still affected by those defects every day." Id. (citing Second Schlosberg Decl. ¶ 6; Defs.' Opp'n to Mot. for Mod. at 3).

Moreover, Plaintiffs contend that the issues of long Service Center wait times, paperwork loss, and processing delays have not been remedied. They set forth a particularly enlightening example to sharpen their point:

> On November 24, 2015, Ms. [Nurian] Flores Rivas submitted an application for Medicaid benefits for her two minor children and [received] a receipt for the visit. [] Pl. Ex. 62 ¶ 8 [Dkt. No. 2102-2] . . . . Over three months later, she ha[d] received no written decision. Even with the assistance of a Legal Aid lawyer, Ms. Flores Rivas has received conflicting information about the status of her application. [DCAS] Customer Service found a record of application only for her son and not for her daughter and also found an approval for her son. The ESA Customer Service [representative], whom she was told to contact next, saw no record of any application for either her daughter or her son and no record of any approval for her son. Id. ¶ 8(e). [As of March 9, 2016, after the date the District represented

that it had eliminated the application backlogs], Ms.
Flores Rivas ha[d] not received a notice of DHS's
determination concerning her children's application[,]
and they [could not] access Medicaid benefits. <u>Id.</u> ¶
8(g).

Pls.' Reply in Support of Mot. for Mod. at 15.

The District responds to this particular example by
contending that individualized mistakes, rather than systemic
problems led the Flores Rivas children's loss of coverage. <u>See</u>
Defs.' Surreply at 6. It notes that "ESA records indicate that a
caseworker erroneously labeled the application [submitted by Ms.
Flores Rivas on November 24, 2015] as a recertification instead of
an application. . . . Ms. Flores Riva's son was approved for
Medicaid but the daughter was not approved because her application
was mislabeled." <u>Id.</u>

The District's attempt to separate the mistakes of individual
District employees from the systemic issue plaguing the Medicaid
system is unconvincing. The two are interrelated. Just as the
complexity of the system increases the opportunity for individual
errors, individual errors combine to form systemic problems.

Accordingly, it is clear that despite its substantial
progress, the District has still not been able to entirely
remediate the problems that Plaintiffs document.

### 2.  Benefit Renewals

In the 1996 merits Opinion, the Court held that "[t]he
District of Columbia is required, under federal law, to give

Medicaid recipients timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility and to provide an opportunity for a hearing if it takes such action." Salazar, 954 F. Supp. at 326 (internal brackets and quotation marks omitted).

Under the ACA's implementing regulations, the District is required to "passively" renew[10] the Medicaid benefits of Medicaid beneficiaries "if able to do so based on reliable information contained in the individual's account" or if such information is otherwise available to the agency through federal and local databases and other sources. See 42 C.F.R. § 435.916(a)(2). If sufficient information is available to the agency to permit an eligibility determination, the Medicaid recipient cannot be required to take any action. Id. If sufficient information is not available to passively renew an individual, the agency must mail a form that contains the information already available to the agency and ask the Medicaid recipient to complete the missing portions and return the form by telephone, e-mail, online, or in person. 42 C.F.R. § 435.916(a)(3). The latter process is referred to as "manual" renewal.

---

[10] The "passive renewal" occurs when a Medicaid recipient's benefits are renewed without the recipient having to provide any additional information to the District.

Ordinarily, if the information available to the District is insufficient to establish ongoing Medicaid eligibility, the beneficiary is sent a form 60 days prior to the renewal date. Scholsberg Decl. ¶ 33. The form instructs the beneficiary to return the form after adding the needed information. Id. If the beneficiary does not return the form, the beneficiary is provided 30 days' notice that benefits will terminate if the form is not returned before the renewal date. Id.; see also MAGI 30-day Notice, Defs. Ex. D [Dkt. No. 2077-4]. Recipients of this notice are advised of their appellate rights. Schlosberg Decl. at ¶ 33; Defs. Ex. D. However, when an individual fails to provide the needed information on time, the District extends a 90-day grace period, meaning that benefits will terminate at the end of the certification period as required by law, but if a beneficiary returns the completed form late, benefits can be restored retroactive to the date of termination if the beneficiary's information establishes that he or she remains eligible. Schlosberg Decl. at ¶ 33.

Another serious problem occurs because during the ongoing transition from the District's legacy ACEDS system to the new DCAS system, renewals cannot be done through DCAS directly. Instead,

data must be transferred from DCAS to ACEDS. These large-scale data transfers did not perform as the District hoped.[11]

In April 2015, the District began receiving reports from the managed care organizations ("MCOs") that their enrollment numbers were declining by the thousands, even when beneficiaries received a passive renewal approval letter or timely returned the renewal form. See Pls. Ex. 12 at DHCF 12 [Dkt. No. 2070-11]. The District investigated the problem over the next several months and, by June, it had identified 1,149 cases in which the information in DCAS was not automatically transferring to ACEDS, meaning that Medicaid recipients were listed as receiving benefits in DCAS and yet were not actually receiving benefits in ACEDS. See Pl. Ex. 13 at 6 [Dkt. No. 2070-12].

However, the people who were affected had to wait six months for any benefits. The District contends that the MCOs' specific concerns about declining enrollment were unfounded -- in fact, MCO enrollment has increased by approximately 9% since the District started using DCAS. Schlosberg Decl. ¶ 98. However, the

---

[11] Technological and organizational failures in the District's administration of the Medicaid program have affected different populations in disparate ways. For example, Medicaid beneficiaries who are eligible on the basis of disability face different obstacles than beneficiaries eligible on the basis of income. See Pls.' Mot. for P.I. at 5-9; Defs.' Opp'n to Mot. for P.I. at 8-9. However, these distinctions are not material to the outcome of Plaintiffs' Motion or the relief Plaintiffs seek.

investigation that the MCOs' inquiry launched gave the District the opportunity to find serious problems in the renewal system that had developed and were unknown to the District.

In early October 2015, the District discovered that due to the same stuck/malformed technological defect affecting initial applications in DCAS, many renewal "cases were not populated correctly in the [DCAS] system and thus lost coverage." See Pls. Ex. 21 Response No. 2(d). As of October 26, 2015, the District had identified 86 renewal cases that had lost coverage at the time of renewal due to this defect and had only restored coverage to a subset of these cases. See id. Response 2(c) (indicating restoration of coverage to only 68 individuals). Data provided at a D.C. Medical Care Advisory Committee meeting on December 10, 2015, indicates that this defect affected 361 renewal cases (and likely more individuals, as a case may include multiple members of a household). Pl. Ex. 1 at 3. By December 10, 2015, 131 cases remained to be reviewed to determine, in the first instance, whether coverage had been lost. Pl. Ex. 1 at 3.

Of course, the long lines and wait times at ESA Service Centers add difficulty to an already trying process. See, e.g., Pl. Ex. 25 ¶ 8 [Dkt. No. 2070-23] ("We [Whitman Walker Health] hear from consumers that they must line up as early as 4 am for an opening time of 7:45 am or 8 am in order to be seen . . . .

Consumers reported to me . . . that they wait for many (often more than 4) hours to meet with a case worker to get help.").

Further technological errors have plagued what is supposed to be an automatic renewal process. In May 2014, the District discovered that DCAS had erroneously denied an unknown number of individuals who had been granted asylum in the United States (who are Medicaid eligible) the coverage to which they were entitled. See Pl. Ex. 15 at 2, 5. However, the District points out that technical problems that led to the error regarding asylum status were fixed by November 2014. Schlosberg Decl. ¶ 31.

Additionally, DCAS system defects led to the failure to automatically account for certain life changes that can affect Medicaid coverage, such as the birth of a baby. The District has recognized DCAS's "inability to accurately redetermine eligibility once a life event has been reported due to system defects." E-mail Communications between CMS and DHCF, January 2015, Pl. Ex. 16 at DHCF 1850 [Dkt. No. 2070-15]; see also id. at DHCF 1955 ("We are having major challenges with processing change [sic] in circumstances for all reported changes."). The District must "manually add[] newborns and additional household members to the case by using [its] old legacy system" to avoid a loss of coverage. Id. at DHCF 1850. As of August 2015, the District reported "a significant backlog in . . . life event processing." E-mail Communications Between DHS and DHCF, August to September 2015, Pl.

Ex. 17 at DHCF 51 [Dkt. No. 2070-16]. The District maintains that because it has been manually processing life event changes "[n]o individual has lost coverage due to such issues." Defs.' Opp'n to Mot. for P.I. at 26 (citing Schlosberg Decl. ¶ 94).

In addition to these technical errors, the District's failure to process renewal paperwork in a timely manner has led to confusion and the loss of coverage by Medicaid beneficiaries. Email exchanges between the District and the Centers for Medicare and Medicaid Services ("CMS") in January 2015, indicate that the District was regularly taking 90 days to process renewals, which CMS considered too long. Pl. Ex. 16 at DHCF 1847-1849; id. at 1849 ("The agency should be working to process the returned form as expeditiously as possible and . . . the whole process ordinarily should not take 90 days . . . ."); see also Pl. Ex. 17 at DHCF 47-48 (referring to a "backlog renewal"). Individual examples provided by several of the District of Columbia's most reliable and experienced legal aid and public health organizations help convey the severity of the problem:

> One client [of the D.C. Legal Aid Society], a mother of seven with severe disabilities, submitted her Medicaid renewal form in January 2015. She got a notice in late February stating that the form had not been received. She then got a notice in early March stating that the form had been received. She went to a [S]ervice [C]enter in April to renew her SNAP benefits and was told that there was nothing more that she needed to do to renew her Medicaid. Then she received another notice in April telling her that she needed to verify District residency for herself and one of her children. The client had not

> recently moved, and all of her children live with her.
> After Legal Aid got involved, the client's benefits were
> restored in May 2015. The client and her son -- who both
> have serious health conditions -- were unable to receive
> needed treatment during the weeks that they went without
> coverage.

Legal Aid Decl., Pl. Ex. 26 ¶ 6(e) [Dkt. No. 2070-24].

> [Bread for the City] Patient I, a Spanish speaker who
> managed to submit a timely renewal form, despite it being
> sent in English, received verbal confirmation of
> receipt, but was terminated in October 31, 2015, and [as
> of December 22, 2015] remain[ed] without coverage[.]

Pls.' Mot. for P.I. at 23 (citing Pl. Ex. 24 ¶ 19).

> [Bread for the City] Patient J, who is incontinent,
> completed and timely submitted her renewal form, but
> nevertheless experienced a temporary loss in coverage
> resulting in her going without needed incontinence
> supplies, limiting her ability to fully function[.]

Pls.' Mot. for P.I. at 23 (citing Pl. Ex. 24 ¶ 20).

> [Bread for the City] Patient K, who suffers from prostate
> cancer, submitted his renewal form and proofs twice, but
> was left to cope with a demeaning situation because he
> could not afford to pay for incontinence supplies out-
> of-pocket during the lapse in coverage[.]

Pls.' Mot. for P.I. at 23 (citing Pl. Ex. 24 ¶ 21) (internal

quotation marks omitted).[12]

Lest the reader be getting exhausted reading all these numbers

and examples, s/he must constantly keep in mind that these are

---

[12] See also Whitman-Walker Decl., Pl. Ex. 25 ¶ 9(a) (A Whitman-Walker patient was informed by ESA staff that his form had been received, yet his coverage was still terminated.); id. ¶ 9(b) (A Whitman-Walker patient was unable to access life-saving medications after coverage was terminated following completion of form at service center.).

real people -- poor and sick people and their children -- who are being denied the health care and the dignity of receiving health care to which they are entitled by law.

Plaintiffs' counsel represents that s/he also encounters these types of improper terminations with some frequency among the individuals that are represented. For example, the District failed to renew the Medicaid coverage of Terri Jackson and her family, despite the fact that they timely submitted a renewal form first online and then at a service center. Accordingly, Ms. Jackson and her family lost their Medicaid coverage.

Among other problems, this resulted in Ms. Jackson's Medicare Part B premiums being withheld from her Social Security check for six months. Jackson Decl., Pl. Ex. 32, ¶¶ 1-3, 8-12 [Dkt. No. 2070-30]. Ms. Jackson's husband and son, who suffer from chronic health conditions, also lost coverage, forcing Ms. Jackson to purchase medications out-of-pocket for them and causing the family a great deal of stress. Id. ¶¶ 6, 12; see also Declaration of Vera Edmonds ("Edmonds Decl."), Pl. Ex. 48 [Dkt. No. 2070-46](Ms. Edmonds, who timely mailed renewal forms for her family, found out her coverage had lapsed when she went to the doctor following a car accident; as a result, she has been unable to attend rehabilitation therapy or pay for needed medication).

For its part, the District states that it has reviewed each of the foregoing individual cases, that all of them were resolved

in the first half of 2015. Defs.' Opp'n to Mot. for P.I. at 29.
The District also states that it reported the resolution of each
case to the relevant legal services providers in June of 2015. Id.
Moreover, the District claims that most of these cases were the
result of systemic problems that had already been fixed by the
time the legal service providers became involved. Schlosberg Decl.
¶¶ 90-91. The others were the result of routine processing errors
that are not indicative of systemic issues within DCAS. Id.

While the District is clearly doing its best to rectify errors
and to provide retroactive status to those who lost coverage, the
end result is that a significant number of very sick people, or
elderly people, or parents of children, are suffering from the
time their benefits lapse erroneously until the District can fix
the error and make benefits retroactive.  In the interim, those
people may not be able to buy their cancer medicine, receive
necessary mammograms, or continue necessary physical therapy.

Plaintiffs next point out that the District often terminates
the Medicaid coverage of beneficiaries who, despite becoming
ineligible on one basis, remain eligible on another. Legal Counsel
for the Elderly reports recurring issues with the District
terminating Medicaid coverage based on recipients' slight change
in income, even when these same recipients are eligible for
Medicaid under another coverage category. See Pl. Ex. 30 ¶¶ 5-8
[Dkt. No. 2070-28]. When these individuals experience a loss of

coverage, they are unable to access needed medical care, such as personal care aide services, and are at an increased risk of institutionalization. Id. ¶ 6.

For example, when Fonda Carroll's husband died and she became eligible for a widow's benefit, she lost her Medicaid coverage, which she had obtained due to a disability, because she was considered over-income. Carroll Decl., Pl. Ex. 31 ¶¶ 1-6, 9 [Dkt. No. 2070-29]. Although Ms. Carroll was eligible for Medicaid under a different category (as a childless adult under 65) despite her income increase, she was not screened for eligibility under that category prior to termination. Instead, her coverage was terminated and she was informed that she should re-apply through DCAS. Id. ¶¶ 10-11. As of December 22, 2015, she had a pending Medicaid application, but while waiting for a determination, she could not obtain needed doctor's appointments or her chronic obstructive pulmonary disease medication because she cannot afford the hundreds of dollars to pay for even a single inhaler. Id., ¶¶ 12-13.

The District responds to this particular example, noting that it had insufficient information to establish that this individual was eligible for a different coverage category. Schlosberg Decl. ¶ 97. On April 8, 2015, Ms. Carroll received a 30-day notice to terminate her Medicaid benefits because she was over income. Id. In addition, Ms. Carroll received general correspondence from the

District specifically advising her to file an application through DCAS so that she could be considered for eligibility under other Medicaid coverage groups and informing her that she could apply in person, on line and over the telephone. Schlosberg Decl. at ¶ 97. According to the District's records in ACEDS, Ms. Carroll received a total of three such communications. Id. Eventually, she did file the correct application, and her Medicaid coverage in the childless adults category began on December 1, 2015. Id.

Additionally, the District claims that it does consider whether individuals who lose their Medicaid eligibility on one basis might still be eligible on another. The problem, it contends, is that the District often lacks sufficient information to automatically grant benefits on new grounds. Schlosberg Decl. ¶ 95. In such cases, the District requests that the beneficiary submit any missing information needed to establish eligibility. Id. If the information is received prior to the beneficiary's renewal date, and the information establishes eligibility in a different coverage group, the beneficiary will not experience a lapse in coverage. If not, the beneficiary will lose coverage (although benefits may be restored retroactively to the date coverage was lost during the 90-day grace period). Id.

As noted above, "[t]he District of Columbia is required, under federal law, to give [Medicaid] recipients timely and adequate notice of proposed action to terminate, discontinue, or suspend

their eligibility and to provide an opportunity for a hearing if it takes such action." Salazar, 954 F. Supp. at 326 (internal quotation marks and citation omitted). However, Plaintiffs respond that the District has failed to send renewal forms notifying recipients of the need to renew.[13]

Bread for the City's medical director, Dr. Randi Abramson, explains that "DHS frequently terminates Medicaid coverage without providing recipients with any notice that they are required to renew their coverage" and recounts the stories of several individuals who had their Medicaid coverage terminated without receiving any advance notice of the need to renew. Pl. Ex. 24, ¶¶ 13-14 [Dkt. No. 2070-22]; id. ¶ 15 (Patient F, who never received a renewal form and found out her coverage had been terminated at doctor's office, was unable to receive needed

_____

[13] Plaintiffs also contend that the District fails to send appropriate notices upon a lapse in coverage, but the District notes that it does in fact send notice of its intent to terminate 30 days prior to the scheduled termination date. Pls.' Mot. for P.I. at 30; Defs.' Opp'n to P.I. at 29. ACA implementing regulations require that the District provide "timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility" at least 10 days before the proposed termination. 42 C.F.R. § 435.919(a). Thus, the 30-day notice complies with these regulations.

Plaintiffs point out that if a beneficiary returns a renewal form but loses coverage because of the District's failure to timely process the form, then the beneficiary has not received adequate notice of termination. The real problem faced by the hypothetical Medicaid beneficiary Plaintiffs describe is the unlawful termination of Medicaid coverage, not the concomitant lack of notice.

mammogram); id. ¶ 16 (Patient G, who never received a renewal form, had coverage terminated and could not obtain needed orthopedic care); id. ¶ 17 (Patient H, who never received a renewal form for herself and her son, found out their coverage was terminated when she attempted to obtain medication).

In October 2015, the District discovered a computer error that garbled the mailing addresses of Medicaid recipients from May to October 2015, preventing many recipients from receiving the renewal form. Pl. Ex. 1 at 3. The renewal forms that the District is supposed to send to each Medicaid beneficiary in advance of termination have unique codes that must be provided during the renewal process. Thus, if a Medicaid recipient cannot access the renewal code because they never received the renewal form on which it appeared, they must go to great lengths to obtain a replacement form or face an indefinite period without coverage. See Pl. Ex. 24 ¶ 15 (Patient F was only able to activate coverage after visiting a service center twice to obtain her existing renewal form); id. ¶ 16 (Patient G is still unable to renew because he cannot obtain his renewal code); id. ¶ 17 (Patient H remains without coverage because she is unable to reach DCAS to obtain the necessary renewal form and code).

As with the initial application backlogs discussed above, the District has made substantial progress with respect to the issue of passive renewals. In February 2016, the District processed

benefits renewals for approximately 7,000 Medicaid recipients whose eligibility is determined by their income. Of those, the District was able to passively renew 59% of the beneficiaries. Second Schlosberg Decl. ¶ 12. Moreover, as of February 26, 2016, the District had reduced the number of renewals affected by the stuck/malformed issue to zero and was "not aware of any issue causing a backlog of renewals, nor [wa]s it aware of any issue that is impeding the processing or mailing of notices." Defs.' Opp'n to Mot. for Mod. at 3-4 (citing Second Schlosberg Decl. ¶¶ 13, 16).

The District also notes that the response rate for beneficiaries who received renewal notices in 2015 was 86.3%, which compares favorably to a historical rate of 60%. Schlosberg Decl. ¶ 100. Finally, the District notes that

> [s]ince August 2015, in addition to tracking notices, [it] has implemented an enhanced quality oversight protocol. On a daily basis, [the District] receives a sample from the daily batch of notices from [DCAS] prior to mailing. Each sample is reviewed for accuracy, correct notice logic, and adherence to policy guidelines. If there are issues, the notice in question is put on hold until the technical issues are resolved. If there are no issues, the batch of notices is released and the notices are sent to the recipients.

Second Schlosberg Decl. ¶ 17.

However, Plaintiffs point out that even the District's recent numbers reflect that some Medicaid beneficiaries are still losing coverage at the renewal stage. Plaintiffs also point out that the

District cannot currently accept renewals submitted on-line, which will lead to additional loss of Medicaid coverage. Second Schlosberg Decl. ¶ 12. Some Medicaid recipients have had difficulty renewing their benefits over the telephone. See Whitman-Walker Decl. Pl. Ex. 25 ¶ 10 [Dkt. No. 2070-23] ("ESA Customer Service Line Staff indicate that they are not authorized to complete the renewal process over the phone but customers must walk into a service center"); Declaration of Albert Tillman, March 4, 2016, Pl. Ex. 66 ¶ 6; L. Jackson Decl., Pl. Ex. 71 ¶¶ 5-7. Thus, the long lines at service centers and paperwork processing issues already discussed are likely to lead to future losses in coverage.

Plaintiffs again provide a wealth of individual narratives to demonstrate ongoing barriers that Medicaid beneficiaries face in renewing their coverage. Several of these narratives are consistent with the District's story of progress -- that is, issues affecting the individuals described were, in fact, resolved by the date of the District's Opposition, February 26, 2016.

For example, the Declaration of Jocelyn Blier describes the situation of one Medicaid beneficiary who sent her Medicaid recertification form to the District in December of 2015. Pls.' Ex. 64. In early February, she received a notice that the District had not received her recertification form. Id. According to Plaintiffs' counsel, when asked about this, the District stated that the processing backlog had prevented timely processing of the

beneficiary's form; however, by the end of February, the District had succeeded in processing the form and the beneficiary never experienced a loss of coverage. Id.

With respect to this particular case, the District states that it never received a recertification form in December 2015, and denies that this individual was affected by any renewal backlog. Defs.' Surreply at 9-10. The District states that when it did not receive a renewal form in December 2015, it sent the appropriate 30-day notice on January 29, 2015. Id. The District agrees with Plaintiffs that this individual never experienced a loss of coverage. Id.

Other narratives, however, demonstrate the presence of renewal issues beyond February 26, 2016, the date at which the District believed that it had rectified the lion's share of systemic renewal problems.

Larry Campbell, who suffers from liver disease, high blood pressure, and diabetes, received notice from the District that he needed to submit additional information by February 14, 2016 or risk termination of his Medicaid benefits on February 28, 2016. Declaration of Larry Campbell, March 7, 2016, Pl. Ex. 70 ¶¶ 3-6. Mr. Campbell submitted a renewal form before the due date. Id. Yet on March 2, 2016, he received a notice informing him that his Medicaid coverage will be terminated in April 2016, leaving him

without access to needed medical care. Id. However, the notice provided no reason for the termination. Id.

The District claims that although Mr. Campbell submitted the proper renewal form, he failed to also submit a "required Medical Examination Report at that time." Defs.' Surreply at 11. After being informed that his benefits would be terminated on April 1, 2016, "Mr. Campbell then submitted the completed form, and his coverage has been extended through September 2016." Id. The District does not address Plaintiffs' assertion that the notice of termination failed to provide a reason for the termination.

In late January, Leslie Jackson received multiple notices warning that her Medicaid benefits as well as the benefits of her minor son, who suffers from a severe form of epilepsy, would be terminated. L. Jackson Decl., Pl. Ex. 71 ¶¶ 3-9, 15. The multiple forms contained inconsistent information concerning the date the renewal form was due. Id. On February 5, 2016, Ms. Jackson renewed her son's coverage over the phone, and on February 8, 2016, she confirmed that coverage had been renewed. Id. ¶¶ 5-6. Yet on February 9, 2016, Ms. Jackson received a termination notice from the District stating that her son's coverage would end at the end of the month for failure to submit information required for renewal. Id. ¶ 7.

Ms. Jackson had a number of additional interactions with District personnel that left her unsure of whether she and her son

would continue to obtain their Medicaid benefits. Id. ¶ 8-14. As late as March 8, 2016, the District continued to provide inaccurate information that appears to be the product of either computer errors, processing backlogs, or both. On that date, Ms. Jackson received yet another termination notice from the District stating that her son's Medicaid coverage would be terminated on March 21, 2016 for failure to return a form with information necessary for renewal. Id. ¶ 15.

With respect to Ms. Jackson's own benefits, the District states that she is, in fact, no longer Medicaid eligible. Defs.' Surreply at 8. "When the District attempted to re-determine Ms. Jackson's eligibility in February 2016, available records suggested that she remained over income and that her coverage might terminate unless she was eligible under another coverage category." Id. The District sent her notice of its findings and asked her to complete a questionnaire to determine her eligibility under non-income-based categories. Id. Based on her responses, Ms. Jackson was found to be ineligible for Medicaid but was eligible for a cost-sharing program called Qualified Medicare Beneficiary. Id. Thus, the District concludes, "the system has functioned for [Ms. Jackson] as it should." Id.

The situation of Ms. Jackson's son, on the other hand, resulted from the District's mistakes. The multiple notices that Ms. Jackson received about her son's Medicaid benefits "were the

result of an error by a caseworker who [mistakenly] . . . opened a new case for the son" rather than adding him to Ms. Jackson's case, "resulting in two cases for the same individual." Id. at 7. On February 9, 2016, the son's renewal of benefits was recorded in only one of the two duplicate cases, and a termination notice was automatically generated for the case that was not renewed. Id. at 7-8.

The District construes what happened to Ms. Jackson's son as another individualized error that does not signal system problems. However, as noted at the conclusion of the previous section, it is impossible to separate individual mistakes from the systemic problems facing the District's Medicaid beneficiaries. The bottom line is that whether it is an "individualized error" or a "system problem," it is the beneficiary who is suffering

On the basis of the facts stated above, it is clear that a significant number of Medicaid beneficiaries have been harmed by the District's failure to efficiently send and process benefits renewal forms.

## C.   Relief Requested

In light of the forgoing facts, Plaintiffs request that the Court modify the Settlement Order so that

- [the District] shall provisionally approve all Medicaid applications pending over 45 days until a final determination can be made; . . .

- [the District] shall continue the eligibility of all Medicaid recipients due to be renewed or recertified; . . .

- these remedies shall remain in place until [the District] demonstrate[s] to the Court, based on substantial evidence, that [its] technology and business processing systems for making timely eligibility determinations on applications[] and providing adequate notice to Medicaid recipients and applicants of the decisions on renewals and applications are functioning as required to ensure and protect the rights of Medicaid recipients and applicants under the Due Process Clause of the Fifth Amendment of the United States Constitution, Title XIX of the Social Security Act, 42 U.S.C. 1395, <u>et seq.</u>, and accompanying regulations, 42 C.F.R. 430, <u>et seq.</u>, and the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, <u>et seq.</u> ("ACA"), and its implementing regulations; . . .

- [the District] may move to terminate [these remedies] anytime [it] can make the demonstration [] described [above]; and . . .

- during the time [these remedies are] in effect, [the District] shall report monthly on [its] compliance with [their] terms.

Proposed Order Accompanying Pls.' Mot. for Mod. at 1-2.

## III. STANDARD OF REVIEW

Plaintiffs' Motion for Modification of Settlement Order is governed by Federal Rule of Civil Procedure 60(b). As Plaintiffs point out several times in their briefs, Paragraph 71 of the Settlement Order provides that "either party shall have the right to move the Court for a modification of this Order at any time for any reason." Settlement Order ¶ 71. The Settlement Order's very next paragraph clarifies that "[i]n determining motions for a

modification of this Order under paragraphs 70 and 71 above, the general body of federal law governing motions to modify orders in contested matters pursuant to Rule 60(b) of the Federal Rules of Civil Procedure shall apply." Settlement Order ¶ 72.

Plaintiffs rest their Motion for Modification upon Rule 60(b)'s fifth subsection, which provides in relevant part that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding [when] . . . applying it prospectively is no longer equitable[.]" Fed. R. Civ. P. 60(b)(5).

The District claims that Rule 60(b)(5) is inapplicable to Plaintiffs' Motion because Plaintiffs seek to modify provisions of the Settlement Order that are not prospectively applicable. <u>See</u> <u>Twelve John Does v. District of Columbia</u>, 841 F.2d 1133, 1138 (D.C. Cir. 1988). ("an order or judgment may be modified under . . . Rule 60(b)(5) only to the extent that it has 'prospective application.'").

In the District's view, Plaintiffs' Motion for Modification seeks to reinvigorate Sections II & III of the Settlement Order, which were terminated by this Court's Orders of February 24, 2009 and October 18, 2013. Thus, the Government contends, Plaintiffs' Motion seeks relief from those termination Orders, which have no prospective application. "[A]n order or judgment has prospective application within the meaning of Rule 60(b)(5) [only if] it is executory <u>or involves the supervision of changing conduct or</u>

conditions." Id. at 1139 (internal quotation marks omitted)
(emphasis added). The Government argues that the Court's Orders
terminating Sections II & III of the Settlement Order are neither
executory nor involve the supervision of changing conduct or
conditions. In fact, termination of Section II & III meant the end
of the Court's supervision of conduct related to those Sections.

Contrary to the District's assertions, however, Plaintiffs
disclaim that they are seeking to revive Sections II & III of the
Settlement Order, and "[i]nstead, [] seek modification of the
Settlement Order, granting additional injunctive relief, based on
the new factual circumstances." Pls.' Reply in Support of Mod. for
Mod. at 3. They note that the Settlement Order has prospective
application, and thus may be modified under Rule 60(b)(5), because
sections of the Settlement Order relating to early and periodic
screening, and diagnostic and treatment services ("EPSDT") very
clearly require the supervision of changing conduct or conditions.
Id. (citing Settlement Order ¶¶ 36, 41, 47, 79); see also Pls.'
Mot. for Mod. at 17, 18. The modifications Plaintiffs propose are
within the sphere of the Settlement Order's prospectively
applicable EPSDT provisions because "it is common sense that a
child cannot obtain any EPSDT service when he or she lacks Medicaid
eligibility." Pls.' Reply in Support of Mod. for Mod. at 9-10.

Courts applying Rule 60(b) "must strike a 'delicate balance
between the sanctity of final judgments . . . and the incessant

command of a court's conscience that justice be done in light of all the facts.'" Twelve John Does, 841 F.2d at 1138 (quoting Good Luck Nursing Home, Inc. v. Harris, 636 F.2d 572, 577 (D.C. Cir. 1980)).

As our Court of Appeals has stated, "[t]he power of a court of equity to modify a decree of injunctive relief . . . is long-established, broad, and flexible." United States v. W. Elec. Co., 46 F.3d 1198, 1202 (D.C. Cir. 1995) (internal citations and quotation marks omitted) (quoting New York State Ass'n for Retarded Children, Inc. v. Carey, 706 F.2d 956, 967 (2d Cir. 1983), cert. denied, 464 U.S. 915 (1983) (Friendly, J.)). "At the request of the party who sought the equitable relief, a court may tighten the decree in order to accomplish its intended result." Id. (citing United States v. United Shoe Machinery Corp., 391 U.S. 244, 252 (1968)). Thus, Rule 60(b)(5) is merely "a codification of the universally recognized principle that a court has continuing power to modify or vacate a final decree[.]" Id. (quoting 11 Charles A. Wright, et al., Federal Practice & Procedure § 2961 (1994)).

"A consent decree[,]" such as the Settlement Order at issue here, "no doubt embodies an agreement of the parties and thus in some respects is contractual in nature." Rufo v. Inmates of Suffolk Cty. Jail, 502 U.S. 367, 378 (1992). However, the Supreme Court has made clear that agreements embodied in a consent decree remain "subject to the rules generally applicable to other judgments and

-44-

decrees." Id. "A consent decree, in other words, is subject to modification to the same extent as if it had been entered as a final judgment after a full trial." W. Elec. Co., 46 F.3d at 1205.

In Rufo, the Supreme Court set forth the test for determining whether modification of a consent decree is warranted under Rule 60(b)(5). 502 U.S. at 383. Emphasizing the flexibility provided by Rule 60(b)(5), the Court held that "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Id. at 383.

"Ordinarily, . . . modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." Id. at 385. However, "Rule 60(b)(5) does not foreclose modifications based on developments that, in hindsight, were things that 'could' happen. . . . The focus of Rule 60(b)(5) is not on what was possible, but on what the parties and the court reasonably anticipated." W. Elec. Co., 46 F.3d at 1205.

"Once a moving party has met its burden of establishing either a change in fact or law warranting modification of a consent decree, the District Court should determine whether the proposed

modification is suitably tailored to the changed circumstance."
Rufo, 502 U.S. at 391.[14]

## IV.  ANALYSIS

### A.  Significant Change in Circumstances

Based on the extensive evidence submitted by Plaintiffs, it
is clear that circumstances have changed significantly since entry
of the Settlement Order. Given the numerous case histories
presented by Plaintiffs, there is no question that many of the
class members are being irreparably harmed by their inability to
obtain Medicaid benefits, even though the District is acting with
the best of intentions to comply with the ACA.

The narratives set forth above clearly demonstrate that
numerous Medicaid-eligible residents of the District were denied
benefits to which they were entitled due the District's failure to
timely process initial applications, failure to deliver adequate
and timely renewal notices, and failure to efficiently process

---

[14] In the alternative, Plaintiffs put forth Rule 60(b)(6) as grounds
for their Motion. Rule 60(b)(6) is a catch-all provision, which
permits relief "from a final judgment, order, or proceeding for
. . . any other reason that justifies relief." Subsection (6) is
only applicable when none of the five other grounds for relief
under Rule 60(b) are available. Salazar v. District of Columbia,
633 F.3d 1110, 1116 (D.C. Cir. 2011). The Supreme Court has held
that relief under 60(b)(6) may be granted only under "extraordinary
circumstances," Ackermann v. United States, 340 U.S. 193, 199, 202
(1950), and our Court of Appeals has noted "that a more compelling
showing of inequity or hardship is necessary to warrant relief
under subsection (6) than under subsection (5)[,]" Twelve John
Does, 841 F.2d at 1140.

renewal requests. These changed circumstances, which violate the Constitution and the ACA, affect members of the Plaintiff class. See Salazar v. D.C., 954 F. Supp. 278, 326 (D.D.C. 1996); 42 C.F.R. 435.912(c)(3); Order at 1-2 [Dkt. No. 100]. Accordingly, modification of the Settlement Order to address these violations is warranted.

The District's significant progress in reducing the processing time for the backlogs and stuck/malformed errors in the month of February 2016 does not change the conclusion that changed circumstances warrant relief. Before Plaintiffs filed their Motion for Preliminary Injunction, the District had made only moderate progress in reducing the application backlogs between April of 2015, when they were first discovered, Schlosberg Decl. ¶ 66 [Dkt. No. 2077-1], and December 2015. At the end of this nine-month period, there were still close to 5,000 Medicaid applications in the backlog. Pl. Ex. 1 at 6 [Dkt. No. 2070-2].

Since the filing of Plaintiffs' initial Motion on December 22, 2015, the District has been able to resolve all of the thousands of remaining cases in just over one month's time. While the District's progress is commendable, the timing of it suggests that Court oversight has been a boon rather than a hindrance. Moreover, the Court has no assurance that the significant problems (and violations of the law) that arose will not arise again.

In order for relief to be proper under Rule 60(b)(5), the cited change in circumstances cannot have been anticipated or foreseen by the parties. See Agostini v. Felton, 521 U.S. 203, 215-216 (1997). The District contends that the troubled implementation of the ACA's reforms were foreseen by both the Parties and the Court. See, e.g., Amended Memorandum Opinion and Order of Oct. 17, 2013 at 6 [Dkt. No. 1886] (predicting that "implementation [of the ACA's reforms] w[ould] undoubtedly be both rocky and fairly long in coming").

However, despite the District's contentions, no one could have predicted the magnitude of the problems that attended the ACA's implementation. Indeed, the Memorandum Opinion cited immediately above related only to portions of the Settlement Order dealing with Medicaid benefits renewal procedures, but as is now clear, the problems facing Medicaid-eligible residents go far beyond renewal procedures and affect initial applications, as well as the basic administration of the program.

More importantly, the relevant inquiry with respect to the foreseeability of changed circumstances is not whether the Parties or the Court anticipated the changes at any point, but instead, whether the circumstances "actually were anticipated at the time [the Parties] entered into a decree." Rufo, 502 U.S. at 385. Needless to say, no one did or could have anticipated, in 1999

-48-

when the Settlement Order was entered, the passage of the ACA, no less its complexity and its reforms to our health care system.

The District claims that the relief Plaintiffs request would essentially reinstate Sections II and III of the Settlement Order. This, the District contends, would deprive it of the sunset provisions that it had negotiated in Section II and substitute for a foregone appeal with respect to Section III. See EEOC v. Local 40, 76 F.3d 76, 81 (2d Cir. 1996) ("If we were to enforce this consent decree against Local 40 twelve years after its expiration, we would be depriving the union of the benefit of its bargain."); cf. Twelve John Does, 841 F.2d at 1141 ("Indeed, it is a commonplace that Rule 60(b)(6) may not be used as a substitute for an appeal not taken."). Additionally, the District contends that the Court lacks jurisdiction to restore terminated portions of a consent decree.

Plaintiffs have expressly disclaimed that they seek to reinstate Sections II and III of the Settlement Order. As they put it, "Plaintiffs do not seek to relitigate terminated provisions of the settlement order." Pls.' Reply in Support of Mod. for Mod. at 2 (capitalized in original). "Instead, [P]laintiffs seek modification of the Settlement Order, granting additional injunctive relief, based on the new factual circumstances." Id. at 3 (emphasis added). Accordingly, the District's concerns regarding

reinstatement of terminated provisions of the Settlement Order are misplaced.[15]

The District also notes that courts overseeing institutional reform consent decrees must interpret Rule 60(b) in a manner that ensures that "'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." Horne v. Flores, 557 U.S. 433, 450 (2009) (quoting Frew v. Hawkins, 540 U.S. 431, 442 (2004)). The District objects that the modifications Plaintiffs propose would further hamstring its efforts to run its Medicaid program and would delay the prompt return of authority to District officials.

However, Plaintiffs' proposed relief itself makes provision for allowing the District to be free of the proposed remedy as

---

[15] Before disclaiming, in their Reply, any reliance on Sections II and III, Plaintiffs asserted in their Motion for Modification that a footnote in the 2013 Order terminating Section III indicates the Court's intention to retain broad jurisdiction over the District's processing of Medicaid applications and renewals. See Salazar v. D.C., 991 F. Supp. 2d 34, 38 (D.D.C. 2013) ("members of the plaintiff class can also contact Plaintiffs' counsel, as they have been doing over the years, to obtain legal assistance"). Plaintiffs read too much into this footnote. As the District points out, the footnote mentions no further oversight role for the Court in these areas. The footnote only serve to reaffirm the right of Plaintiffs' counsel to represent residents of the District who are inquiring about their Medicaid eligibility, as counsel has done admirably for many years. Thus, the jurisdictional foundation of Plaintiffs' Motion must rest upon the grounds confirmed in their Reply: the Settlement Order's prospectively applicable EPSDT provisions.

soon as it "demonstrate[s] to the Court, based on substantial evidence, that [the District's]" systems and processes will comply with applicable law.[16] Proposed Order Accompanying Pls.' Mot. for Mod. at 1-2. The proposed relief further provides that "[the District] may move to terminate [these remedies] anytime [it] can make the demonstration [] described [above.]" Id. Accordingly, Plaintiffs' proposed relief is consistent with the goal of restoring responsibility over local management functions as quickly as possible.

Finally, the District contends that modification of the Settlement Order is unwarranted because the changed circumstances are unrelated to the remaining portions of the Settlement Order, which relate to the delivery of EPSDT services to children:

---

[16] The full provision reads as follows:

> [T]hese remedies shall remain in place until defendants demonstrate to the Court, based on substantial evidence, that defendants' technology and business processing systems for making timely eligibility determinations on applications, and providing adequate notice to Medicaid recipients and applicants of the decisions on renewals and applications are functioning as required to ensure and protect the rights of Medicaid recipients and applicants under the Due Process Clause of the Fifth Amendment of the United States Constitution, Title XIX of the Social Security Act, 42 U.S.C. 1395, et seq., and accompanying regulations, 42 C.F.R. 430, et seq., and the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, et seq. ("ACA"), and its implementing regulations; . . .

Proposed Order Accompanying Pls.' Mot. for Mod. at 1-2.

> [W]hether an initial application for Medicaid benefits
> is processed within 45 days has no bearing on the
> District's ability to achieve an adequate participant
> ratio for well-child visits, to advise children or their
> caretakers regarding the need for and importance of
> EPSDT services, to train providers of EPSDT services, or
> its ability to offer transportation and scheduling
> assistance as required by Sections V and VI of the
> Settlement Order. Nor can plaintiffs advance any
> reasonable argument that the District's compliance with
> its EPSDT obligations is frustrated by an alleged lack
> of advance notice before terminating Medicaid benefits
> in the context of renewal.

Defs.' Opp'n to Mot. for Mod. at 8.

Plaintiffs, however, provide a simple and convincing response

to this argument: "[I]t is common sense that a child cannot obtain

any EPSDT service when he or she lacks Medicaid eligibility." Pls.'

Reply in Support of Mod. for Mod. at 9-10. Moreover, children make

up a substantial proportion of the District's Medicaid population.

In 2014, there were 98,350 children eligible for Medicaid, Form

CMS-416, line 1a [Dkt. No. 2039-1], and as of October 2014, there

were a total of 247,850 people on DC Medicaid, Pl. Ex. 61, column

1 [Dkt. No. 2102-1]. Thus, issues affecting initial applications

and renewals are clearly related to portions of the Settlement

Order concerning EPSDT services.

For all of these reasons, significant changes in facts and

law warrant modification of the Settlement Order.

### B.   Suitably Tailored Relief

Once a court has determined that a change in circumstances

warrants revisions to a consent decree, it must consider whether

the relief requested is suitably tailored to those changes. Rufo, 502 U.S. at 391. "A change in circumstances is not a free pass to rewrite a consent decree; rather 'the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances.'" Keepseagle v. Vilsack, 118 F. Supp. 3d 98, 127 (D.D.C. 2015) (quoting Rufo, 502 U.S. at 391).

The District contends that the relief Plaintiffs seek is not suitably tailored because it would provide assistance to individuals beyond the population that receives EPSDT benefits. Defs.' Opp'n to Mot. for Mod. at 8 n.3. The District's argument construes the Court's power to amend consent orders too narrowly.

The Supreme Court has stated that "[o]nce a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." Rufo, 502 U.S. at 391. The "problems created by the change in circumstances" that brought about Plaintiffs' Motion are not limited to the delivery of EPSDT services. True, Plaintiffs rely exclusively on the EPSDT provisions of the Settlement Order to demonstrate that the Order itself has prospective application, but the "problems created" by the District's implementation of the ACA's provisions include the denial of coverage to eligible adults as well as children. It is

-53-

in the public interest to ensure that those children and adults do not lose the vital services provided by Medicaid coverage under the ACA.

Put differently, Plaintiffs have shown that changed circumstances have led the District to violate its obligations to adjudicate Medicaid applications within 45 days and to renew Medicaid benefits in accordance with the ACA's implementing regulations and due process. The general thrust of the remedies that Plaintiffs propose are suitably tailored to resolve those problems. That is what Rufo requires. That is all Plaintiffs ask for.

The District also contends that because it has made significant progress in resolving the problems that led Plaintiffs to file their Motions (by eliminating all known backlogs and reducing the number of stuck/malformed applications to 67), the relief requested is unnecessary.

However, the first prong of relief Plaintiffs request does nothing more than address the systemic problems that arose during the District's implementation of the ACA and may well arise again. The first prong would simply require provisional approval of Medicaid applications pending longer than 45 days until a final determination can be made. If the District complies with the law by reaching final determinations within 45 days (as it claims to have done in the month for February 2016), this relief will impose

no additional burden at all. It is, accordingly, suitably tailored to respond to the District's failure to timely process Medicaid applications.

By contrast, the second prong of relief requested by Plaintiffs, which would indefinitely continue the benefits of all Medicaid recipients due to be renewed or recertified, does indeed sweep too broadly. See Proposed Order Accompanying Pls.' Mot. for Mod. at 1-2 ("[the District] shall continue the eligibility of all Medicaid recipients due to be renewed or recertified").

The narratives detail that many Medicaid beneficiaries lost access to benefits to which they were entitled because of the District's failure to send appropriate renewal forms or to efficiently process renewals. However, the District notes that Plaintiffs' request to continue the benefits of all Medicaid recipients due to be renewed or recertified contains no end date or provision for terminating the benefits of Medicaid recipients whose ongoing eligibility cannot be verified or who are simply no longer eligible for Medicaid. Thus, the requested relief "would virtually eliminate the District's ability to terminate coverage for individuals who are not eligible or entitled to Medicaid benefits at heavy costs to the District's taxpayers." Defs.' Opp'n to Mot. for Mod. at 16.

Although the situation faced by many beneficiaries due to renew their benefits is indeed dire, that does not justify

obligating the District to indefinitely continue the Medicaid benefits of individuals who may no longer be eligible to receive them. Simply put, if the Court were to impose the second prong of Plaintiffs' requested remedy, the District would be required to continue providing benefits to individuals required to recertify even if it knew that such individuals no longer qualified for Medicaid. Such a result cannot be justified, and thus, it is clear that the second prong of Plaintiffs' requested relief is not suitably tailored to resolve the problems discussed above.

However, despite the unsuitability of the second prong as requested, a slight modification will provide the necessary tailoring. The second prong of relief shall read as follows:

> [The District] shall continue the eligibility of all Medicaid recipients due to be renewed or recertified for 90 days after each recipient's renewal or recertification deadline unless [the District] ha[s] affirmatively determined that the recipient is no longer eligible for Medicaid[.]

Order Accompanying This Memorandum Opinion at 2.

As modified by the Court, this relief will adequately remedy the problem of Medicaid recipients losing benefits due to the District's failure to effectively provide and efficiently process renewal forms. Medicaid recipients will maintain the full value of their benefits during the 90-day grace period, rather than lose their access to health care for reasons beyond their control. At the same time, the District -- and by extension, the District's

taxpayers -- will not be saddled with the burden of indefinitely furnishing benefits to individuals who may no longer be Medicaid eligible.

The final provisions of Plaintiffs' request enhance the suitability of the foregoing remedies. The proposed relief provides that the substantive remedies shall remain in place until the District demonstrates by substantial evidence that its processes will ensure the rights of Medicaid eligible residents of the District. Proposed Order Accompanying Pls.' Mot. for Mod. at 1-2. The Proposed Order also provides that the District may move to terminate the imposed relief any time it can make the required demonstration of non-eligibility. Id. All of these provisions combine to ensure that the relief imposed will last no longer than is necessary to cure the "problems created by the change in circumstances." Rufo, 502 U.S. at 391.[17]

The District contends that Plaintiffs' requested relief is likely to lead to waste and abuse of Medicaid resources. The Court recognizes that there may be some instances of fraud and abuse of the system. However, there is no way to know the scope of such incidents. Moreover, the modification of the second prong of relief

---

[17] Plaintiffs request that the Court order the District to submit monthly reports regarding its compliance with the remedies imposed. Such reports would be unnecessarily burdensome and shall not be required.

discussed above will significantly reduce any likelihood of fraud or abuse by limiting the period that the District must provide benefits to individuals whose ongoing eligibility is unknown. Finally, the equities -- balancing the District's concerns about wasted resources against the needs of children and low-income adults for medical care to which they are entitled -- clearly favor granting the relief which will be ordered.

For all of these reasons, the Court concludes that Plaintiffs' proposed amendments to the Settlement Order -- incorporating the Court's alterations -- are "suitably tailored."[18]

---

[18] In its Opposition to Plaintiffs' Motion for Preliminary Injunction, the District argues that the Preliminary Injunction should not be granted because the United States is a necessary party to the present controversy because the relief requested would necessarily bind the United States as well as the District. See Fed. R. Civ. P. 65(d)(2) (injunction issued by federal court may bind only the parties, their agents, servants, employees and attorneys, and other persons who are in active concert or participation with any of the aforementioned); see also Fed. R. Civ. P. 19. This, the District argues, is because federal funds may be available to the District under 42 C.F.R. 250(b)(2) or 42 C.F.R. 435.1002(c) to offset the costs of compliance with the injunction.

The District makes no reference to this particular argument in its briefs on the Motion for Modification, which leaves unclear whether it meant to preserve the argument. In any case, Plaintiffs have a satisfactory answer: "[P]laintiffs seek relief only from [The District], not from CMS or any other party." Pls.' Reply in Support of P.I. at 6. The fact that the District may eventually be reimbursed for its costs of complying with this Court's Order does not automatically make the federal reimbursing agency, CMS, a necessary party to this proceeding. The District offers no authority to the contrary.

## V.   CONCLUSION

For the forgoing reasons, Plaintiffs' Motion for Modification of the Settlement Order shall be **granted**. An Order shall accompany this Memorandum Opinion.


April 4, 2015

*Gladys Kessler*
Gladys Kessler
United States District Judge


**Copies to:** attorneys on record via ECF